**No. 26-1377**

*In the*

# United States Court of Appeals
*for the*
# Federal Circuit

---

Honeywell International Inc.,

Plaintiff-Appellant,

vs.

United States,

Defendant-Appellee.

---

ON APPEAL FROM THE
UNITED STATES COURT OF INTERNATIONAL TRADE
Case No. 1:17-cv-00256-MAB    Hon. Mark A. Barnett

---

**BRIEF FOR APPELLANT HONEYWELL INTERNATIONAL, INC.**

---

WM. RANDOLPH RUCKER
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. CANAL STREET
SUITE 3300
CHICAGO, IL 60606
RANDY.RUCKER@FaegreDrinker.com
PHONE: (312) 569-1000

*Counsel for Plaintiff-Appellant*

ANDY TAYLOR
FAEGRE DRINKER BIDDLE & REATH LLP
2200 WELLS FARGO CENTER
90 S. 7TH STREET
MINNEAPOLIS, MN 55402
ANDREW.TAYLOR@FaegreDrinker.com
PHONE: (612) 766-7000

*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1377

**Short Case Caption** Honeywell International, Inc. v. United States

**Filing Party/Entity** Appellant Honeywell International, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/01/2026

Signature: /s/ Wm. Randolph Rucker

Name: Wm. Randolph Rucker

**FORM 9. Certificate of Interest**

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Honeywell International, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Wm. Randolph Rucker | | |
| Andy Taylor | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)   ☑  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**TABLE OF CONTENTS**

**Page(s)**

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES...................................................................2

STATEMENT OF THE CASE ......................................................................2

SUMMARY OF THE ARGUMENT ............................................................6

STANDARD OF REVIEW ..........................................................................8

ARGUMENT ...............................................................................................10

    I.    THE CIT MISAPPLIED THE GOVERNING TARIFF CLASSIFICATION.................................................................10

        A.    Under GRI 1, the Imported Segments Are Properly Classified as Parts of Aircraft .......................................11

        B.    The CIT Erred in Applying a GRI 2(a) Analysis to the Needled Preforms Made after Importation ..............................20

        C.    The CIT Improperly Based Its Analysis on Post-Importation Processing .........................................................28

    II.    THE SEGMENTS QUALIFY AS "BLANKS" UNDER GRI 2(a)......................................................................34

        A.    The Needled Preforms Satisfy the Explanatory Notes' Two-Part Definition of "Blanks" ..............................34

        B.    The CIT Misapplied GRI 2(a) by Disregarding the Controlling Case Law on "Blanks" ...........................39

        C.    Longstanding Customs Practice Confirms the Two-Part Test for GRI 2(a) Blanks.............................................44

        D.    Statutory Construction Supports the More Reasonable Interpretation of GRI 2(a) .......................................47

i

III.  THE CIT ERRED BY SUSTAINING CLASSIFICATION UNDER HEADING 6307 WITHOUT DETERMINING ITS CORRECTNESS..................................................................48

A.    The CIT Erred by Sustaining a Residual Basket Provision Without Performing the Required Independent Classification Analysis..............................................48

B.    The CIT Failed to Properly Apply Its Own Classification Analysis..................................................................52

CONCLUSION ................................................................................55

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*ABB, Inc. v. United States*, 421 F.3d 1274 (Fed. Cir. 2005).................................22

*Aceto Chemical Co. v. United States*,
    465 F.2d 908 (C.C.P.A. 1972) ........................................................................20

*Acme Shear Co. v. United States*,
    63 C.C.P.A. 12 (1975) ...................................................................................34

*ADC Telecomms., Inc. v. United States*,
    916 F.3d 1013 (Fed. Cir. 2019) .......................................................................8

*Am. Import Co. v. United States*,
    26 C.C.P.A. 72 (1938) .............................................................................32, 34

*American Schack Co., Inc. v. United States*,
    1 C.I.T. 1 (Ct. Int'l Trade 1980) .................................................................9, 16

*Austin Chem. Co. v. United States*,
    835 F.2d 1423 (Fed. Cir. 1987) .....................................................................14

*Avecia, Inc. v. United States*,
    469 F. Supp. 2d 1269 (Ct. Int'l Trade 2006) .................................................20

*Bauerhin Technologies Ltd. P'ship v. United States*,
    110 F.3d 774 (Fed. Cir. 1997) .......................................16, 17, 18, 19, 25

*Baxter Healthcare Corp. of Puerto Rico v. United States*,
    182 F.3d 1333 (Fed. Cir. 1999) .....................................................................29

*Benteler Indus., Inc. v United States*,
    840 F.Supp. 912 (Ct. Int'l Trade 1993) .........................................................35

*Better Home Plastics Corp. v. United States*,
    119 F.3d 969 (Fed. Cir. 1997) .......................................................................25

*Bufkin v. Collins*,
    604 U.S. 369 (2025).......................................................................................46

*Chemtall, Inc. v. United States*,
    878 F.3d 1012 (Fed. Cir. 2017) .......................................................................8

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012)..............................................................45

*Cummins Engine Co. v. United States*,
   83 F. Supp. 2d 1366 (Ct. Int'l Trade 1999) (*Cummins I*)............................*passim*

*Cummins Inc., v. United States*,
   377 F. Supp. 2d 1365 (Ct. Int'l Trade 2005) (*Cummins II*).........................39, 43

*Cummins v. United States*,
   454 F.3d 1361 (Fed. Cir. 2006) .......................................................40

*E.M. Chems. v. United States*,
   920 F.2d 910 (Fed. Cir. 1990) .......................................................25

*Engis Equip. Co. v. United States*,
   60 C.C.PA. 436, 440 (1968) .........................................................21

*Ford Motor Co. v. United States*,
   926 F.3d 741 (Fed. Cir. 2019) ......................................................7, 8

*Fuji Am. Corp. v. United States*,
   519 F.3d 1355 (Fed. Cir. 2008) .......................................................8

*Gallagher & Ascher Co. v. United States*,
   52 C.C.P.A. 11 (1964) ...............................................................16

*Honda of America Mfg., Inc. v. United States*,
   607 F.3d 771 (Fed. Cir. 2010) ....................................................15, 19

*Int'l Bus. Machines Corp. v. United States*,
   152 F.3d 1332 (Fed. Cir. 1998) ...................................................18, 34

*Ishida v. United States*,
   59 F.3d 1224 (Fed. Cir. 1995) .......................................................22

*Jam v. United States*,
   340 U.S. 593 (1951)..................................................................37

*Jarvis Clark Co. v. United States*,
   733 F.2d 873 (Fed. Cir. 1984) ...................................................*passim*

iv

*Jedwards Int'l Inc. v. United States*,
   161 F. Supp. 3d 1350 (Ct. Int'l Trade 2016) ......................................49

*Lemans Corp. v. United States*,
   660 F.3d 1311 (Fed. Cir. 2011) .........................................................8

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................44

*Microsoft Corp. v. i4i L.P.*,
   564 U.S. 91 (2011) ..........................................................................46

*Mita Copystar America v. United States*,
   21 F.3d 1079 (Fed. Cir. 1994) ..........................................................9

*Mitsubishi Int'l Corp. v. United States*,
   182 F.3d 884 (Fed. Cir. 1999) .........................................................16

*Nutricia N. Am., Inc. v. United States*,
   159 F.4th 1344 (Fed. Cir. 2025) ......................................................46

*Orlando Food Corp. v. United States*,
   140 F.3d 1437 (Fed. Cir. 1998) ...................................................7, 10

*Outer Circle Prods. v. United States*,
   590 F.3d 1323 (Fed. Cir. 2010) .........................................................8

*Peter J. Schweitzer Division, Kimberly-Clark Corp. v. United States*,
   54 C.C.P.A. 44 (1967) ................................................................14, 26

*Pleasure-Way Indus., Inc. v. United States*,
   Slip Op. 16-100, 2016 WL 6081818 (Ct. Int'l Trade Oct. 18, 2016)................33

*Pomeroy Collection, Ltd. v. United States*,
   893 F. Supp. 2d 1269 (Ct. Int'l Trade 2013) ....................................20

*Processed Plastics Co. v. United States*,
   473 F.3d 1164 (Fed. Cir. 2006) .......................................................14

*R.T. Foods, Inc. v. United States*,
   757 F.3d 1349 (Fed. Cir. 2014) ....................................................8, 48

*In re Ripley*,
  926 F.2d 440 (5th Cir. 1991) ...................................................................46

*Rubies Costume Co. v. United States*,
  279 F. Supp. 3d 1145 (Ct. Int'l Trade 2017) ......................................37

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)..................................................................................44

*United States v. Citroen*,
  223 U.S. 407 (1911)....................................................................................9

*United States v. Menasche*,
  348 U.S. 528 (1955)..................................................................................22

*United States v. Pompeo*,
  43 C.C.P.A. 9 (1955) ..........................................................................16, 17

*United States v. Willoughby Camera Stores, Inc.*,
  21 C.C.P.A. 322 (1933) ...........................................................................17

*United Techs. Corp. v. United States*,
  315 F.3d 1320 (Ct. Int'l Trade 2003) ...................................................16

*Walther v. Secretary of Health and Human Servs.*,
  485 F.3d 1146 (Fed. Cir. 2007) .............................................................48

*Worthington v. Robbins*,
  139 U.S. 337 (1891)..................................................................................26

**Statutes, Rules & Regulations**

19 C.F.R. § 181.64 ........................................................................................33

19 U.S.C. § 3005(a)(2)..................................................................................40

28 U.S.C. § 1295............................................................................................1

28 U.S.C. § 1581(a) ...................................................................................1, 3

Federal Rule of Appellate Procedure 32................................................54

§ 515 of the Tariff Act of 1930 ..................................................................1

USCIT Rule 59................................................................................4

**Other Authorities**

H.R. Rep. No. 1235 (1980) ..............................................................49

*Harmonized Tariff Schedule of the United States* ("HTSUS")........................2, 4, 49

General Rules of Interpretation Explanatory Notes..............................................8, 47

Heading 6307 Explanatory Notes ........................................6, 11, 18, 24, 47, 48, 49

HRL 084217 (June 28, 1989)..............................................................42

HRL 950118 (Dec. 10, 1991) ............................................................34

HRL 964019 (Dec. 13, 2000) ............................................................39

HRL 967908 (Jan. 24, 2006)..............................................................44

HRL H006327 (Aug. 28, 2007) ..........................................................44

HRL H095037 (May 20, 2010)............................................................43

HRL H243798 (May 19, 2017) ............................................................49

NYRL N220176 (July 5, 2012) ............................................................44

NYRL N260676 (Feb. 6, 2015) ............................................................42

NYRL N350641 (July 18, 2025) ..........................................................42

World Customs Organization Classification of Certain Forgings for Crank Shafts, Doc. v (Oct. 10, 2000) ............................................................41

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiff-Appellant Honeywell International, Inc. states the following:

(a) No other appeal in or from the same civil action or proceeding in the originating tribunal was previously before this or any other appellate court. Counsel is not aware of any case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case.

(b) There are no directly related appeals before the U.S. Court of International Trade.

## JURISDICTIONAL STATEMENT

The Court of International Trade had jurisdiction under 28 U.S.C. § 1581(a), which grants exclusive jurisdiction over any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930. Honeywell timely filed a notice of appeal on January 23, 2026.  (R. Doc. 80.) This Court's jurisdiction is based on 28 U.S.C. § 1295 because this is an appeal of a final judgment entered on November 25, 2025. (Add.24, R. Doc. 78.)

1

## STATEMENT OF THE ISSUES

1.    Whether, contrary to governing precedent, the Court of International Trade erred in its application of the "subpart rule" to the imported Segments by basing its decision on post-importation processing, rather than as imported.

2.    Whether, contrary to governing precedent, the Court of International Trade erred in its analysis of what is a "blank" for purposes of a GRI 2(a) analysis.

3.    Whether, contrary to governing precedent, the Court of International Trade erred in its tariff classification analysis at the rehearing stage by failing to conduct the required tariff classification analysis and by improperly shifting the burden of proof.

## STATEMENT OF THE CASE

This appeal concerns the proper tariff classification of certain radial, web, and chordal brake segments (the "Segments") imported by Honeywell International Inc. ("Honeywell") for use in the production of brake discs for airplanes. The material facts are undisputed.

The Segments are aircraft-specific components manufactured from nonwoven polyacrylonitrile ("PAN") fiber for incorporation into aircraft brake discs. (R. Doc. 34 ¶ 8.) Aircraft brake discs are parts of aircraft braking systems. (R. Doc. 67 at 9.) Aircraft braking systems are used in aircraft landing gear and are parts of aircraft. (*Id*.) There is no dispute that Segments are an upstream component used in the

production of aircraft brake discs, which are a part of an aircraft. (R. Doc. 67 at 15; Add.5, R. Doc. 77 at 5.) At the time of importation, the Segments require no further cutting, shaping, or resizing to be used in the manufacture of brake discs for a particular type of aircraft. (R. Doc. 43 at 4–6 (Pl.'s SOF ¶¶ 11–15).) In other words, the Segments *as imported* are used in the manufacture of aircraft brake discs.

After importation, the Segments undergo assembly/needling, carbonization, and densification processes to create finished brake discs. (R. Doc. 54 at 13–16.) The Segments "are dedicated for use in, and are integral to, the manufacturing of needled preforms and, ultimately, aircraft brake discs, and are imported in a condition suited for that use." (Add.9, 14–15, R. Doc. 77 at 9, 14–15.) The parties do not dispute the nature of the imported merchandise, or the downstream manufacturing process performed in the United States; the dispute concerns only the legal classification of the imported merchandise under the *Harmonized Tariff Schedule of the United States* ("HTSUS").

Honeywell imported the Segments through the ports of Minneapolis, Charlotte, and Atlanta during 2015 and 2016. (R. Doc. 43 at 3 (Pl.'s SOF ¶¶ 1–2).) Contrary to their proper classification, U.S. Customs and Border Protection ("Customs") liquidated the Segments under HTSUS subheading 6307.90.9889, which provides for "*[o]ther made up articles, including dress patterns*," dutiable at seven percent *ad valorem*. (R. Doc. 34 ¶¶ 13–15.) Because the as-imported Segments

3

are aircraft parts, Honeywell contended that the Segments are properly classified under HTSUS subheading 8803.20.00, which provides for "*[p]arts of goods of heading 8801 or 8802: ... [u]ndercarriages and parts thereof*," a duty-free provision applicable to aircraft parts. (R. Doc. 34 ¶ 30.) Honeywell protested and paid all duties and fees due. (R. Doc. 34 ¶¶ 4–6.) After Customs denied the protests, Honeywell commenced an action in the U.S. Court of International Trade ("CIT") pursuant to 28 U.S.C. § 1581(a). (R. Doc. 34 ¶ 3.)

The parties filed cross-motions for summary judgment. (R. Docs. 43, 54.) On January 30, 2025, the CIT granted Honeywell's motion and held that the Segments are properly classified under HTSUS subheading 8803.20.00. (R. Doc. 67 at 30.) The CIT concluded that the imported Segments constitute finished parts identifiable to aircraft brake discs for a particular type of aircraft and rejected the Government's arguments premised on post-importation processing. (*See generally* R. Doc. 67.)

The Government moved for rehearing pursuant to USCIT Rule 59, arguing that the court erred by failing to analyze the imported merchandise under General Rule of Interpretation ("GRI") 2(a) and by not determining whether the Segments, or intermediate articles in the brake disc manufacturing process, constituted unfinished brake discs lacking the essential character of the finished article. (R. Doc. 69 at 8–25.) On November 25, 2025, the CIT granted the Government's motion for

4

rehearing, vacated its prior judgment, and sustained Customs' classification under HTSUS subheading 6307.90.98. (Add.23, R. Doc. 77 at 23.)

On rehearing, the CIT conducted a review of the "needled preforms" made from the Segments after importation. The CIT concluded the needled preforms were not unfinished brake discs and were not classifiable as part of an aircraft brake disc, so the Segments were not classifiable as part of a brake disc. The CIT then concluded that Honeywell had not carried its burden of proving Customs' classification was incorrect, and so classified the Segments under heading 6307. (Add.20–23, R. Doc. 77 at 20–23.) Final judgment was entered for the United States, and this appeal followed.

Honeywell seeks review of the CIT's rehearing decision sustaining classification under HTSUS subheading 6307.90.98. Specifically, Honeywell challenges the CIT's conclusion that (i) the Segments are not "parts" of aircraft within the meaning of HTSUS heading 8803 and Section XVII, Note 3; (ii) the CIT's application of GRI 2(a) to analyze the goods at different stages of production after importation, rather than determining classification based on their condition as imported; and (iii) the CIT's decision to sustain the Government's proposed classification without independently determining whether that classification is correct under the HTSUS.

## SUMMARY OF THE ARGUMENT

Under the governing rules of interpretation, the Segments are properly classified as parts of aircraft under heading 8803. The CIT acknowledged aircraft brake discs are parts of an aircraft, and the imported Segments are finished parts within the brake disc manufacturing process. Longstanding judicial precedent recognizes that a component dedicated and integral to a larger article qualifies as a part of that article, and that a part of the larger part is also a "part" for tariff purposes and both articles get the same tariff classification. By focusing on post-importation, downstream processing steps rather than the condition and identity of the merchandise at entry, the CIT departed from these settled principles.

The CIT compounded this error by invoking (and misinterpreting) GRI 2(a) and applying this interpretative rule to the needled preforms made after importation, an article with no independent commercial identity outside of the brake disc manufacturing process, rather than focusing on the condition of the Segments "as entered." The CIT's fixation on the post-importation brake disc manufacturing steps led to its erroneous decision to exclude the Segments from classification as parts of aircraft under heading 8803.

Contrary to the CIT's holding on rehearing, GRI 1 resolves the relevant classification inquiry in this case and directs the Segments to classification as aircraft parts because they have a fixed identity and exclusive aircraft use at importation.

6

The Segments are not undifferentiated textile goods that later acquire their character by some further processing. Instead, they are aircraft brake parts at the moment they enter the United States and are identifiable to the ultimate downstream article (*i.e.*, a specific type of airplane). The CIT's reliance on post-importation, intermediate manufacturing stages to reframe the merchandise as something else was legal error. Moreover, it defies logic that when an imported article for an aircraft break disc is further processed toward its ultimate use as part of that brake disc that it somehow, as part of the post-importation processing, no longer qualifies as a part of an aircraft break disc.

The judgment also cannot stand because the CIT sustained classification of the Segments under heading 6307 without independently determining that the Government's proposed classification is correct. Rather than engaging in a proper analysis of the terms of heading 6307 as it applies to the Segments, the CIT concluded that, because Honeywell had not established the needled preforms made after importation were classifiable as part of an aircraft brake or as an unfinished brake disc, no other suitable provision applied to the imported Segments. Therefore, the CIT ruled the  Segments fell within the residual textile heading applied by Customs at entry. This finding is contrary to  the governing "subpart rule." To remove the  Segments from classification as an aircraft part in heading 8803, the CIT

7

was required to make an affirmative determination they are properly classified in another heading. It did not do so.

Because the CIT misapplied the rule that classification is determined by the condition of the merchandise as imported, improperly applied GRI 2(a) to post-importation production stages, and classified the imported goods under a residual basket provision without affirmatively determining its correctness for the imported good, its judgment should be reversed and judgment entered classifying the Segments under heading 8803.

## STANDARD OF REVIEW

The Federal Circuit "review[s] the CIT's decision to grant summary judgment de novo, applying the same standard used by the CIT to assess Customs' classification. *Ford Motor Co. v. United States*, 926 F.3d 741, 748 (Fed. Cir. 2019) (citation omitted). This Court determines the proper meaning of tariff terms without deference to the CIT's decision. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "A classification decision involves two underlying steps: determining the proper meaning of the tariff provisions, which is a question of law; and then determining which heading the disputed goods fall within, which is a question of fact." *Outer Circle Prods. v. United States*, 590 F.3d 1323, 1325 (Fed. Cir. 2010) (citations omitted). "Where, as here, no genuine dispute exists as to the nature of the subject merchandise, the two-step inquiry 'collapses into a question of

8

law we review *de novo*.'" *ADC Telecomms., Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019) (internal quotation marks and citation omitted).

The classification of merchandise imported into the United States is governed by the HTSUS. *Ford Motor Co.*, 926 F.3d at 748. The HTSUS "contains the 'General Notes,' the 'General Rules of Interpretation' ('GRI'), the 'Additional [U.S.] Rules of Interpretation' ('ARI')." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014). "The GRI and the ARI govern the classification of goods within the HTSUS." *Ford Motor Co.*, 926 F.3d at 749.

This Court may also consider the relevant Explanatory Notes ("ENs") published by the World Customs Organization ("WCO"). *Id.* (citing *Fuji Am. Corp. v. United States*, 519 F.3d 1355, 1357 (Fed. Cir. 2008)). "The [ENs] provide persuasive guidance and are generally indicative of the proper interpretation, though they do not constitute binding authority." *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1019 (Fed. Cir. 2017) (internal quotations and citation omitted); *see also, Lemans Corp. v. United States*, 660 F.3d 1311, 1316 (Fed. Cir. 2011) (citations and internal quotation marks omitted).

## ARGUMENT

### I.   THE CIT MISAPPLIED THE GOVERNING TARIFF CLASSIFICATION

The primary legal issue in this case is whether the imported Segments qualify as a "part" of an aircraft under heading 8803. Two settled principles govern that inquiry allowing resolution under GRI 1. First, "[i]t is well settled law that merchandise is classified according to its condition when imported." *Mita Copystar America v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citing *United States v. Citroen*, 223 U.S. 407, 414–15 (1911)). Second, "[i]n the field of [C]ustoms jurisprudence it is a well-recognized principle that a part of a part is a part for tariff purposes." *American Schack Co., Inc. v. United States*, 1 C.I.T. 1, 3 (Ct. Int'l Trade 1980). In the proceedings below, this principle was described by the CIT as "the subpart rule." (R. Doc. 67 at 15–16 (explaining that "the 'subpart rule' may apply to articles within the aircraft parts supply chain—no matter how far upstream—provided those articles meet the requirements for a part (or a part of a part, as the case may be) and are not otherwise excluded from classification as a part by relevant section and chapter notes.").)

The rehearing decision cannot be reconciled with either rule. Rather than classifying the Segments according to their condition as imported, the CIT evaluated their classification relative to successive stages of post-importation processing

10

despite the fact the Segments and the brake discs made from the Segments "will only ever end up in an aircraft." (Add.10, R. Doc. 77 at 10.) Further, rather than applying the settled principle that a component of a brake disc—an undisputed aircraft subpart—is itself a part for tariff purposes, the CIT treated downstream manufacturing steps within the brake disc production process as creating "articles" (the preform production stages) that were categorically excluded from heading 8803, but without affirmatively determining where those downstream "articles" are classified. Both moves depart from established tariff classification doctrine.

When merchandise may be *prima facie* classifiable under more than one heading, the Court must apply the GRIs sequentially to determine the single correct classification. *See Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) (establishing the court's duty to reach the "correct result"); *Orlando Food*, 140 F.3d at 1442 (GRIs applied in order until proper classification is determined). Proper application of the GRIs results in the classification of the Segments in heading 8803.

### A. Under GRI 1, the Imported Segments Are Properly Classified as Parts of Aircraft

Under GRI 1, classification is determined "according to the terms of the headings and any relative section or chapter notes." In this case, the parties offered, and the CIT considered, only two alternative tariff classifications for the Segments.

11

HTSUS heading 6307 was considered because the Segments are made of a textile material. HTSUS heading 8803 was considered because the Segments are component parts of aircraft brake discs.

As it concerns the ultimate use of the Segments, the CIT made a specific, and correct, finding that "the segments are imported into the United States as an upstream product for the production of the aircraft brake discs." (R. Doc. 67 at 15.) The fact the Segments are used to make brake discs for use as parts of aircraft is consistently expressed in the CITs opinions and is unequivocal. *See* Doc. 67 at 23 ("… here, the segments, as imported, are cut-to-size and identified for the production of a brake disc for a particular type of aircraft."); R. Doc. 67 at 27 ("…the imported segments, each of which is identifiable as a radial, web, or chordal segment, cut to size for the production of, and identified by part number for, the production of a brake disc for a particular type of aircraft."); Add.14–15, R. Doc. 77 at 14–15 ("The segments are like parts because they are dedicated for use in, and are integral to, the manufacturing of needled preforms and, ultimately, aircraft brake discs, and are imported in a condition suited for that use."); R. Doc. 67 at 23–34 ("The imported segments are used in their condition as imported to produce the needled preforms that are, thereafter, used in the manufacturing of aircraft brake discs."). There are no facts that support a different conclusion.

The CIT also found that aircraft brake discs are used in aircraft landing gear and are parts of aircraft braking systems that are parts of aircraft. (R. Doc. 67 at 9; Add.5, R. Doc. 77 at 5.) There is no dispute that aircraft brake discs and aircraft braking systems are classifiable as parts of aircraft. (R. Doc. 67 at 9.) Therefore, by application of the "subpart rule," the Segments are classifiable as aircraft parts in heading 8803. The CIT reached this same conclusion. *See* R. Doc. 67 at 27 (" . . . the court finds that the segments are prima facie classifiable as parts of aircraft."). The Segments' status as a "part" was confirmed at the rehearing stage. (Add.9–10, R. Doc. 77 at 9–10.)

Regardless of the type or extent of post-importation processing, the Segments are identifiable to a specific aircraft, the ultimate downstream article, and have no other use. Therefore, they are classifiable as parts of aircraft. The CIT got this right in its initial summary judgment decision, stating:

> [N]otwithstanding the post-importation processing that is required as part of the production process, the imported segments are identifiable to the downstream article and are used for no other purpose. Thus, taking account of the considerations deemed relevant in the foregoing cases, the court finds that the imported segments are classifiable as parts of aircraft.

(R. Doc. at 24.)

This is a critical determination that sets heading 8803 as the default tariff classification for the Segments because there is no larger whole that the Segments

13

may be a "part" of. Therefore, the Segments will remain classified here unless they are excluded by some applicable interpretive rule, section note, or chapter note. The relevant questions for completing this analysis are: whether, by application of such rules, there is another tariff classification that may cover the Segments more specifically; or whether there is an identifiable intermediate article that the Segment goes into that has a separate tariff classification (based on the facts above, we would consider the brake disc, the braking system, and the undercarriage). The answer to both questions is no.

On rehearing, the CIT determined that the post-importation brake disc preform manufacturing stages must also be considered in the Segment classification analysis. Even under this (incorrect) approach, the inquiry and result remain the same. The Government indicates the densified preform stage is classifiable as an aircraft part. (R. Doc. 54 at 32.) This leaves only the needled preform and carbonized preform stages for review, but neither the parties nor the CIT identified an alternative classification for these "articles." (*See* Add.19, R. Doc. 77 at 19 n.15 ("neither party proffers an alternative classification for the needled preforms").) Thus, there is no more specific alternative tariff classification that would apply to the Segments and direct them away from heading 8803. Based on the undisputed facts and proper application of the "subpart rule," the Segments are classifiable as parts of aircraft in heading 8803.

14

Resort to heading 6307, a residual basket provision, is improper where a "parts" provision already describes the goods. Nevertheless, the CIT concluded—without citing controlling authority—that "[w]hile the court continues to find that the segments are finished parts in relation to the needled preform, the same must also be true for the needled preform (and interim articles upstream from the brake disc) in relationship to the brake disc." (Add.17, R. Doc. 77 at 17.) This is not the correct analysis.

The CIT improperly shifted the focus from the condition of the Segments at importation to downstream, post-importation manufacturing stages that further advance the imported Segments toward their ultimate end use in an aircraft. This position cannot be reconciled with the CIT's prior holding that "notwithstanding the post-importation processing that is required as part of the production process, the imported segments are identifiable to the downstream article and are used for no other purpose." (R. Doc. 64 at 24.) It is not proper to consider whether any interim "articles" made from the Segments after importation are "finished" in relation to the ultimate downstream article. Rather, as this Court has made clear, "[t]he classification of imported items is determined by their condition at the time of entry." *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006)) (citing *Austin Chem. Co. v. United States*, 835 F.2d 1423, 1426 (Fed. Cir. 1987); *see also Peter J. Schweitzer Division, Kimberly-Clark Corp. v. United States*, 54

15

C.C.P.A. 44, 46 (1967) ("It is axiomatic that imported merchandise is to be classified according to its condition at the time of importation, and not on the basis of some condition resulting from post-importation processing.").

The proper analysis is not the type or extent of processing the part undergoes post-importation, but whether the imported part is processed into a separately classifiable article after import before it is incorporated into the ultimate downstream article. In other words, is there some identifiable article of commerce that the part goes into that has its own tariff classification, such that although the part is a part of a larger whole (*e.g.*, an aircraft), it is properly classified in another heading as part of that intermediate article? There being no intervening, specific classification for the preform manufacturing stages, the Segments remain properly classified in the aircraft parts provision.

We must also consider whether there is some tariff classification rule (GRI, section note, chapter note) that would direct the imported Segments to another tariff classification (per GRI 1, we must consider the terms of the headings and relative section or chapter notes). *See Honda of America Mfg., Inc. v. United States*, 607 F.3d 771, 774–76 (Fed. Cir. 2010) (although the oil bolt was a part of a vehicle, it was classified as a bolt under the "parts of general use" provisions as directed by section and chapter notes). If there is no more specific heading and the guidance of the HTSUS section or chapter notes do not direct the "part" to another heading, it will

16

remain classifiable as part of the larger whole. *See Mitsubishi Int'l Corp. v. United States*, 182 F.3d 884 (Fed. Cir. 1999) (holding that "a part that falls under an appropriate general heading [must] be classified under that heading, even if it could also be classified more specifically as part of a machine"). For example, jet engine parts for aircraft are classified in heading 8411 ("*Turbojets, turbopropellers and other gas turbines, and parts thereof*") even though they fall within the scope of heading 8803, since they are specifically named in that tariff provision. *See United Techs. Corp. v. United States*, 315 F.3d 1320 (Ct. Int'l Trade 2003) (affirming classification of aircraft engine parts in heading 8411). There is no more specific heading that covers the Segments. No chapter note, section note or other classification rule directs the Segments away from heading 8803. Therefore, the Segments are properly classified as "parts" of aircraft.

Longstanding "parts" jurisprudence confirms that an article designed and dedicated for incorporation into a larger article, and which becomes an integral constituent thereof, is properly classified as a "part." *See United States v. Pompeo*, 43 C.C.P.A. 9 (1955); *Gallagher & Ascher Co. v. United States*, 52 C.C.P.A. 11 (1964); *see also* Add.8, R. Doc. 77 at 8 n.4 (explaining that "this case implicates 'the subpart rule,' the rule 'that a part of a part is a part for tariff purposes.'" (quoting *American Schack Co.*, 1 C.I.T. at 5). This Court has clarified how these authorities must be applied. In *Bauerhin Technologies Ltd. P'ship v. United States*, 110 F.3d

17

774, 778–79 (Fed. Cir. 1997), this Court reconciled *United States v. Willoughby Camera Stores, Inc.*, 21 C.C.P.A. 322 (1933) with *Pompeo* and held the *Willoughby* "integral" formulation is not exclusive. Where an imported item is "dedicated solely for use with another article and is not a separate and distinct commercial entity," *Pompeo* controls and the item qualifies as a "part." 110 F.3d at 779. *Bauerhin* rejected the government's attempt to impose a rigid requirement that a component be indispensable to the primary function of the larger article. *Id.* Instead, the proper inquiry focuses on the nature of the imported article and its dedicated use. *Id.*

That reasoning applies squarely here. The Segments are not separate commercial entities, and neither are the post-importation preform production stages made from the Segments. They are dedicated solely to the production of brake discs and incorporation into aircraft braking systems. (Doc. 43 at 5, 7 (Pl.'s SOF ¶¶ 20, 33).) Once incorporated, they become integral constituents of the aircraft braking system and landing gear (undercarriage). (Add.14–15. R. Doc. 77 at 14–15.) The identity and function of the Segments are fixed at importation, and this does not change when they are further manufactured after importation. (R. Doc. 67 at 27.) Like the goods in *Pompeo* and *Bauerhin*, the Segments are irrevocably committed to use with a specific larger article. Under *Bauerhin*, such dedicated components qualify as "parts" of that larger article.

18

Moreover, *Bauerhin* confirms that once an article qualifies as a "part" under a parts heading, classification under that heading prevails over a residual basket provision. 110 F.3d at 779. *See also Int'l Bus. Machines Corp. v. United States*, 152 F.3d 1332, 1338 (Fed. Cir. 1998) (explaining that "'parts' provisions prevail over 'basket' provisions"). Heading 8803 is a specific provision for parts of aircraft. Heading 6307 is a catch-all for "other made up articles" not more specifically included elsewhere. Under the governing interpretive rules, the specific parts provision controls.

An imported article's character as part of a larger whole does not change by virtue of further processing toward its use in the ultimate downstream article. In other words, once an imported article is established as a part of a downstream article, its use as a part of that article cannot be made less defined or less specific by virtue of post-importation processing that further advances the part towards its use in that downstream article. To hold otherwise defies logic and common sense. The question of whether the imported article is properly classified as part of the ultimate downstream article is a separate matter, but again is not impacted by post-importation processing. Whether the proper tariff classification of the item is in a more specific tariff classification that might name it specifically or encompass it as part of some intermediate article can be determined based on the item's condition at the time of importation.

Under GRI 1 and settled "parts" jurisprudence, the Segments are classifiable as parts of aircraft under heading 8803. The CIT properly reached this conclusion. (R. Doc. 67 at 30.) Because heading 8803 applies by its terms and no more specific tariff classification was identified for the Segments, the analysis should have ended there. The CIT's resort to application of GRI 2(a) to assess intermediate manufacturing steps therefore reflects a departure from the hierarchical structure of the GRIs and constitutes reversible error.

**B.    The CIT Erred in Applying a GRI 2(a) Analysis to the Needled Preforms Made After Importation**

Although it was established that the Segments are parts of brake discs and brake discs are parts of aircraft, and further that parts of parts are properly considered parts of the whole (subpart rule), the CIT on rehearing decided to revisit its classification of the Segments as parts of aircraft in heading 8803. (*See* App.14–15, R. Doc. 77 at 14–15; App.16–17, R. Doc. 77 at 16–17. This included the application of GRI 2(a) to the post-importation production process for manufacturing brake discs from the imported Segments. That analytical move was both unnecessary and legally erroneous.

The GRIs are applied hierarchically. *Honda of America Mfg.*, 607 F.3d at 773 (citing cases). GRI 1 governs classification "according to the terms of the headings and any relative section or chapter notes." GRI 2(a), which states the following,

20

extends the scope of a heading to cover "incomplete or unfinished" articles that possess the essential character of the finished article.

> Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, **as entered**, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

(emphasis added).

Resort to GRI 2(a) is appropriate only if classification cannot be resolved under GRI 1. Where a heading applies by its terms to the article as imported, the inquiry ends. GRI 2(a) is triggered only when the article, "as entered" is an incomplete or unfinished version of a finished article and classification cannot otherwise be determined under GRI 1. *See Pomeroy Collection, Ltd. v. United States*, 893 F. Supp. 2d 1269, 1286 (Ct. Int'l Trade 2013) (concluding "GRI 2(a), which addresses incomplete or unfinished goods, is not relevant here").

This principle applies even where additional processing occurs after importation. Courts have recognized that where merchandise already possesses its functional identity at entry, classification is resolved under GRI 1 without resort to GRI 2(a). *Avecia, Inc. v. United States*, 469 F. Supp. 2d 1269, 1273 (Ct. Int'l Trade 2006) (reviewing unfinished ink-jet products that were "capable of printing in their condition as imported"); *Aceto Chemical Co. v. United States*, 465 F.2d 908, 911–

21

12 (C.C.P.A. 1972) (holding that an imported unfinished shampoo mixture contained the essential elements that impart the function of shampoo even though water, perfume, and coloring agents were added after importation).

The CIT agreed that GRI 2(a) does not apply to classification of the Segments in their condition as imported as they are finished parts. (R. Doc. 67 at 18 n.16; R. Add.15–16, Doc 77 at 15–16.) The Segments were not imported as unfinished brake discs, and the CIT found the Segments are finished parts that ultimately are made into brake discs. The Segments were imported as discrete components, engineered and designed specifically for incorporation into brake discs (*i.e.*, parts of brake discs) that are ultimately incorporated into an aircraft. This should have been the end of the inquiry since it is undisputed that they are incorporated into aircraft parts, and ultimately aircraft, after entry. However, the CIT went on to apply GRI 2(a) to the post-importation production stages of the brake discs made from the Segments. This is improper as the application of GRI 2(a) should be limited to the Segments in their imported condition.

The CIT's use of GRI 2(a) also inverted the function of that rule. GRI 2(a) is an enlarging rule; unless the heading requires otherwise, it expands a GRI 1 analysis to include certain incomplete, unfinished, unassembled, or disassembled articles. *See ABB Inc. v. United States*, 21 F.3d 1274, 1276 n.4 (Fed. Cir. 2005) (explaining that, although merchandise is generally classified according to its condition when

22

imported, GRI 2(a) expands heading references to include covered articles entered incomplete, unfinished, unassembled, or disassembled). It is not a limiting rule that narrows a parts provision based on post-importation processing. Yet the CIT used GRI 2(a) to exclude the Segments from heading 8803 because later "intermediate articles" made from the Segments after importation did not independently qualify as finished or unfinished brake discs. That approach is inconsistent with GRI 2(a)'s text and function. The rule asks whether an incomplete or unfinished article, "as entered," has the essential character of the finished article; it does not authorize a post-entry, stage-by-stage analysis to deny "parts" classification to the finished imported components the CIT already found the Segments to be.

That error matters because GRI 2(a)'s essential-character inquiry is limited to the imported article in its condition at entry. GRI 2(a) applies to incomplete or unfinished articles presented in a condition that already embodies the essential character of the finished article. The inquiry focuses on the condition of the article at the time of importation, not on what the article may become after additional processing. *See Engis Equip. Co. v. United States*, 60 C.C.PA. 436, 440 (1968) (collecting cases and explaining that post-importation processing "is irrelevant; for it is a settled principle that classification is determined on the basis of the condition of the imported articles at the time of importation and not afterward.").

Some HTSUS interpretive rules contain specific language that limits their application to specific times. AUSRI 1(a) looks at the use of an article "at, or immediately prior to, the date of importation." By contrast, AUSRI 1(c) looks to use "intended at the time of importation" and the actual use after entry. GRI 2(a) also contains a temporal limitation as the language is clear that the review is focused on the condition of the article "as entered," not at some point after. No other GRIs contain a similar restriction. The CIT's application of GRI 2(a) to post-importation processing stages ignores this language and makes it superfluous. *Contra United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute . . ." (internal quotation marks and citation omitted)); *see also Ishida v. United States*, 59 F.3d 1224, 1230 (Fed. Cir. 1995) ("The rules of statutory construction require a reading that avoids rendering superfluous any provision of a statute." (internal quotation marks and citation omitted)).

At the time of entry, the Segments qualify as "parts" and by their undisputed end use, as parts of aircraft under GRI 1. The CIT therefore had no occasion to invoke GRI 2(a) to the imported goods. And it did not. Instead, the CIT shifted its focus to the post-entry manufacturing steps that take place to produce brake discs from the Segments, applying GRI 2(a) to the needled preform manufacturing stage.

24

By doing this, the CIT altered the framework of the dispute and effectively redefined the classification process by moving away from a review of the Segments in their condition at the time of importation (*i.e.*, the imported Segment is a finished part).

The CIT went on to determine that an "article" made from the Segments after importation (needled preforms), is not an unfinished brake disc, a part of a brake disc, or a part of an aircraft. This was not because the Segments were made into another identifiable article of commerce after importation. Instead, the CIT found a manufacturing step that further advanced the Segments toward the finished brake discs did not qualify as a finished or unfinished brake disc.

The essential character inquiry under GRI 2(a) must be conducted with respect to the article "as entered." It does not permit the CIT to redefine the imported merchandise by reference to successive stages in a post-importation manufacturing process. The relevant unit of analysis is the imported article itself in view of its intended use as a part of another article, not consideration of a post-importation stage of production when the imported article has been further processed but is not yet converted into the finished article. Yet that is precisely what occurred. The CIT evaluated the Segments' relationship to interim manufacturing stages of the production process, rather than focusing on the identity and characteristics of the imported merchandise itself in comparison to the finished good it is a part of. (Add.16–18, R. Doc. 77 at 16–18.) This approach collapses the distinction between

25

a component part and the finished article into which it will ultimately be incorporated.

Instead, the inquiry should be limited to whether there is a separately identifiable article of commerce that the imported "part" goes into that has its own specific tariff classification. There is no separately classifiable intermediate article in the production of Segments to brake discs, just as there is no separately classifiable intermediate article in the production of brake discs to braking systems to aircraft undercarriages. All these parts and subparts are properly classified in HTSUS heading 8803 as parts of aircraft.

When an article is a "part" and there is a specific tariff provision covering the downstream article the part goes into, consideration of a basket provision is precluded. Once the Segments are identified as a "part" and the ultimate downstream article (airplane) is established, heading 6307 is eliminated at the heading level because it is a basket provision. Heading 8803 will always be applicable to these "parts" regardless of the number or extent of manufacturing steps before the Segment is ultimately incorporated into the aircraft (based on the subpart rule).

Even if GRI 2(a) were implicated for the needled preforms created from the Segments after importation, the essential character analysis would not support classification under heading 6307. In determining essential character, the Federal Circuit has looked to the nature of the article, its role in relation to its use, and its

26

commercial identity. *See, e.g., Better Home Plastics Corp. v. United States*, 119 F.3d 969, 971–72 (Fed. Cir. 1997) (finding that the shower curtain sets at issue were classifiable based on the essential character of the liner due to its functionality and cost considerations). The Segments and the needled preforms incorporating them are manufactured to aircraft-specific engineering requirements and are dedicated exclusively to incorporation into aircraft braking systems. (Add.9, R. Doc. 77 at 9.) They are not generic textile materials that later acquire a distinct character; the Segments enter the United States with a fixed identity and defined function. Their shape, design, and sole use are determined at importation. Where an article's identity and dedicated use are fixed at entry, it is not properly treated as a mere unfinished version of some other article. *See Bauerhin*, 110 F.3d at 779; *E.M. Chems. v. United States*, 920 F.2d 910, 914 (Fed. Cir. 1990). The further manufacturing steps to produce brake discs from the Segments do not change this identity.

By applying GRI 2(a) to the needled preforms created after importation, the CIT effectively bypassed the hierarchical structure of the GRIs and recharacterized the imported merchandise to avoid application of heading 8803. That was legal error. Because classification was determinable under GRI 1, and because the Segments were not incomplete articles within the meaning of GRI 2(a) at the time of importation, the CIT's resort to essential character analysis for the needled preforms was improper and its judgment should be reversed.

27

**C.    The CIT Improperly Based Its Analysis on Post-Importation Processing**

While the CIT found the Segments are "parts," it proceeded with an "analysis of the intermediate articles" that are created during the brake disc manufacturing process based on the Government's contention that an "essential character" analysis of the imported good and all downstream articles must precede any determination that the Segments are "parts" of aircraft. (Add.11, R. Doc. 77 at 11.) For the reasons discussed above, this is incorrect. Even assuming *arguendo* that such an analysis was appropriate, the CIT's reasoning cannot be sustained because it rested on post-importation processing and downstream manufacturing stages rather than on the condition of the merchandise as imported. (Add.16–17, R. Doc. 77 at 16–17.)

More than a century ago, the Supreme Court established that tariff classification turns on a review of the article "as imported." *Worthington v. Robbins,* 139 U.S. 337, 334 (1891). That principle has been consistently reaffirmed, so imported merchandise may not be classified "on the basis of some condition resulting from post-importation processing." *Peter J. Schweitzer*, 54 C.C.P.A. at 46. The essential character inquiry under GRI 2(a), like all classification analysis, must therefore focus on the article as presented at entry.

The CIT's rehearing opinion departed from that rule. Rather than examining the Segments as discrete engineered components of identified downstream articles— the brake discs that are parts of airplanes—the CIT evaluated the Segments' status

28

relative to post-importation processing steps in the production of brake discs—*i.e.*, needling, carbonization, and densification stages. (Add.16–17, R. Doc. 77 at 16–17.) Rather than comparing the imported Segments to the completed brake disc, the CIT focused on upstream "interim articles" in the production chain. (Add.17, R. Doc. 77 at 17.) In doing so, the CIT shifted the unit of analysis away from the condition of the merchandise at the time of importation. Consideration of downstream processing may have a proper role in a different inquiry—namely, whether the imported article is more specifically described by another tariff provision, which is a question of competing classifications, not whether an article that is otherwise a "part" of a larger whole. The latter determination must be made based on the condition of the merchandise as imported.

That approach conflates two distinct concepts: (i) whether an imported article is incomplete or unfinished but can still be classified as the finished good, and (ii) whether further processing performed on an article after importation impacts its classification. Here, the Segments were imported in their final geometric form as identifiable components of brake discs ready for manufacture into the finished good (*i.e.*, finished brake disc parts). (R. Doc. 67 at 4.) They were not imported as partially formed brake disc parts. They were not lacking some finishing step that would complete them into brake disc parts. They were imported as discrete components

29

designed for incorporation directly into brake discs and this is in fact what occurs after importation. (Add.15–15, R. Doc. 77 at 14–15.)

Rather than accepting these established facts for purposes of the classification analysis for the imported Segments in their imported condition, the CIT's analysis turned to post-importation processing. Specifically, the CIT focused on the needled preforms made from Segments after importation and found they were not unfinished brake discs solely because additional processing is needed after the needling/assembly process. As a result, the Segments, items that are finished parts identifiable to an ultimate use in aircraft, somehow are no longer classifiable as part of an aircraft.

That reasoning is incompatible with the "condition as imported" rule. The character of an imported article cannot be assessed by parsing through its condition during post-importation manufacturing steps. The imported part is still a "part" of the downstream article whether in its condition at the time of importation or some condition within the manufacturing steps needed to produce the downstream article. If the imported "part" were manufactured into some completely new article of commerce with a separate tariff classification the result may be different, but that is not the case here. Further, such analysis could be conducted at the time of importation by inquiring whether the imported "part" could be manufactured into something else. Here, again, the Segments have only one use.

30

The proper inquiry must focus on whether the imported article itself possesses a fixed identity and defined use at the time of entry. *See Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333, 1339 (Fed. Cir. 1999) (stating that when "the item as imported can be made into multiple parts of articles, the item must identify and fix with certainty the individual parts that are to be made from it"). The record establishes the Segments do exactly that as they are manufactured to aircraft-specific requirements and dedicated exclusively to incorporation into aircraft braking systems. (R. Doc. 43 at 5, 7 (Pl.'s SOF ¶¶ 20, 33).) These characteristics do not change throughout the course of the post-importation processing and are present at all stages of brake disc preform manufacturing. The CIT's focus on the presence or lack of certain technical characteristics at various post-importation brake disc manufacturing stages is improper. The focus should be on whether, at the time of importation, the Segments are intended to be made into brake discs used for aircraft, not on the technical characteristics of the partially manufactured brake disc at some point in its post-importation production process.

Based on its review of the post-importation processing steps, the CIT concludes, "[t]he needled preforms are not a finished 'part' of an aircraft." (Add.16, R. Doc. 77 at 16.) This ignores the same argument could be made for any component that is not already attached to the aircraft by making a comparison to a downstream article that is not complete – *i.e.*, the brake discs are "unfinished" when compared to

31

the braking system and the braking system is "unfinished" when compared to the undercarriage. The subpart rule obviates this approach by its broad application to all parts and parts of parts no matter how far upstream.

Despite the well-established rules for "parts" classification, the CIT finds "[t]he needled preforms, however, are not finished because, unlike the segments that are needled together to produce the preform, the preforms (both needled and carbonized) are not suitable for their intended use and, instead, must undergo substantial additional processing." (Add.16–17, R. Doc. 77 at 16–17.) However, this conclusion is not supported by the facts as all "articles" in the brake disc production process are suitable for their intended use—the Segments are a finished part suitable for their intended use of being made into a needled preform, which is suitable for its intended use of being made into a carbonized preform, which is suitable for its intended use of being made into a densified preform, which is then made into a brake disc.

At this point, the case has become a post-importation processing review. As detailed in the briefs and the CIT's opinion on summary judgment, it is well-established that it is not proper to consider post-importation processing for goods identified as finished parts. The CIT even recognizes this in the rehearing opinion, stating "[i]t is also true that "[r]ecognition of the imported merchandise as a part is not precluded simply because the article of which the import is a part undergoes

32

further processing provided the import meets the requirements for classification as a part, is not mere material for a part, and is not excluded by operation of the section and chapter notes." *Id*. at 1363. (Add.17, R. Doc. 77 at 17.)

If post-importation processing were sufficient to defeat the "part" status of an imported good or to recharacterize a component as "unfinished" because the article it goes into is not "finished" until the manufacturing process for that article is complete, it would render the condition-as-imported rule meaningless. This would also eliminate the "subpart rule" as any further production of a subpart into an "unfinished" good would result in the subpart losing its "part" classification status. Under this approach, any component of a downstream article that undergoes additional manufacturing after import could be recast as no longer being a component of that downstream article by selectively reviewing the post-importation manufacturing steps to pick a time when the product lacks certain characteristics of the finished good. That is not the law.

By considering the character of intermediate articles and basing its analysis on successive stages of downstream production rather than in the identity of the imported merchandise itself, the CIT applied the wrong analytical lens. Because classification must be determined based on the condition of the goods at importation, the CIT's reliance on post-importation processing constitutes reversible legal error.

## II.    THE SEGMENTS QUALIFY AS "BLANKS" UNDER GRI 2(a)

### A.    The Needled Preforms Satisfy the Explanatory Notes' Two-Part Definition of "Blanks"

If this Court concludes that a GRI 2(a) analysis must be applied to the post-importation processing steps to determine the proper classification of the Segments, the dispositive question is whether the needled preforms qualify as "unfinished" brake discs, which includes determining whether they are "blanks" within the meaning of the Explanatory Notes. Since the needled preforms and carbonized preforms are "unfinished" brake discs, the Segments are properly classified in heading 8803.

As discussed above, GRI 2(a) extends the scope of a heading to cover referenced articles even if they are "unfinished."[1] Heading 8803 specifically covers parts of aircraft. Therefore, based on GRI 2(a), heading 8803 covers all finished and unfinished/incomplete aircraft parts and their subparts. Therefore, the CIT recognized needled preforms may still be classified as parts of aircraft if they are "unfinished" parts under GRI 2(a). (Add.17, R. Doc. 77 at 17.) However, the CIT

---

[1] In *Am. Import Co. v. United States*, 26 C.C.P.A. 72, 74 (1938), the tariff meaning of "unfinished" was stated as follows: "It has long been the generally accepted rule that a thing may be classified for tariff duty purposes under the *eo nomine* provision for the article unfinished if that thing has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or that class of articles alone." This case has been favorably cited by the courts and Customs for this proposition and we assert there is no reason to depart from this standard.

34

found the needled preforms cannot be classified as a "finished aircraft part" per GRI 2(a). (*Id.* at 18.) Since GRI 2(a) does not involve establishing the articles as "finished goods," the CIT applied the wrong test.

As a basis for its determination that the needled preforms are not a "finished" part of an aircraft, the CIT relied on the definition of "finished" goods in *Pleasure-Way Indus., Inc. v. United States*, Slip Op. 16-100, 2016 WL 6081818, at *3 (Ct. Int'l Trade Oct. 18, 2016), *aff'd*, 878 F.3d 1348 (Fed. Cir. 2018) (stating "A 'finished' good is one that is suitable for its ultimate 'intended use.'"). (*See* Add.16, R. Doc. 77 at 16.) However, this case addressed the term "finished" as found in the Customs Regulations at 19 C.F.R. § 181.64, which guides the application of HTSUS subheading 9802.00.50. The term "finished" as defined in *Pleasure-Way* is not part of the HTSUS statutory text and has no relevance or application in this case.

The definition of "unfinished" for tariff classification purposes has been addressed in many cases. It has long been the generally accepted rule that an "unfinished" article may be classified in the tariff provision for the finished article if it "has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or that class of articles alone." *Am. Import Co.*, 26 C.C.P.A. at 74–76 (finding "that material that has been so far processed from the material stage to a partly-completed article [] loses its character as material and takes on the characteristics of the article for which the material was intended."). This

interpretation has also been applied to the classification of parts. *Acme Shear Co. v. United States* 63 C.C.P.A. 12, 14 n.1 (1975) ("Where an article has been so far advanced in manufacture as to be dedicated to a specific use, and to have no other use or ultimate intendment, it is to be regarded, for tariff purposes, as the article it is intended to be when completed. Particularly is this so in the case of articles which, in their finished condition are destined for use as parts.").

While the *American Import* decision predates the HTSUS and GRI 2(a), its guidance on the classification of "unfinished" articles has been adopted by this court. *See Int'l Bus. Machines Corp.*, 152 F.3d at 1336–37 (Fed. Cir. 1998) (favorably citing the *American Import* and *Acme Shear* cases for their interpretation of "unfinished"). Further, Customs has adopted this definition of "unfinished" in its application of GRI 2(a). (*See, e.g.,* Add.26, HRL 950118 (Dec. 10, 1991) (relying upon the definition of "unfinished" in *American Import* to conclude that the absence of certain components did not detract from classifying unassembled car bodies as the complete article); *see also Benteler Indus., Inc. v United States*, 840 F. Supp. 912, 917 (Ct. Int'l Trade 1993) (relying on *American Import* to assert that identifiable articles emerging from undifferentiated material constitutes a part, not material).

The Explanatory Notes for GRI 2(a) also reference "blanks" as articles "not ready for direct use" that (1) have "the **approximate shape or outline** of the finished

article or part" and (2) "can **only be used**, other than in exceptional cases, **for completion into the finished article or part**." (Add.42, Explanatory Notes to GRI 2(a) (emphasis added).) This definition contains no limitation based on the degree of processing required to complete the "blank" into the finished article.

The needled preforms satisfy both criteria. First, they possess the approximate shape and outline of the finished brake discs. Once the Segments are assembled (needled), they have the circular brake disc geometry. (R. Doc. 67 at 4–5.) Although further carbonization, densification, and finishing operations occur after this step, the outer configuration (shape/size) of these unfinished brake discs does not change. (R. Doc. 43 (Pl.'s SOF ¶ 28).) The needled preforms are not generic textile forms or undifferentiated materials; they are a step in the further manufacture of brake discs from Segments.

Second, the needled preforms can only be used for completion into aircraft brake discs. They are manufactured to aircraft-specific engineering requirements and are dedicated exclusively to incorporation into aircraft braking systems. (Add.9, R. Doc. 77 at 9.) The needled preforms will not be made into frisbees, donuts, or some other article—they will only be made into brake discs, a characteristic that is inherent in the Segments at the time of importation and is bolstered as these parts undergo further processing after importation. (R. Doc. 43 (Pl.'s SOF ¶ 28).) The needled preforms, like the Segments, are not marketed, sold, or usable apart from that

37

purpose. (Add.14–15, R. Doc. 77 at 14–15.) The sole commercial identity of the Segments and the preform manufacturing stages is for use in the manufacture aircraft brake discs. (Add.9, R. Doc. 77 at 9.) That is precisely what the Explanatory Notes describe.

The CIT nevertheless concluded that the needled preforms are not "blanks" because they undergo additional manufacturing before becoming finished brake discs. (Add.22, R. Doc. 77 at 22.) But "blanks," by definition, are "not ready for direct use" and must be evaluated "as entered." (Add.42, Explanatory Notes to GRI 2(a).) Further processing is therefore inherent in the concept. Nothing in GRI 2(a) or the Explanatory Notes distinguishes between minor and substantial processing, nor does the text condition "blanks" status on the extent of post-importation operations. *See Cummins Engine Co. v. United States*, 83 F. Supp. 2d 1366, 1371 (Ct. Int'l Trade 1999) (*Cummins I*) (finding unfinished crankshafts to be "blanks" where they had the general shape of the finished article and were solely intended for completion into crankshafts).

The court incorrectly relied on dictionary definitions of the term "blanks" to impose a minimal post-entry processing requirement as a condition of GRI 2(a) "blank" status. (Add.21, R. Doc. 77 at 21.) As the court in *Cummins I* determined, "blanks" is a term of art and the scope and definition of "blanks" for purposes of GRI 2(a) is informed by the Explanatory Notes. 83 F. Supp. 2d at 1370. In alignment

38

with the ENs language describing "blanks," the focus is limited to shape and use. Therefore, the court improperly imposed a third criterion not found in the Explanatory Notes. *See Jam v. United States*, 340 U.S. 593, 596 (1951) ("It is for [judges] to ascertain—neither to add nor to subtract, neither to delete nor to distort."). The plain meaning rule prohibits such an expansion of the language of the ENs. *See Rubies Costume Co. v. United States*, 279 F. Supp. 3d 1145, 1168-69 (Ct. Int'l Trade 2017) (applying the statutory rule of construction *ejusdem generis* to interpret the Explanatory Notes). In short, the CIT's decision abandons the objective two-part inquiry that controls under GRI 2(a): whether the imported article, as entered, already possesses the size and shape of the finished article or part and can only be used for completion into the finished article or part.

> **B. The CIT Misapplied GRI 2(a) by Disregarding the Controlling Case Law on "Blanks"**

The CIT's decision also cannot be reconciled with the only caselaw to interpret "blanks" for GRI 2(a). This Court should not depart from those decisions, including its prior affirmance of the CIT's *Cummins* decisions employing GRI 2(a)'s two-part test—an approach this Court did not disturb on appeal.

In *Cummins I,* an importer challenged Custom's classification treatment of crankshaft forgings imported into Mexico for NAFTA qualification purposes of the crankshafts ultimately imported into the U.S. Customs determined—and the CIT

agreed—the crankshaft forgings were "blanks" when imported into Mexico because they possessed the shape and were intended solely for use as crankshafts. *Cummins I*, 83 F. Supp. 2d at 1371. There was no extended essential character analysis for the crankshaft forgings—rather, the "blanks" determination was based only on their shape and intended end use.

Cummins argued that the government's classification should have accounted for essential characteristics of finished crankshafts, such as surface condition, balance, and hardness, which were not present upon importation. *Id.* at 1376. The CIT rejected this argument, holding that under GRI 2(a), "blanks" that are recognizable by shape and intended for sole use as the finished article are classifiable as "unfinished." *Id.*

Subsequently, "Cummins filed for an amended advanced ruling letter with one variation in the facts stated in *Cummins I*." *Cummins v. United States*, 377 F. Supp. 2d 1365, 1369 (Ct. Int'l Trade 2005) (*Cummins II*), *aff'd* 454 F.3d 1361 (Fed. Cir. 2006). Despite the change, Customs maintained its original position that the crankshaft forgings were "blanks." *Id.* The Customs ruling that led to the *Cummins II* litigation reflected the two-part approach, emphasizing that the forgings were "recognizable as crank shafts" based on their shape and their sole use as crankshafts. (Add.49, HRL 964019 (Dec. 13, 2000).) "In formulating this analysis, Customs submitted the question to the WCO." *Id.* (citing *Classification of Certain Forgings*

40

*for Crank Shafts*, Doc. NC0317E1 (Oct. 10, 2000) ("*Certain Forgings*")). "After a formal review, the WCO issued a classification opinion which was approved by the member states 31 to 1" and confirmed Customs' classification. *Id.; see also* Add.60, *Certain Forgings* at ¶ 27 (explaining that "blanks" "have the approximate shape or outline of the finished article, *i.e.*, unfinished articles having the essential character of the finished article").

In *Cummins II*, the CIT again confirmed that the crankshaft forgings met the definition of a "blank" because the goods "had the general shape of crankshafts and were intended for use solely as crankshafts." 377 F. Supp. 2d. at 1381. In so doing, the CIT relied on the Explanatory Notes to GRI 2(a). *Id.* at 1380. The CIT also declined Cummins' invitation to deviate from the WCO's opinion. *See id.* at 1375 ("For the United States to defect from the international norm would frustrate the objectives of a harmonized tariff system." (citing 19 U.S.C. § 3005(a)(2)).

On appeal, Cummins challenged the CIT's ruling, including its discussion of the WCO's *Certain Forgings* opinion. This Court found the CIT was entitled to consult the WCO's opinion "for its persuasive value," but stressed that—regardless of the opinion's value—the CIT "independently construed" the relevant language of the GRIs in reaching its decision. *Cummins v. United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006) (affirming *Cummins II*). Critically, this Court applied the two-part test from the Explanatory Notes to GRI 2(a) to find the "the product imported into

41

Mexico had the general shape of a crankshaft and was intended for use only in producing a finished crankshaft." *Id.* at 1366.

Thus, the *Cummins* cases provide specific guidance regarding the treatment of "blanks" under GRI 2(a)—a point the CIT wholly missed in its rehearing decision. The CIT's discussion of the *Cummins* cases posits that "[t]he case law provides little guidance" on the EN for GRI 2(a) "blanks," and concludes that *Cummins I* "did not . . . address whether the essential character requirement of GRI 2(a) applied to products that otherwise constituted a blank," Add.20, R. Doc. 77 at 19-20. Not so. *Cummins I* clearly determined that the crankshaft forgings were classifiable under subheading 8483.10.30 by "employing GRI 2(a)," meaning the court found the crankshaft forgings had the essential character of finished crankshafts. *Cummins I*, 83 F. Supp. 2d at 1376. The facts supporting this conclusion were shape and intended use. In *Cummins I,* the CIT cited the EN language on "blanks" and did not conduct a separate essential character analysis, focusing instead on the physical form and single-use requirement.

In short, the caselaw holds that a "blank" exists only where the article is both dedicated to a single use and has been advanced to the point that it embodies the finished article or part's defining physical form. Thus, an article that still requires processing to assume the shape and properties of the finished article is not a "blank." *Id.* at 1376. The CIT departed from that rule by rejecting "blanks" treatment for the

42

needled preforms even though it had already achieved the size and shape that made it recognizable as the finished article (a brake disc) and would be used for no other purpose. The remaining brake disc manufacturing operations do not alter this defining physical form or use.

The error is outcome determinative. The CIT erred by failing to apply the proper rule for "blanks" under GRI 2(a). Had it properly interpreted GRI 2(a), it would have found the needled preforms are "blanks" that are properly considered unfinished brake discs within the scope of heading 8803. Requiring a separate essential character analysis beyond determining whether the merchandise already possessed the size and shape that make it recognizable as the finished article was wrong. Under GRI 2(a) and the analysis this Court adopted in the *Cummins* cases, that threshold "blanks" inquiry ends the analysis for GRI 2(a): if the article's geometry and dimensions already correspond to the finished good and it is dedicated for use it is a "blank" that is considered an unfinished good within the scope of the tariff classification for the finished good. Subsequent processing cannot defeat this classification as a "blank." By failing to properly interpret this rule, the CIT misapplied controlling precedent and improperly denied "blanks" treatment to the brake disc preforms.

43

### C.    Longstanding Customs Practice Confirms the Two-Part Test for GRI 2(a) Blanks

Administrative practice confirms this reading, contrary to the Government's arguments and the CIT's rehearing decision. For decades, Customs has articulated the same two-part "blanks" test drawn from the Explanatory Notes: approximate shape and sole use for completion. (*See, e.g.*, Add.70, HRL 084217, at 3 (June 28, 1989) ("2(a) applies to blanks which, although not ready for direct use, have the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part."); Add.74, New York Ruling Letter ("NYRL") N260676 (Feb. 6, 2015) (concluding  blanks that had the exact size and shape of the finished good and had no other use other than being made into the finished good, had the essential character of the finished good under GRI 2(a)); Add.76, NYRL N350641, at 2 (July 18, 2025) (explaining that the "two criteria which an article must meet in order to be classified as a blank for purposes of GRI 2(a) are (1) it must possess the approximate shape or outline of the finished article, and (2) the sole use must be for completion into the finished article").) These rulings demonstrate that since the inception of the HTSUS, the agency with specialized expertise in tariff classification has consistently stated that the only two requirements for "blanks" are those found in the ENs.

Further, Customs has acknowledged that this is how the courts have interpreted the term "blanks" for GRI 2(a):

> The Courts have considered the definition of a "blank" and have held that an article which had the general shape of the completed article and was intended solely for use as the completed article, met the definition of a "blank" within the meaning of EN (II) to GRI 2(a). *Cummins Inc., v. United States,* 29 C.I.T. 525; 377 F. Supp. 2d 1365 citing *Cummins Engine Co. v. United States*, 23 C.I.T. at 1023-24, 83 F. Supp. 2d at 1371.

(Add.102, HRL H095037 (May 20, 2010).) In fact, Customs has acknowledged the two-part test for "blanks" stands in place of broader essential character test for other unfinished articles, stating:

> [T]he GRI 2(a) discussion of "blanks" at EN (II) to GRI 2(a), "provides an independent, objective criteria for determining whether an incomplete or unfinished good is to be classified as if complete or finished." CBP explained that "[i]f this were not the case, the 'blanks' language would be unnecessary and superfluous as the classification of articles having the approximate shape or outline of the finished good would in all cases be governed by the principal of essential character."

(Add.87, HRL H006327 (Aug. 28, 2007) (quoting Add.89, HRL 967908 (Jan. 24, 2006)).) Customs has further noted that the determination of whether a product is a "blank" "is made without regard to the cost and intricacy of the subsequent manufacturing in the United States." (Add.85, HRL H006327.) *See also* Add.95, NYRL N220176 (July 5, 2012) ("the degree or substantial nature of processing required to finish blanks is not addressed in GRI 2(a)."). Additionally, Customs has been clear that "the 'lack of important performance requirements . . . is not deemed

45

legally relevant' when determining whether a good constitutes a blank under GRI 2(a)." (Add.86, HRL H006327).)

While agency interpretations do not bind the Court, they are persuasive where consistent and long-standing. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) (finding that while agency interpretation is not binding on a court, it is informative especially when within the agency's expertise); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (stating that "rulings, interpretations and opinions" by an agency "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" and "the weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control").

Here, Customs' uniform application of the two-part test aligns with the text of the Explanatory Notes and has been affirmed by this Court, the CIT, and the WCO. Further, Customs' position confirms that the extent of post-importation processing is not relevant or dispositive to determining whether an article is a "blank." Therefore, Customs' consistent application of the two-part "blanks" test is persuasive and indicative of the agency's true position on this issue.

In contrast, no deference is owed to the Government's "convenient litigating position" in this case—which departs from Customs' consistent position on "blanks"

over the course of decades and the position it advocated before this Court. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (finding that deference to an agency interpretation is unwarranted when it conflicts with prior interpretation).

Because the needled preforms (and subsequent preform manufacturing stages) possess the approximate size and shape of the finished brake discs and are dedicated exclusively to completion into aircraft brake discs, they qualify as "blanks" under GRI 2(a). Therefore, under a proper GRI 2(a) analysis, the needled preforms (and subsequent preform manufacturing stages) are properly classifiable as "unfinished" aircraft parts under heading 8803.

### D.    Statutory Construction Supports the More Reasonable Interpretation of GRI 2(a)

Finally, canons of statutory interpretation support Honeywell's position. "[O]ne of the 'golden rules' of statutory interpretation . . . states 'that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result.'" *In re Ripley*, 926 F.2d 440, 448 (5th Cir. 1991) (citation omitted). Likewise, "[t]he canon against surplusage can be meaningful when a competing interpretation would avoid superfluity. *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (citing *Microsoft Corp. v. i4i L.P.*, 564 U.S. 91,

106 (2011)). *See also Nutricia N. Am., Inc. v. United States*, 159 F.4th 1344, 1354 (Fed. Cir. 2025) (stating that the "surplusage canon of construction [] prefers interpretations that 'give [] effect to every clause and word' in a [tariff] provision") (citation omitted).

The Government's position violates both of these canons by undercutting the need for the language pertaining to "blanks" and reducing GRI 2(a) to an essential character analysis for all unfinished or incomplete articles. Such an interpretation would constitute an unreasonable interpretation of the language of GRI 2(a) in that it would directly contradict the Explanatory Notes and render the language defining "blanks" meaningless.

## III. THE CIT ERRED BY SUSTAINING CLASSIFICATION UNDER HEADING 6307 WITHOUT DETERMINING ITS CORRECTNESS

### A. The CIT Erred by Sustaining a Residual Basket Provision Without Performing the Required Independent Classification Analysis

If this Court agrees with Appellant's proposed classification, it need not reach this argument. However, in the event the Court reaches this argument, reversal is also required because the CIT failed to determine the correct classification for the needled preforms as required by *Jarvis Clark*. That decision makes clear that the CIT's function is not limited to choosing between the parties' competing positions.

Rather, the CIT must independently determine the *correct* classification under the HTSUS. 733 F.2d at 878.

The rehearing opinion does not satisfy that obligation. After "[t]urning to the merits," Add.15, R. Doc. 77 at 15, the CIT devoted only limited analysis to classification of the imported Segments and ultimately concluded that heading 6307 applied because, "[i]n the absence of any other suitable provision, the segments are properly classified under heading 6307." (Add.22, R. Doc. 77 at 22.) That reasoning is legally insufficient under *Jarvis Clark* for three reasons.

First, the CIT failed to make the required affirmative, text-based determination that heading 6307 governs the imported merchandise. A residual provision such as heading 6307—covering "*[o]ther made up articles*"—applies only where the merchandise is not more specifically provided for elsewhere in the nomenclature. The CIT must therefore demonstrate, through the GRIs, section and chapter notes, and relevant ENs, that the statutory terms of the residual provision are satisfied. The rehearing opinion contains no such analysis. It does not explain how the merchandise falls within the scope of "*[o]ther made up articles*," nor does it engage with the governing interpretive framework.

Second, the CIT's reasoning impermissibly shifts the analytical burden even though "our legal system rarely requires a party to prove a negative." *Walther v. Secretary of Health and Human Servs.*, 485 F.3d 1146, 1150 (Fed. Cir. 2007). By

relying on the "absence of any other suitable provision," the Court effectively required Honeywell to disprove heading 6307 without first establishing its applicability. But *Jarvis Clark* requires the court to determine the correctness of the Government's classification as a matter of law. 733 F.2d at 878. A failure of proof by the importer does not, by itself, validate the Government's position.

Nor does the rehearing posture cure that error. The CIT observed that Honeywell had not addressed the Government's newly framed "intermediate articles" argument in its initial rehearing response, but the CIT then ordered supplemental briefing on that issue and expressly declined to find forfeiture because, after supplemental briefing, it had "the benefit of the parties' complete views." (Add.15, R. Doc. 77 at 15.) Having elected to reach the issue, the CIT was required to carry the *Jarvis Clark* inquiry through to completion. It could not use Honeywell's supposed failure to anticipate the CITs reformulated intermediate-article analysis as a substitute for the court's own obligation to determine the correct classification. Yet that is what the rehearing opinion did: after rejecting Honeywell's proposed classification, the CIT concluded that Honeywell had "not carried its burden" and sustained heading 6307 "[i]n the absence of any other suitable provision." (Add.23, R. Doc. 77 at 22–23.) That reasoning impermissibly converts the importer's burden to overcome Customs' classification into a burden to negate every conceivable alternative classification, including a residual basket provision, before the

50

Government's classification is affirmatively shown to be correct. *Jarvis Clark* requires more. Once the CIT reopened the judgment and revisited classification, it was required to determine the correct classification under the HTSUS—not merely fault Honeywell for failing to disprove heading 6307.

Third, the CIT's approach reflects an improper process-of-elimination methodology untethered to the statutory text. A basket provision cannot be invoked simply because an importer's proposed classification is rejected. Rather, the court must first determine—affirmatively—that no more specific provision applies and that the residual provision's terms are satisfied. *See, e.g., R.T. Foods*, 757 F.3d at 1354. The CIT did neither. Its conclusion rests entirely on the absence of an identified alternative, not on an analysis demonstrating that heading 6307 is correct.

*Jarvis Clark* is not just good law, it is a "seminal decision" of this Court. *Jedwards Int'l Inc. v. United States*, 161 F. Supp. 3d 1350, 1353 (Ct. Int'l Trade 2016). Its bedrock principle is the need for "uniform and consistent interpretation and application" of the customs laws. *Jarvis Clark*, 733 F.2d at 876 (quoting H.R. Rep. No. 1235, at 29 (1980)). That objective cannot be achieved where the CIT affirms a classification without explaining why the statutory terms are satisfied.

This error is particularly acute because heading 6307 is a catch-all provision. As the agency itself recognizes, such provisions are appropriate only where the merchandise is not more specifically described elsewhere. (Add.112, HRL

51

H243798, at 6; Add.114, 6307 ENs.) By sustaining a basket provision without conducting the required affirmative analysis, the CIT effectively sanctioned classification by default rather than by statutory text.

The rehearing opinion also fails to address whether other provisions—most notably heading 8803—more specifically govern the merchandise based on its established use as aircraft components. Nor does it analyze whether Section XVII Note 3 or GRI 1 foreclose resort to a textile basket provision under these facts. Instead, having concluded that Appellant did not carry its burden, the CIT sustained heading 6307 without independently determining its correctness.

That is precisely what *Jarvis Clark* prohibits. The question on appeal is not merely whether Appellant proved its preferred classification, but whether the CIT performed the independent, text-driven analysis required by the HTSUS. Because it did not—and instead upheld a residual provision by default—its judgment must be reversed.

**B.    The CIT Failed to Properly Apply Its Own Classification Analysis**

Even assuming the CIT properly considered post-importation processing, its classification analysis is legally defective because it failed to apply the correct analytical framework in a consistent and sequential manner. Under the HTSUS, and in particular GRI 2(a), the determination whether an article constitutes a "part" or an unfinished article must be made by comparison to the appropriate reference articles.

That comparison must be applied coherently at each stage of production where the court elects to treat intermediate goods as separately classifiable articles.

The CIT identified the relevant manufacturing sequence as: Segment to needled preform to carbonized preform to densified preform to brake disc. (*See* R. Doc. 67 at 16.) Having determined that the needled preform constitutes a distinct article, the CIT was required to apply its analytical framework consistently across each stage of that manufacturing sequence. It did not do so.

Most fundamentally, the CIT erred by applying the wrong comparator. In assessing whether the needled preform was a "part" or an unfinished article, the court compared it only to the finished brake disc. That is not the relevant inquiry. The needled preform is not processed directly into a brake disc; it is first converted into a carbonized preform. The proper comparison, therefore, is between the needled preform and the carbonized preform. By skipping this intermediate step, the CIT misapplied their own governing analysis.

From there, the CIT should have applied this same analysis sequentially to the carbonized preform and densified preform—*i.e.,* to determine whether each is a part of, or an unfinished version of, the next-stage article. On this point, the Government asserted that the densified preform stage was an unfinished brake disc and is classifiable as an aircraft part pursuant to GRI 2(a). (Add.11, R. Doc. 77 at 11 ("The Government agrees that a carbon-carbon brake disc is classifiable as a finished

53

aircraft part.").) The rehearing opinion contains no such analysis. Instead, the court truncated its review after the needled preform stage.

This CIT's selective application of this analytical framework is inconsistent with the parties' shared recognition that the subpart rule removed any basis for creating "an arbitrary cut-off point whereby products further upstream cannot be considered aircraft parts despite their dedicated use in aircrafts." (R. Doc. 67 at 18 (discussing aircraft brake discs as a potential cut-off point).) Likewise, there is no basis for treating the needled preform, carbonized preform, and densified preform as an arbitrary cut-off point. By analyzing only one intermediate stage—and doing so against the wrong comparator—the CIT effectively introduced the very arbitrariness it purported to reject.

While the CIT recognized the "the segments are finished parts in relation to the needled preform" it continued "the same must also be true for the needled preform (and interim articles upstream from the brake disc) in relationship to the brake disc." (Add.17, R. Doc. 77 at 17.). The CIT cited its failure "to conduct an analysis of the interim articles, beginning with the needled preform" as the basis for its rehearing review. (*Id.*) However, the CIT's limited review of the needled preform stage and failure to review the other preform stages exposes the flaws in its analysis and constitutes reversible error.

Because the CIT applied an incorrect comparator, failed to conduct the required sequential analysis, and did not consistently apply its own stated framework, its classification determination cannot stand. These errors reflect a misapplication of the governing interpretive rules and constitute reversible error.

## CONCLUSION

Honeywell respectfully asks this Court to reverse the judgment below and find that the imported Segments must be classified under heading 8803.

Dated: May 1, 2026

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Wm. Randolph Rucker*
Wm. Randolph Rucker
320 S. Canal Street
Suite 3300
Chicago, IL 60606
Randy.Rucker@FaegreDrinker.com
Phone: (312) 569-1000

Andy Taylor
2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, MN 55402
Andrew.Taylor@FaegreDrinker.com
Phone: (612) 766-7000

*Counsel for Plaintiff-Appellant*

55

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation under Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Federal Circuit Rule 32(b)(1) because the brief contains 12,855 words.

/s/ Wm. Randolph Rucker
Wm. Randolph Rucker
*Counsel for Plaintiff-Appellant*

56

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2026, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service of the brief will be accomplished by the appellate CM/ECF system.

/s/ Wm. Randolph Rucker
Wm. Randolph Rucker
*Counsel for Plaintiff-Appellant*

57

No. 26-1377

*In the*

# United States Court of Appeals
*for the*
# Federal Circuit

Honeywell International Inc.,

Plaintiff-Appellant,

vs.

United States,

Defendant-Appellee.

ON APPEAL FROM THE
UNITED STATES COURT OF INTERNATIONAL TRADE
Case No. 1:17-cv-00256-MAB    Hon. Mark A. Barnett

## APPELLANT'S ADDENDUM

# TABLE OF CONTENTS

**Document**　　　　　　　　　　　　　　　　　　　　　　　　　　**Page**

Opinion and Order Granting Motion for Rehearing, R. Doc. 77 (Nov. 25, 2025)................................................................................................................Add.1

Judgment, R. Doc. 78 (Nov. 25, 2025) ....................................................Add.24

Errata for Slip Op. 25-146, R. Doc. 79 (Nov. 26, 2025) .........................Add.25

HRL 950118 (Dec. 10, 1991) ...................................................................Add.26

HRL 082694 (Apr. 11, 1989)....................................................................Add.30

HRL 964446 (Jan. 15, 2001).....................................................................Add.35

General Rules of Interpretation Explanatory Notes...................................Add.41

HRL 964019 (Dec. 13, 2000) ...................................................................Add.49

World Customs Organization Classification of Certain Forgings for Crank Shafts, Doc. NC0317E1 (Oct. 10, 2000) ...................................................Add.56

HRL 084217 (June 28, 1989) ....................................................................Add.68

NYRL N260676 (Feb. 6, 2015) ................................................................Add.74

NYRL N350641 (July 18, 2025) ...............................................................Add.76

HRL H006327 (Aug. 28, 2007).................................................................Add.80

HRL 967908 (Jan. 24, 2006).....................................................................Add.89

NYRL N220176 (July 5, 2012) .................................................................Add.94

HRL H095037 (May 20, 2010) .................................................................Add.98

HRL H243798 (May 19, 2017) ................................................................Add.107

Heading 6307 Explanatory Notes ............................................................Add.114

i

Slip Op. 25-146

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Mark A. Barnett, Chief Judge <br> Court No. 17-00256 |

## <u>OPINION AND ORDER</u>

[Granting Defendant's motion for rehearing and classifying subject imports under subheading 6307.90.98 of the Harmonized Tariff Schedule of the United States.]

Dated: November 25, 2025

<u>Wm. Randolph Rucker</u>, Faegre Drinker Biddle & Reath, LLP, of Chicago, IL, for Plaintiff Honeywell International, Inc.

<u>Edward F. Kenny</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant United States. On the brief were <u>Yaakov M. Roth</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Aimee Lee</u>, Assistant Director, and <u>Justin R. Miller</u>, Attorney in Charge, International Trade Field Office. Of counsel on the brief was <u>Yelena Slepak</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Barnett, Chief Judge: At issue in this case is the correct classification of certain radial, web, and chordal segments ("the segments") imported by Plaintiff Honeywell International, Inc. ("Honeywell"). Honeywell argues for classification pursuant to subheading 8803.20.00 of the Harmonized Tariff Schedule of the United States ("HTSUS") as "[p]arts of goods of heading 8801 or 8802: . . . [u]ndercarriages and parts thereof," a duty-free provision applicable to parts of aircraft. Defendant United States

("the Government") argues for classification of the segments pursuant to subheading

6307.90.98 of the HTSUS as "[o]ther made up articles, including dress patterns,"

dutiable at seven percent *ad valorem*.[1]  The court previously concluded that the

segments are properly classified pursuant to subheading 8803.20.00.  *See Honeywell*

*Int'l, Inc. v. United States* (*Honeywell I*), 49 CIT __, 756 F. Supp. 3d 1346 (2025).  The

Government seeks reconsideration of that decision.  Def.'s Mem. of Law in Supp. of its

Mot. for Rehearing and for the Ct. to Amend its Findings of Fact and Conclusions of

Law and Make Add'l Ones ("Def.'s Mem."), ECF No. 69.[2]  Plaintiff opposes the motion.

Pl.'s Resp. in Opp'n to Gov't's Mot. for [Rehearing] ("Pl.'s Resp."), ECF No. 70.  The

Government filed a reply.  Def.'s Reply Mem. of Law in Supp. of its Mot. for Rehearing

("Def.'s Reply"), ECF No. 71.  The parties also filed supplemental briefs in response to

the court's questions.  *See* Pl.'s Suppl. Br. in Opp'n to Gov't's Mot. for [Rehearing]

("Pl.'s Suppl. Br."), ECF No. 73; Def.'s Resp. to Pl.'s Suppl. Br. Regarding the Gov't's

Mot. for Rehearing ("Def.'s Suppl. Br."), ECF No. 76.

---

[1] All citations to the HTSUS are to the 2015 version, as determined by the date of importation of the merchandise.  *See LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).

[2] While the Government states that it "moves for rehearing," Def.'s Mem. at 1, the Government filed only a memorandum in support of its motion, and no document titled "motion."  USCIT Rule 7(b)(1)(B) requires "[a] request for a court order" to "be made by motion" that "state[s] with particularity in a single document the grounds for seeking the order and the legal argument necessary to support it."  The rule further states that "[a] separate brief supporting . . . a motion must not be filed unless specifically required by the [c]ourt."  The court construes the Government's memorandum as a motion with the required statement of grounds and legal argument, consistent with Rule 7(b)(1)(B).

Court No. 17-00256                                                                                                          Page 3

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a) (2018).

For the reasons discussed herein, the court will grant the Government's motion, revise

its decision as detailed herein, and enter a new judgment accordingly.

**LEGAL STANDARD**

The Government seeks rehearing pursuant to Rule 59. "The court may, on

motion, grant a new trial or rehearing on all or some of the issues -- and to any party . . .

after a nonjury trial, for any reason for which a rehearing has heretofore been granted in

a suit in equity in federal court." USCIT Rule 59(a)(1)(B). "Although the Rule

references nonjury trial[s], subsection (B) has been expansively read by this Court to

encompass rehearing[s] of any matter[s] decided by the court without a jury." *AD HOC*

*Utilities Grp. v. United States*, 33 CIT 1284, 1285 n.1, 650 F. Supp. 2d 1318, 1321 n.1

(2009) (internal quotation marks and citation omitted) (alterations in original). The court

may also "open the judgment if one has been entered, take additional testimony, amend

findings of fact and conclusions of law or make new ones, and direct the entry of a new

judgment." USCIT Rule 59(a)(2); *see also* USCIT Rule 52(b) (similar).

Reconsideration is appropriate to correct "a significant flaw in the conduct of the

original proceeding" but is not intended "to allow the losing party to reargue its case."

*Acquisition 362, LLC v. United States*, 45 CIT __, __, 539 F. Supp. 3d 1251, 1255–56

(2021), *aff'd*, 59 F.4th 1247 (Fed. Cir. 2023), *cert. denied*, 144 S. Ct. 81 (2023). "The

decision whether to grant reconsideration lies largely within the discretion of the [lower]

court." *Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990).

Court No. 17-00256 Page 4

**BACKGROUND**

The Government's motion for rehearing relies on General Rule of Interpretation ("GRI") 2(a), Def.'s Mem. at 9–17; Def.'s Reply at 3–10, and HTSUS Section XVII Note 3, Def.'s Mem. at 17–18; Def.'s Reply at 10–11. Familiarity with *Honeywell I* is presumed. Below the court recounts the background necessary to resolve the pending motion.

### I. The Segments

"The segments are made from nonwoven polyacrylonitrile ('PAN') fiber fabric material that is cut to a specific shape and size." *Honeywell I*, 756 F. Supp. 3d at 1351. "[T]he segments are arc shaped," *id.* at 1352, "'look and feel like fabric material,' and may be folded or crumpled by hand," *id.* (citations omitted). "The imported segments have part numbers based on the segment type, part names indicating, when appropriate, whether the segment is for use in a stator or rotor disc, and a specified aircraft program use." *Id.* at 1352–53.

"After importation, the segments are first used to produce needled preforms" by "Honeywell's contractor, Bethlehem Advanced Materials, Inc. ('BAM')." *Id.* at 1353. The needled preforms consist of several layers of the segments, with each layer "contain[ing] 'six segments of the same type.'" *Id.* A "needling machine picks and lays the segments in a donut formation" while needling the layers together. *Id.* "The completed needled preform is assigned a serial number." *Id.* BAM then gathers and stacks "multiple needled preforms . . . into a furnace with spacers in between" and applies heat and pressure "for three-and-a-half to four days as part of the carbonization

Court No. 17-00256                                                                                          Page 5

cycle." *Id.* The carbonization cycle results in "a molecular change" such that the preform "is considered a carbon material instead of a PAN material" that is "rigid, solid, and inflexible." *Id.*

The carbonized preforms are further processed by Honeywell. That processing comprises "a densification process involving chemical vapor infiltration (CVI) and [a] chemical vapor deposition (CVD) process which deposits additional carbon on and around the carbonized preform." *Id.* at 1353–54 (citations omitted). "The densification process involves months of cyclical heating in the furnace totaling hundreds of hours, increasing the weight of the preforms. The manufacturing process for a densified carbon-carbon preform 'can take up to six months, with the CVD/CVI densification process being the longest portion of that process.'" *Id.* at 1354 (citations omitted).

Lastly, the densified carbon-carbon preforms are machined into aircraft brake discs. *Id.* The parties agree that an aircraft brake disc is a part of an aircraft braking system, which, in turn, is a part of an aircraft. *Id.* at 1354 & n.7.

## II. The General Rules of Interpretation

The GRIs accompanying the HTSUS govern the court's classification of goods pursuant to the HTSUS. *See RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024). The court "appl[ies] the GRIs in numerical order." *Gerson Co. v. United States*, 898 F.3d 1232, 1235 (Fed Cir. 2018). GRI 1 states that "classification shall be determined according to the terms of the headings and any [relevant] section or chapter notes." When an "imported article is described in whole by a single

Add.5                                                    Add.5                                                    Add.5

classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative." *Gerson*, 898 F.3d at 1235 (citation omitted).

When necessary to resolve classification, the court may consider GRI 2(a), which provides that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article."  Explanatory Note ("EN") (II) accompanying GRI 2(a) states that GRI 2 "appl[ies] to blanks unless these are specified in a particular heading."  EN (II), GRI 2(a) (2015). The EN defines a "blank" as "an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part."[3]  *Id.*  By way of example, the EN references "bottle preforms of plastics being intermediate products having tubular shape, with one closed end and one open end threaded to secure a screw type closure, the portion below the threaded end being intended to be expanded to a desired size and shape."  *Id.*  However, "[s]emi[-]manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as 'blanks.'"  *Id.*

---

[3] Explanatory Notes are not legally binding but "are 'persuasive' and are 'generally indicative' of the proper interpretation."  *Otter Prods., LLC v. United States*, 834 F.3d 1369, 1375 (Fed. Cir. 2016).

Court No. 17-00256                                                              Page 7

When "goods are, *prima facie*, classifiable under two or more headings," GRI 3(a) states that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description."

### III.   Case and Procedural History

At liquidation, Customs classified the segments under subheading 6307.90.98. That subheading describes:

**6307** Other made up articles, including dress patterns:

   **6307.90** Other:

   **6307.90.98** Other.

Subchapter 1 of Chapter 63, which includes heading 6307, "applies only to made up articles, of any textile fabric."  HTSUS Ch. 63 Note 1.  For purposes of heading 6307, "the expression 'made up' means," *inter alia*, "[c]ut otherwise than into squares or rectangles."  HTSUS Section XI Note 7(a) (underline omitted).

"The parties do not dispute that the segments are *prima facie* classifiable in heading 6307," and the court agrees.  *Honeywell I*, 756 F. Supp. 3d at 1363–64. Heading 6307, however, covers articles "which are not included more specifically in other headings of Section XI or elsewhere in the Nomenclature."  EN 63.07.  Honeywell contends that the segments are more specifically described by subheading 8803.20.00. That subheading covers:

**8803** Parts of goods of heading 8801 or 8802:

   **8803.20.00** Undercarriages and parts thereof.

Court No. 17-00256                                                                      Page 8

Heading 8802 covers "Other aircraft (for example, helicopters, airplanes); spacecraft (including satellites) and suborbital and spacecraft launch vehicles." Accordingly, heading 8803 effectively covers parts of aircraft, including parts of airplanes, and establishes a duty-free rate for such parts. *See Honeywell I*, 756 F. Supp. 3d at 1350, 1356. Chapter 88 falls within Section XVII of the HTSUS. References in Chapter 88 to "'parts' or 'accessories' do not apply to parts or accessories which are not suitable for use solely or principally with the articles of those chapters." HTSUS Section XVII Note 3.[4]

The Government's motion raises the question whether the segments are finished parts of an aircraft, or unfinished parts classifiable as a finished part pursuant to GRI 2(a), or neither.[5] In *Honeywell I*, the court concluded that the segments are finished parts of the needled preforms. 756 F. Supp. 3d at 1359–63.[6] The court observed that

---

[4] Additional U.S. Rules of Interpretation 1(c) states similarly that "a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for 'parts' or 'parts and accessories' shall not prevail over a specific provision for such part or accessory."

[5] To some extent, this case implicates "the subpart rule," the rule "that a part of a part is a part for tariff purposes." *Am. Schack Co. v. United States*, 1 CIT 1, 5 (1980). In *Honeywell I*, the court noted that

> [t]he parties agree that the "subpart rule" may apply to articles within the aircraft parts supply chain—no matter how far upstream—provided those articles meet the requirements for a part (or a part of a part, as the case may be) and are not otherwise excluded from classification as a part by relevant section and chapter notes. Oral Arg. at 02:00–03:50 (colloquy with Plaintiff's counsel); *id*. at 45:15–45:39 (colloquy with Defendant's counsel).

756 F. Supp. 3d at 1357–58.

[6] The court used the phrasing "recognizable parts of the needled preforms." *Id.* at 1361. By this phrasing the court meant to convey the finished status of the segments in relation to the needled preforms.

Court No. 17-00256                                                              Page 9

"[t]his case stands apart from other classification cases involving parts of articles."  *Id.* at

1357.  That observation was grounded in the recognition that the segments are

principally, if not solely, "use[d] in the production of aircraft brake discs" yet "undergo

substantial post-importation processing in the manufacturing of needled preforms,

carbonized preforms, carbon-carbon preforms and, finally, aircraft brake discs."  *Id.* at

1358.  The court nevertheless concluded that the need for the additional processing did

not remove the segments from classification as a part.  *Id.* at 1363.

The court further found that the segments are not mere materials for parts.  *Id.*

The court based these findings on the following undisputed facts: (1) "the segments, as

imported, are cut-to-size and identified for the production of a brake disc for a particular

type of aircraft," *id.* at 1361; (2) "[t]he imported segments are used in their condition as

imported to produce the needled preforms that are, thereafter, used in the

manufacturing of aircraft brake discs," *id.*; and (3) "[u]pon importation, the segments are

suitable for use in the needled preforms, requiring no further processing prior to such

use," *id.*  The court concluded that "the segments are dedicated to that use [in needled

preforms] and had no other substantial commercial application."  *Id.* at 1362 & n.19.

Moreover, the court found, "[t]he segments may also be considered integral, constituent,

and component parts of the needled preforms because each of those preforms are

*made from* various combinations of the segments.  Simply put, without the segments,

there would be no needled preforms."  *Id.* at 1362.

The court rejected the Government's argument that "the line separating parts

from raw material is separability from the downstream article."  *Id.*  The court explained

Add.9                                          Add.9                                          Add.9

that, "[i]n *E.M. Chemicals. v. United States*, 13 CIT 849, 851, 858, 728 F. Supp. 723, 725, 730 (1989), *aff'd*, 920 F.2d 910 (Fed. Cir. 1990), the court classified liquid crystals as parts of LCDs when, after importation, the liquid crystals were 'sandwiched between two "plates."'" *Id.* at 1362.

The court also rejected the Government's argument "that the segments constitute mere materials." *Id.* at 1362. The court explained that the segments are distinct from the judicially recognized examples of raw materials that typically constitute imported articles with other commercial uses or do not fix with certainty the identity of the part to be made from the imported article. *Id.* at 1363.

The court further stated: "notwithstanding the post-importation processing that is required as part of the production process, the imported segments are identifiable to the downstream article and are used for no other purpose." *Id.* at 1361. Put differently, the segments are used in their condition as imported (not modified, not cut to size) to produce the needled preforms, and will only ever end up in an aircraft.

The court's conclusion that the segments are classifiable as parts of aircraft prompted the Government's motion for rehearing.

## DISCUSSION

For the reasons discussed herein, the court reconsiders its classification analysis and applies GRI 2(a). The court declines to reconsider its analysis pursuant to Section XVII Note 3.[7]

---

[7] For a brief discussion on Note 3, see *infra* note 18.

Court No. 17-00256                                                                Page 11

## I.    Parties' Contentions

The Government contends that the court addressed GRI 1 and GRI 3(a) but skipped the necessary consideration of GRI 2(a).  Def.'s Mem. at 11.  The Government argues that the court failed to make an explicit finding with respect to whether the segments are finished parts or unfinished parts, and if they are unfinished, whether the segments have the essential character of a finished aircraft part.  *See id.* at 11–13.

The Government also contends that the needled preform "is itself an unfinished article," and the court failed to analyze "whether any of the intermediate articles, *i.e.*, the needled preform, the carbonized preform or the densified carbon-carbon preform, can be considered parts of aircraft or whether any of them are unfinished goods having the essential character [of] a finished good pursuant to GRI 2(a)."  *Id.* at 14; *see also* Def.'s Reply at 5.  The Government agrees that a carbon-carbon brake disc is classifiable as a finished aircraft part.  Def.'s Reply at 2.  The Government also acknowledges that "the densified carbon-carbon preform, which has the essential characteristics of the carbon-carbon brake disc," would likewise be classifiable as an aircraft part pursuant to GRI 2(a).  *Id.*  The problem, according to the Government, is that neither the segments nor the needled preforms have the essential character of the brake disc.  *Id.* at 6.

Plaintiff responds that the court properly declined to analyze the segments under GRI 2(a) because the court correctly concluded that the segments are finished parts. Pl.'s Resp. at 4.  Plaintiff did not, however, address the Government's arguments regarding application of a parts analysis to the "intermediate articles."  *See* Pl.'s Resp. at 3–9.

Court No. 17-00256                                                                                          Page 12

The court understands the Government to argue that, for the segments, there are two avenues to classification as a part of an aircraft. One avenue is through GRI 2(a) *provided* the segments have the essential character of the finished part, i.e., the aircraft brake disc. *See* Def.'s Mem. at 9–12, 16–17. The other avenue is through application of the subpart rule, but for that to apply, Defendant contends, the court must find each part in the production chain to constitute either 1) a finished part, or 2) an unfinished part having the essential character of a finished part (of a part, as the case may be). For this latter path, the Government contends that additional findings are necessary to apply that rule, *see id.* at 14–15, and it further contends that the segments do not meet the requirements for either path.

Because Plaintiff did not respond to the Government's arguments regarding analysis of the intermediate articles, the court ordered supplemental briefing on that point. Order (June 23, 2025), ECF No. 72. The court noted that, at oral argument, "Plaintiff argued that whether the segments are considered parts of the needled preforms or parts of the aircraft brake discs is 'a distinction without a difference' after application of the subpart rule" and directed Plaintiff to "present further argument on this issue and identify undisputed material facts and legal support for its assertion or explain any change in Plaintiff's position." *Id.* at 2 (citation omitted).

In its supplemental brief, Honeywell first argues that the court "must" disregard the Government's arguments regarding application of a parts analysis to the intermediate articles because those arguments are untimely. Pl.'s Suppl. Br. at 3. On the merits, Plaintiff argues that "*the intermediate articles are themselves*

*indistinguishable from the Brake Discs*, which both parties agree is a part of an aircraft." *Id.* at 4. Thus, according to Plaintiff, no further analysis is required because "the preforms are just different stages of the brake disc production, rather than distinct entities requiring a separate 'parts' analysis." *Id.* at 2; *see also id.* at 3.

Honeywell further avers that, if the court applies a GRI 2(a) analysis to the needled preform, of which the segments are a part, the court should find that the needled preforms may be considered "blanks" as discussed in the Explanatory Notes "and properly considered to be unfinished brake discs" because they "have the approximate size and shape of the finished brake disc." *Id.* at 5–6; *see also id.* at 7 ("Since the preforms resemble the finished brake discs (same shape/size) and are used solely in the manufacture of brake discs, they are unfinished brake discs classified in heading 8803 as parts of airplanes.").

The Government responds that the court should not find forfeiture of its arguments based on the court's "mandate to 'reach a correct result." Def.'s Suppl. Br. at 2 n.1 (quoting *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878 (Fed. Cir. 1984)). The Government also relies on 28 U.S.C. § 2643(b), *id.*, which permits "rehearing for all purposes."[8] The Government argues that the segments "require extensive manufacturing and sequential transformation into three unique intermediate articles

---

[8] Section 2643(b) states: "If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."

before being finished into a carbon-carbon brake disc," and that "the essential characteristics of the finished carbon-carbon brake disc are acquired only upon the completion of the densified carbon-carbon preform stage of manufacturing." Def.'s Suppl. Br. at 3. Defendant contends that the intermediate articles are indeed distinguishable from the brake discs and Plaintiff's reliance on "size and shape" to argue that the needled preform has the essential character of the brake disc is misplaced. *Id.* at 4–5. Size and shape are not enough, the Government argues, because the essential characteristics of the brake discs include "high strength, thermal capabilities, heat transfer and absorption, and friction generation." *Id.* at 5 (quoting *Honeywell I*, 756 F. Supp. 3d at 1354).

Defendant further avers that Plaintiff's reliance on "blanks" overlooks that the EN does not replace the "essential character" requirement with something less. *Id.* at 6. The Government contends that "even if as entered, the segments are a part of the needled preform or the carbonized preform, neither the segments nor the intermediate articles have the 'essential character of the complete or finished' densified carbon-carbon aircraft brake disc as required by the plain terms of GRI 2(a)." *Id.* at 7.

## II. The Court Reconsiders Its Classification Analysis

As an initial matter, the court will consider Defendant's arguments for reconsideration based on an analysis of the intermediate articles. From the outset, this case has differed "from other classification cases involving parts of articles." *Honeywell I*, 756 F. Supp. 3d at 1357. That is because, as a factual matter, the segments appear to share characteristics of both parts and raw materials. The segments are like parts

because they are dedicated for use in, and are integral to, the manufacturing of needled preforms and, ultimately, aircraft brake discs, and are imported in a condition suited for that use.  *See id.* at 1359.  The segments are also like raw materials.  Although they are unlike the factual scenarios in which courts have found articles to constitute raw materials, they are imported upstream in the production process before undergoing substantial post-importation processing, including a change at the molecular level, resulting in several identifiable (intermediate) articles before the final product.  *See id.* at 1360–63 (discussing case law distinguishing parts from raw materials and applying that precedent to the segments).  Neither the tariff schedule nor the relevant caselaw provided clear guidance in this scenario.

Additionally, the purpose of the doctrine of forfeiture is to ensure that courts have the benefit of parties' positions on all salient issues.  *See, e.g.*, *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (discussing the adversarial system); *Royal Brush Mfg., Inc. v. United States*, 44 CIT __, __, 483 F. Supp. 3d 1294, 1305 n.19 (2020) (declining to find an argument forfeited when the plaintiff "could have been more explicit" with its arguments but "the parties' briefing [was] sufficient for the court to address the competing arguments").  After receiving the parties' briefs (and supplemental briefs) on the issues raised by Defendant's motion for rehearing, the court has the benefit of the parties' complete views on the application of the subpart rule to the intermediate articles.  Thus, the court declines to find forfeiture of any salient arguments.

Turning to the merits, the court previously placed the segments within the category of a finished part of the needled preform and not within the category of raw

materials. *See Honeywell I,* 756 F. Supp. 3d at 1361–63. For the reasons discussed in

*Honeywell I,*[9] the court sees no reason to reconsider *that* decision.[10]

But as the Government articulates well in its motion for rehearing, that is not the

end of the inquiry. The needled preforms are not a finished "part" of an aircraft. "A

'finished' good is one that is suitable for its ultimate 'intended use.'" *Pleasure-Way*

*Indus., Inc. v. United States*, Slip Op. 16-100, 2016 WL 6081818, at *3 (CIT Oct. 18,

2016), *aff'd*, 878 F.3d 1348 (Fed. Cir. 2018) (quoting *United States v. J.D. Richardson*

*Co.*, 36 C.C.P.A. 15, 18 (1948)).[11] That is why, as the parties agree, an aircraft brake

disc may be classified as a part of an aircraft braking system and, in turn, a part of an

aircraft. The needled preforms, however, are not finished because, unlike the segments

that are needled together to produce the preform, the preforms (both needled and

carbonized) are not suitable for their intended use and, instead, must undergo

---

[9] Those reasons include the court's reliance on *E.M. Chemicals* to reject the
Government's attempt to impose a separability requirement on a finished part.
*Honeywell I*, 756 F. Supp. 3d at 1362. In briefing its grounds for rehearing, the
Government does not address *E.M. Chemicals* or the court's reliance on that decision.

[10] The Government criticized the court's failure to consider the fact that the contract
between BAM and Honeywell in some instances refers to the segments as raw
materials. *See* Def.'s Mot. at 5 n.2. But as Plaintiff has pointed out, use of that
terminology is inconsistent insofar as the contract documents also use the terms "part"
and "segment." *See* Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 8,
ECF No. 60. The court relied instead on judicial precedent discussing and
distinguishing parts and raw materials and applied that precedent to the undisputed
material facts. *See Honeywell I*, 756 F. Supp. 3d at 1359–63.

[11] The segments are suitable for their ultimate intended use, namely, the production of
the needled preforms. *Honeywell I*, 756 F. Supp. 3d at 1353. That the needled
preforms are not the final downstream product does not mean that the segments are not
a finished good suitable for their intended use because the subpart rule can be applied
to upstream components.

Court No. 17-00256                                                                Page 17

substantial additional processing. *Honeywell I*, 756 F. Supp. 3d at 1353–54. The court

thus reconsiders the implications of the additional processing on the requisite analysis.

It is true, as the court previously found, that the "segments are identifiable to the

downstream article," namely, the brake discs, "and are used for no other purpose." *Id.*

at 1361. It is also true that "[r]ecognition of the imported merchandise as a part is not

precluded simply because the article of which the import *is* a part undergoes further

processing *provided* the import meets the requirements for classification as a part, is not

mere material for a part, and is not excluded by operation of the section and chapter

notes." *Id.* at 1363. Meeting the requirements for a part, however, requires an article to

be a finished part or to meet the requirements for an unfinished part pursuant to GRI

2(a) when the terms of the relevant heading expressly include parts.[12] While the court

continues to find that the segments are finished parts in relation to the needled preform,

the same must also be true for the needled preform (and interim articles upstream from

the brake disc) in relationship to the brake disc. Thus, the court erred in failing to

conduct an analysis of the interim articles, beginning with the needled preform.

---

[12] The court previously questioned the application of GRI 2(a) to subparts because although the rule references an "article" named in a heading (relevant here, in heading 8803, the "part" of an aircraft), it does not reference "subparts." *Honeywell I*, 756 F. Supp. 3d at 1358 n.16. Therein, the court did not intend to convey doubt as to whether GRI 2(a) applies generally to a part. *See* Def.'s Mem. at 15 (arguing that when a heading refers to a part, "GRI 2(a) applies" to that part). Moreover, upon further consideration, the court sees no reason to disregard GRI 2(a) in the analysis of upstream parts and subparts thereof to determine whether the imported article is classifiable under heading 8803.

To that end, Plaintiff makes no argument that the needled preform is a finished

part. *See* Pl.'s Suppl. Br. at 1 (stating that preforms are "not a separate 'part' with a

distinct commercial identity that is separately classifiable in the HTSUS"); *id.* at 2

(similar). Plaintiff argues instead that a needled preform may be considered a "blank"

classifiable as an unfinished aircraft brake disc pursuant to GRI 2(a). *Id.* at 6. Plaintiff

also appears to argue that the needled preforms have the essential character of the

aircraft brake disc in terms of the preform's size and shape. *Id.* at 6–7.[13] The

Government argues that size and shape are not enough and that blanks must also have

the essential characteristics of the finished article. Def.'s Suppl. Br. at 5–6.

As previously discussed, the essential "characteristics of brake discs includ[e]

high strength, thermal capabilities, heat transfer and absorption, and friction

generation." *Honeywell I*, 756 F. Supp. 3d at 1354. Accordingly, the terms of GRI 2(a)

alone do not suffice to classify the needled preforms as a finished aircraft part.

Similarity in size and shape are not enough, and Plaintiff does not argue that the

needled preforms have the essential characteristics of an aircraft brake disc.[14] The

---

[13] Plaintiff does not argue that the needled preforms have the essential character of the carbonized preform. Moreover, facts regarding the essential characteristics of any interim article upstream from the brake disc are not before the court. Similarly, Plaintiff does not argue that each such interim article is an identifiable part as to which the subpart rule applies. Pl.'s Suppl. Br. at 2–3.

[14] Such an argument would likely fail in light of the undisputed facts that are before the court. As discussed above and in *Honeywell I*, the needled preforms undergo a molecular change after several days of applied heat and pressure. 756 F. Supp. 3d at 1353. The preforms shrink in size, lose roughly half their weight, and, instead of exhibiting a fabric-like quality, they become rigid, solid, and inflexible. *Id.* Those carbonized preforms then undergo a months-long densification process to become densified carbon-carbon preforms. *Id.* at 1353–54.

Court No. 17-00256                                                                    Page 19

remaining question, however, is whether the needled preforms are "blanks" pursuant to

EN (II), GRI 2(a).

> As stated above:

> The provisions of [GRI 2(a)] also apply to blanks unless these are specified in a particular heading. The term "blank" means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part.

EN (II), GRI 2(a).[15]  The case law provides little guidance on this EN.  Two related

cases cited by Plaintiff appear to constitute the universe of cases discussing blanks.

*See* Pl.'s Suppl. Br. at 4–5.

In the cited cases, certain crankshaft blanks were classifiable as finished

crankshafts when further processing was performed but "nothing [was] added" to the

blanks "to make them finished crankshafts," *Cummins Engine Co. v. United States*

(*Cummins I*), 23 CIT 1019, 1030–31, 83 F. Supp. 2d 1366, 1376 (1999) (citation

omitted); *see also Cummins Inc. v. United States* (*Cummins II*), 29 CIT 525, 542–43,

377 F. Supp. 2d 1365, 1380–81 (2005), *aff'd*, 454 F.3d 1361 (Fed. Cir. 2006)

(addressing similar facts).[16]  The court concluded that the unfinished crankshafts were

---

[15] The phrase "unless these are specified in a particular heading" requires little consideration for this case.  Neither party addresses the meaning of this phrase. However, the phrase suggests that an article classified elsewhere in the HTSUS may not be classified as a "blank."  The court need not further address this language because unlike the segments that are described by heading 6307, neither party proffers an alternative classification for the needled preforms.

[16] *Cummins I* and *Cummins II* address whether crankshafts imported into Mexico from Brazil were entitled to NAFTA preferential treatment upon importation into the United States as a product of Mexico based on a "tariff shift" in Mexico that was "required [for

classifiable as finished crankshafts even though fourteen different machining operations were performed on the products after importation. *See Cummins I*, 23 CIT at 1021, 83 F. Supp. 2d at 1368; *Cummins II*, 29 CIT at 526 n.2, 377 F. Supp. 2d at 1367 n.2. The court did not, however, address whether the essential character requirement of GRI 2(a) applied to a product that otherwise constituted a blank pursuant to the EN. *See, e.g.*, *Cummins I*, 23 CIT at 1030, 83 F. Supp. 2d at 1376 (summarizing the parties' arguments regarding the essential characteristics of a finished crankshaft and then finding the unfinished crankshafts to constitute blanks pursuant to the EN).

The Government's position that the language regarding blanks in the EN does not obviate the requirement for an unfinished article or part to have the essential characteristics of the finished article, Def.'s Suppl. Br. at 6, appears to be correct. While the *Cummins I* court did not resolve the competing arguments about the crankshaft's essential characteristics, the opinion is consistent with Defendant's position insofar as the processing involved machining operations, i.e., alterations to the size and shape, rather than more significant changes to the product's characteristics. *See* 23 CIT at 1021, 83 F. Supp. 2d at 1368. The concept of a blank applies to a type of intermediate product that is imported, perhaps *en masse*, for final finishing operations particular to the desired end product. The example of a bottle preform made of plastic where "the portion below the threaded end being intended to be expanded to a desired size and

---

the crankshafts] to be deemed goods originating from a NAFTA country." *See, e.g.*, *Cummins I*, 23 CIT at 1020, 83 F. Supp. 2d at 1367. Determining whether a tariff shift occurred required application of the GRIs and other relevant rules of the HTSUS. *See id.* at 1022–23, 83 F. Supp. 2d at 1370.

shape" is indicative of a product composed of the final constituent material (plastic) with the "approximate shape or outline of the finished article or part" that requires some "completion into the finished article."  EN (II), GRI 2(a).  The completion required in the provided example is minimal, or at least well short of what occurs to transform a needled preform into an aircraft brake disc—otherwise the product would not be a "blank," it would be something else.[17]  Thus, the inclusion of blanks in the ENs does not limit the essential character requirements to similarities in size and shape to the exclusion of other material considerations.  Rather, the language regarding blanks explains the application of GRI 2(a) to one type of imported article with an approximate size and shape of the finished article that is subsequently processed to the "desired size and shape."  *See id.*

This understanding of a blank as a product that undergoes finishing operations is consistent with at least one dictionary definition.  *Merriam Webster*, for example, defines a blank, *inter alia*, as "a piece of material prepared to be made into something (as a key) by a further operation."  *Blank*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004).  A "blank" key is a key, but one that requires some machining to become a finished key shaped for a specific lock.  Likewise, a bottle preform is functionally a bottle that is

---

[17] For example, "[s]emi[-]manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as 'blanks.'"  EN (II), GRI 2(a).  For such semi-manufactures, the more significant additional work necessary to shape the bar, disc, or tube, removes the article from the provision for a blank.  This distinction articulated in the ENs between a semi-manufacture and a blank supports the notion that a blank is *not* something that undergoes substantial processing.

further processed to the desired shape. Neither example suggests that the needled preforms are properly considered "blanks" in relation to the aircraft brake disc. Simply put, a needled preform is not a "blank" aircraft brake disc ready to be processed into the "desired size and shape" of an aircraft brake disc. Instead, it must first undergo a days-long molecular change while being processed into a carbonized preform, after which a months-long densification process converts the carbonized preform into a densified carbon-carbon preform. *See Honeywell I*, 756 F. Supp. 3d at 1353–54. Such extensive processes are not akin to the machining processes discussed above.

Insofar as the needled preforms are not classifiable as a part of an aircraft brake disc, neither are the segments, regardless of the fact they may be considered parts of the needled preform. Accordingly, the court reconsiders its decision to classify the segments under heading 8803. In the absence of any other suitable provision, the segments are properly classified under heading 6307, and, thereafter, under subheading 6307.90.98 of the HTSUS.[18]

---

[18] While not necessary to the court's decision herein, for the sake of completeness, the court disagrees that Section XVII Note 3 is a separate or additional basis for reconsidering *Honeywell I*. Contrary to the Government's arguments, Note 3 operates to exclude certain goods from classification as "parts" or "accessories." Note 3 does not supply a particular definition for "parts," but rather excludes from classification those parts that are "not suitable for use solely or principally with the articles of those chapters." The principal use considerations reflected in Note 3 are further evidenced by the Explanatory Notes. Section XVII Explanatory Note (III)(B) (2015), governing the "[c]riterion of sole or principal use" for parts and accessories, provides guidance on the proper classification of articles that are parts or accessories of articles falling within Section XVII and another Section, or falling within two or more headings of Section XVII. Note 3 does not govern the court's consideration of the underlying question about whether an article is a part; for that, the court looks to the judicially established tests

Court No. 17-00256 Page 23

**CONCLUSION AND ORDER**

Plaintiff has not carried its burden of proving that Customs' classification of the

segments was incorrect, either independently or in comparison to Plaintiff's proffered

alternative. *See Jarvis Clark*, 733 F.2d at 876–78. Additionally, the court finds that the

imported segments must be classified under heading 6307. The court **GRANTS** the

Government's motion for rehearing and, not, its motion for summary judgment. A new

Judgment will be entered accordingly.


/s/ Mark A. Barnett
Mark A. Barnett, Chief Judge


Dated: <u>November 25, 2025</u>
New York, New York

---

(and, as set forth above, GRI 2(a)). *See Honeywell I*, 756 F. Supp. 3d at 1359–60.
Thus, Note 3, taken in isolation, does not preclude classification of the segments as
parts of aircrafts. *See id.* at 1362 & n.19 (discussing sole or principal use of the
segments).

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| HONEYWELL INTERNATIONAL, INC., | |
| Plaintiff, | |
| v. | Before: Mark A. Barnett, Chief Judge |
| | Court No. 17-00256 |
| UNITED STATES, | |
| Defendant. | |

### JUDGMENT

This case having been duly submitted for rehearing, and the court, after due deliberation, having rendered a decision herein, now therefore, in conformity with said decision, it is hereby

**ORDERED** that Defendant's motion for rehearing (ECF No. 69) is **GRANTED**; it is further

**ORDERED** that the prior judgment (ECF No. 68) is **REOPENED**; it is further

**ORDERED** that judgment is entered for Defendant; and it is further

**ORDERED** that Plaintiff's merchandise is correctly classifiable under subheading 6307.90.98 of the Harmonized Tariff Schedule of the United States.

/s/     Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: November 25, 2025
   New York, New York

**ERRATA**

*Honeywell International, Inc. v. United States*, Court No. 17-00256, Slip Op. 25-146, dated November 25, 2025:

> Page 23, line 6: change "not" to "now" in the sentence "The court **GRANTS** the Government's motion for rehearing and, . . . ."

November 26, 2025

HQ 950118

December 10, 1991

CLA-2 CO:R:C:M  950118 LTO

CATEGORY:  Classification

TARIFF NO.:  8603.10.00

Mr. Carlo Bruzzone
Bruzzone Shipping, Inc.
132 Nassau Street
New York, New York 10038

RE:  Railway cars; 8607.99.50; GRI 2(a); HQ 084845; HQ 086555; EN
     86.03; EN to Section XVII, Chapter 86; American Import Co.
     v. United States

Dear Mr. Bruzzone:

     This is in response to Ms. Graciela Bruzzone's letter of
August 9, 1991 to this office, requesting the classification of
subway cars under the Harmonized Tariff Schedule of the United
States (HTSUS).

FACTS:

     The transit cars, 100 of which are to be delivered to the
Washington Metropolitan Area Transit Authority (WMATA), are
composed of two distinct carbody sections called "married pairs"
("A" and "B").  When the two sections are joined together they
form one operational passenger railcar.  The initial delivery
consists of four prototype cars (two "A" carbodies and two "B"
carbodies).  They will be shipped in operating condition, except
for minor disassembly needed for shipping purposes.  The importer
states that the "A" carbody and the "B" carbody may be shipped
together on the same vessel or may be shipped separately on
different vessels.

     The other 96 units will be shipped partially assembled.
49.72 percent of the carbodies' constituent parts will be
assembled in Italy.  This assembly includes the structural shell,
windows, doors, underframe, interior lighting and fixtures, air
diffuser ducting, and wiring and tubing for connection to the
electrical and mechanical components.  The balance of 50.28
                          - 2 -

percent of the constituent parts, to be completed in the United
States, includes the Westinghouse Electric Co. (Welco) propulsion

system and ATC equipment, the Westinghouse Air Brake Co. (Wabco) brake equipment and couplers, the Stone Safety Co. air-conditioning system, the Midwest/Harmon intercommunication radio system, the Standard Steel Co. wheel assembly, Teperman seats, Timken bearings, and Sofer Co. trucks.  The final assembly of these vehicles will be performed at a facility located in Harrison, New Jersey.

The transit cars are powered by electrical energy received from a stationary external source.  The "A" and "B" carbodies consist of different equipment and must be joined together to be operational.  The separate cars do not function as self-propelled railcars.

ISSUE:

Situation number one:  Whether the subject "married pairs" of railcars, when imported on the same ship, are classifiable under subheading 8603.10.00, HTSUS, which provides for "[s]elf-propelled railway . . . coaches . . . [p]owered from an external source of electricity."

Situation number two:  Whether the subject "married pairs" of railcars, when imported on separate ships, are classifiable under subheading 8603.10.00, HTSUS, or under subheading 8607.99.50, HTSUS, which provides for "[p]arts of railway or tramway locomotives or rolling stock . . . [o]ther . . . [o]ther."

Situation number three:  Whether the partially assembled railcars are classifiable under subheading 8603.10.00, HTSUS, or under subheading 8607.99.50, HTSUS.

LAW AND ANALYSIS:

The General Rules of Interpretation (GRI's) to the HTSUS govern the classification of goods in the tariff schedule.  GRI 1 states, in pertinent part:

> ...classification shall be determined according to the terms of the headings and any relative section or chapter notes...

Heading 8603, HTSUS, provides for "[s]elf-propelled railway or tramway coaches, vans and trucks, other than those of heading

- 3 -

8604."  Subheading 8603.10.00, HTSUS, provides for railway cars "[p]owered from an external source of electricity."  The Harmonized Commodity Description and Coding System Explanatory Note (EN) 86.03, pg. 1415, HTSUS, states that "[t]hese vehicles may be designed to travel singly, or to be coupled to one or more vehicles of the same type, or to one or more trailer vehicles."

Situation number one describes the importation of complete "A" and "B" cars, or "married pairs," on the same ship.  These "married pairs" must be joined together to be operational.  When together, the "married pairs" are powered from a stationary

external source, and are, thus, classifiable under subheading 8603.10.00, HTSUS.

Situation number two describes the importation of complete "A" and "B" cars when imported on separate ships.  Situation number three describes the importation of unassembled carbodies that will be completed in the United States.  49.72 percent of the carbodies' constituent parts will be assembled in Italy. This assembly consists of the structural shell, windows, doors, underframe, interior lighting and fixtures, air diffuser ducting, wiring and tubing for connection to the electrical and mechanical components.  The balance of 50.28 percent of the constituent parts, to be completed in the United States, includes the propulsion system, ATC equipment, brake equipment, couplers, air-conditioning system, intercommunication radio system, wheel assembly, seats, bearings, and trucks.

General Rule of Interpretation (GRI) 2(a) states that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." Moreover, the Explanatory Notes to Section XVII, Chapter 86, pg. 1414, state that "[i]ncomplete or unfinished vehicles are classified with the corresponding complete or finished vehicles, provided they have the essential character thereof."  For an item to have the essential character of the finished product, it must be recognizable as such a product.  In determining an article's essential character, one must look to the merchandise in question--as it changes, so too may the factors which determine its essential character.  Factors found to be relevant in other contexts include the significance of the imported components or their role in relation to the use or overall functioning of the complete article and, to the extent that it validates the comparison, the cost or value of the complete article versus the cost or value of the imported components.  See HQ 084845, dated November 24, 1989; HQ 086555, dated April 16, 1990.

- 4 -

A complete railway or tramway passenger coach is a wheeled rail vehicle designed to carry passengers for travel.  As designed, a complete coach would ordinarily consist of a structural shell outfitted with seats and other customary furnishings relative to passenger comfort and convenience, an underframe and trucks to support the shell, wheels, axles, brakes, electric subassemblies, and the mode of propulsion.

In situation number two, the "A" and "B" cars are recognizable as a complete railway passenger car.  The "married pairs" each contain all of the above components, and must only be joined together to complete the finished product.  Thus, the cars have the essential character of "[s]elf-propelled railway . . . coaches . . . [p]owered from an external source of electricity," and are classifiable under subheading 8603.10.00, HTSUS.

In situation number three, noting the list of components, the incomplete or unfinished railcar also has the essential

character of a "[s]elf-propelled railway . . . coach[] . . . [p]owered from an external source of electricity," which is classifiable under subheading 8603.10.00, HTSUS.  The term "unfinished" was defined in American Import Co. v. United States, 26 CCPA 72, 74, T.D. 49612 (1938), wherein the court stated:

> It has long been the generally accepted rule that a thing may be classified for tariff duty purposes under the eo nomine provision for the article unfinished if that thing has been so far processed towards its ultimate completed form as to be dedicated to the making of that article or class of articles alone.

In the instant case, the absence of the parts added in the United States does not detract from the railcar's identity as a self-propelled railway passenger car.  The unassembled carbodies are clearly dedicated to the making of the complete article.  They possess the aggregate of distinctive component parts which identify the components in general as a wheeled rail vehicle.  Thus, the railcars described in situation number three are also classifiable under subheading 8603.10.00, HTSUS.

The importer contends that the railcars described in situation number three are classifiable under subheading 8607.99.50, HTSUS, which provides for "[p]arts of railway or tramway locomotives or rolling stock . . . [o]ther . . . [o]ther."  However, according to GRI 2(a) and the Explanatory Notes to Section XVII, Chapter 86, pg. 1414, an article cannot be classified as a part of an item if it has the "essential character" of a finished product described in another heading.

- 5 -

HOLDING:

The railcars, described in situations one, two, and three, are classifiable under subheading 8603.10.00, HTSUS, which provides for "[s]elf-propelled railway . . . coaches . . . [p]owered from an external source of electricity."  The applicable rate of duty for these articles is 6.3% ad valorem.

Sincerely,


John Durant, Director
Commercial Rulings Division

HQ 082694

April 11 1989

CLA-2 CO:R:C:G 082694 JLJ  830383

CATEGORY: Classification

TARIFF No.: 4418.50.0040

Mr. Kevin R. Redl
Secretary/Treasurer
Anglo-American Cedar Products Ltd.
33286 S. Railway Avenue
Mission, British Columbia V2V 4M6
Canada

RE: Classification of Red Cedar "Short Boards"

Dear Mr. Redl:

    You requested a tariff classification ruling for Western red cedar "short boards" imported from Canada.  You submitted samples of a "short board," an 18 inch shingle and an 18 inch "Certigroove Shake" along with your request.

FACTS:

    The  product at issue is Western red cedar "short boards." The boards are 5/8 to 1-1/4 inches thick, 18 inches or 24 inches in length, and in random widths.  In a conversation with our New York office you stated that the short boards are manufactured on a vertical circular saw, the same equipment used to manufacture shingles.  The short boards are made from Western red cedar logs or blocks normally used to make shakes and shingles.

    The instant short boards will be used exclusively to make shingles.  The short boards are one step away from being complete shingles.  In the United States, the boards will be sawn diagonally across the thickness to produce two shingles per board (or, in some cases, four shingles).  You stated that some of the shingles are further manufactured into the machine grooved shakes known as "Certigroove Shakes."  We note that our best information indicates that, in the normal course of manufacturing shingles, short boards are not produced.  The shingles are sawn directly from cedar logs or blocks.

-2-

ISSUE:

Are the instant short boards classified as unfinished shakes or shingles?

LAW AND ANALYSIS:

The Harmonized Tariff Schedule of the United States Annotated (HTSUSA) replaced the Tariff Schedule of the United States (TSUS) on January 1, 1989. Under General Rule of Interpretation 2(a), HTSUSA, "Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article...." Under predecessors to this rule, it has been held that where a provision contains no qualifying words or phrases to indicate whether or not a completely finished article is to be classified thereunder, it includes an article which has been advanced to the point where its use as the article provided for is made clear, or its utility for any other purpose has been destroyed. Waltham Watch Co. v. United States, (Jaeger Watch Co. Inc., Party in Interest), 25 CCPA 330, T.D. 49425 (1938); Oxford University Press, N.Y., Inc. v. United States, 20 Cust. Ct. 78, C.D. 1088 (1948); Norge Division Borg-Warner Corp. v. United States, 44 Cust. Ct. 121, C.D. 2164 (1960); F.W. Myers & Co., Inc. v. United States, 57 CCPA 87, C.A.D. 982 (1970).

A thing may be classified for tariff purposes under an eo nomine provision for the article if that thing has been so far processed toward its ultimate completed form as to be dedicated to the making of that article or that class of articles or has been so far advanced beyond the stage of materials as to be dedicated to and commercially fit only for use as the particular article. American Import Co. v. United States, 26 CCPA 72, T.D. 49612 (1938); Finn Bros., Inc. v. United States, 59 CCPA 72, C.A.D. 1042 (1972); John V. Carr & Son, Inc. v. United States, 72 Cust. Ct. 19, C.D. 4500 (1974); Avins Industrial Products Co. v. United States, 62 CCPA 83, C.A.D. 1150 (1975).

In Doherty-Barrow of Texas, Inc. v. United States, 3 CIT

228, Slip Op. 82-47 (1982), it was held that steel strip so advanced as to be dedicated for use in making steel cotton bale ties, incapable of other commercial or practical use, and requiring only to be cut to length, was classified as bale ties made from strip rather than as strip of iron or steel, since the individual character and identity of the merchandise had been fixed with certainty.

-3-

The instant short boards have been so advanced as to be dedicated for use in making shakes or shingles.  They are incapable of other commercial use and are used only to make shakes or shingles.  They require only diagonal sawing to make shingles.  The short boards meet the requirements of unfinished shingles and shakes.

The short boards are classified as incomplete or unfinished articles which have the essential character of the finished shingles.  The HTSUSA subheading applicable to the short boards is 4418.50.0040, which provides for shingles and shakes, of red cedar, dutiable at the rate of 20 percent ad valorem under HTSUSA subheading 9903.44.10.

HOLDING:

The short boards are unfinished shingles and shakes.  They are classified in subheading 4418.50.0040, HTSUSA.

Sincerely,

John Durant, Director
Commercial Rulings Division

6cc: A.D. N.Y. (NIS-230)
1cc: John Durant
JLJohnson:tj:typed 08/24/88

HQ 964446

January 15, 2001

CLA-2 RR:CR:TE  964446  jsj

CATEGORY: Classification

TARIFF NO.: 4407.10.0068

Mr. Kevin R. Redl
Secretary – Treasurer
Anglo-American Cedar Products Ltd.
7160 Beatty Street
Mission, British Columbia
Canada V2V 4M6

Re: Reconsideration of HQ 082694; Western Red Cedar "short
    boards"; Subheadings 4407.10.0068 and 4418.50.0010; General
    Rule of Interpretation 2 (a); Unfinished shakes and shingles.

Dear Mr. Redl:

The purpose of this correspondence is to advise you that the United States Customs Service has reconsidered Headquarters Ruling Letter 082694 issued to Anglo-American Cedar Products Ltd. (Anglo-American) on April 11, 1989.  The article in issue in HQ 082694 was Western Red Cedar "short boards."

The Customs Service classified Western Red Cedar "short boards" in HQ 082694 in subheading 4418.50.0040[1] of the Harmonized Tariff Schedule of the United States (HTSUS).  It is the conclusion of the Customs Service, subsequent to a review of HQ 082694, that the classification of Western Red Cedar "short boards" in subheading 4418.50.0040 was incorrect.  The correct subheading is 4407.10.0068, HTSUS.

Pursuant to section 625 (c), Tariff Act of 1930, as amended,19 U.S.C. 1625 (c), notice of the proposed revocation of HQ 082694 was published on November 15, 2000, in the Customs Bulletin, Volume 34, Number 46.  During the notice and comment period, Customs received three comments.  The initial comment addressed

---

[1] The statistical suffix has changed since 1989.  HTSUS subheading 4418.50.0040 as it appeared in 1989 is currently 4418.50.0010.

countervailing duty issues involving Canadian lumber imports, but was non-responsive to the issue of Customs proposed classification. The second comment disagreed with Customs proposed classification, but did not provide support for the position asserted. The principle focus of the second comment was perceived problems with the United States – Canada Softwood Lumber Agreement. The third comment received supported the position of the Customs Service and offered legal analysis.

The Customs Service, subsequent to reviewing the comments and pursuant to the following analysis, is revoking HQ 082694.

FACTS

The articles in issue, identified as Western Red Cedar "short boards", were described in HQ 082694 as "boards...5/8 to 1-1/4 inches thick, 18 inches or 24 inches in length, and in random widths."

ISSUE

Are the articles in issue, identified as Western Red Cedar "short boards", unfinished shakes or shingles pursuant to General Rule of Interpretation 2 (a) ?

LAW AND ANALYSIS

The classification of imported merchandise pursuant to the Harmonized Tariff Schedule of the United States is governed by the General Rules of Interpretation (GRI). GRI 1 provides that classification decisions are to be "determined according to the terms of the headings and any relative section or chapter notes." GRI 1 further provides that merchandise which can not be classified in accordance with the dictates of GRI 1 should be classified pursuant to the other General Rules of Interpretation in their sequential order.

The principal HTSUS subheadings considered by the Customs Service in rendering this reconsideration were: (1) 4407.10.0068; and (2) 4418.50.0010. Subheading 4407.10.0068 provides:

4407  Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or finger-jointed, of a thickness exceeding 6mm:

4407.10.00   Coniferous

2

4407.10.0068        Other:
                              Not treated:
                                    Other:
                                          Western red cedar:
                                                Rough[2].

Subheading 4418.50.0010 provides:

4418   Builders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes:

   4418.50.00    Shingles and shakes

      4418.50.0010    Shingles:
                                    Of western red cedar.

It is the conclusion of the Customs Service that the Western Red Cedar "short boards" in issue are properly classified pursuant to GRI 1. The "short boards" literally satisfy the dictates of heading 4407 because they are "[w]ood sawn or chipped lengthwise …of a thickness exceeding 6 mm."

Heading 4407 was drafted to be a broad provision for the classification of material. The Explanatory Notes (EN) of the Harmonized Commodity Description and Coding System lend support to this proposition. The Explanatory Notes represent the official interpretation of the HTSUS at the international level. Although the EN's are not law in the United States and the Customs Service is not, therefore, legally obligated to follow them, they are valued as an interpretative aid. *See* T.D. 89-80, 54 Fed. Reg. 35127-28 (Aug. 23, 1989).

The breadth of heading 4407 is evidenced from a reading of EN 44.07. The Explanatory Notes to Chapter 44 of the HTSUS provide that heading 4407 encompasses, "with few exceptions…all wood and timber, of any length but of a thickness exceeding 6mm, sawn or chipped along the general direction of the grain or cut by slicing or peeling." The EN further states that "[s]uch wood and timber includes *sawn* beams, planks, flitches, *boards*, laths, etc." (Emphasis added.) Explanatory Note 44.07.

---

[2] The term "rough" is defined in Statistical Note 1 to Chapter 44 HTSUS to include "wood that has been edged, resawn, crosscut or trimmed to smaller sizes." The Note continues that the term "rough" does not include wood that has been dressed or surfaced by planing on one or more edges or faces or has been edge-glued or end-glued."

3

General Rule of Interpretation 2 (a) provides that any reference in a HTSUS heading to an article "shall be taken to include a reference to that article incomplete or unfinished."  GRI 2 (a) requires, however, that the incomplete or unfinished article have the "essential character" of the complete or finished article.

The General Rules of Interpretation do not define the phrase "essential character", however, its meaning may be understood from an examination of the Explanatory Notes to GRI 2(a).  The EN's to GRI 2 (a) draw a distinction between a "blank" which possesses the essential character of an article and a "semi-manufacture[d]" item that does not have the essential character of an article.

A "blank," as defined in the EN, is an article "not ready for direct use, having the approximate shape or outline of the finished article or part."  The EN continues stating that a "blank" is an article "which can only be used, other than in exceptional cases, for completion into the finished article or part."  A plastic bottle preform is offered in the EN as an example of a blank.  Bottle preforms of plastic are "intermediate products having tubular shape, with one closed end and one open end threaded to secure a screw type closure, the portion below the threaded end being intended to be expanded to a desired size and shape."

"Semi-manufactures" are items that do not yet have the essential shape or character of the finished articles.  Examples of semi-manufactures set forth in the EN's are: "bars, discs, tubes, etc."  Semi-manufactures are specifically not regarded as "blanks."

A review of the description of the Western Red Cedar boards or "short boards," in the condition in which they will be imported, reveals semi-manufactured items rather than blanks.  The boards do not have the essential character of shakes or shingles.  The adjective "short," it should be noted, is an industry term that simply refers to lengths of sawn timber, generally less than six feet long.

A shake, as described by EN 44.18, is "wood split by hand or machine from a bolt or block.  Its face reveals the natural texture of the wood resulting from the splitting process.  Shakes are sometimes sawn lengthwise through their thickness to obtain two shakes, each then having a split face and a sawn back."  The Complete Dictionary of Wood defines "shakes" as "[h]and riven ½-in. shingles, longer than normal, and often staggered for special effect." Corkhill, *The Complete Dictionary of Wood*, 501 (1979).  Reference to the World

4

Wide Web site of Anglo-American suggests that the principal distinction between a shake and a shingle is that shakes have a "natural split face, and a sawn backside" while shingles are "sawn on both sides and produce a smooth finished look." Anglo-American Cedar Products Ltd., www.angloamerican.com/products.htm, visited Sept. 14, 2000.

A shingle, as defined in the EN's to heading 4418, is "wood sawn lengthwise which is generally thicker than 5mm at one end (the butt) but thinner than 5mm at the other end (the tip).  It may have its edges resawn to be parallel; its butt may be resawn to be at right angles to its edges or to form a curve or other shape.  One of its faces may be sanded from the butt to the tip or grooved along its length." *See also*, Corkhill, *The Complete Dictionary of Wood*, 504 (1979).

The boards that were the subject of HQ 082694 issued to Anglo-American in 1989 have not been sufficiently processed beyond the stage of material lumber.  They are rectangular lumber boards sawn to size. They are not tapered to any degree, nor are they in a condition in which they may be deemed dedicated to use only as shakes or shingles.  They do not have the approximate shape or outline of a shake or shingle and are more closely analogous to the examples of semi-manufactured items in the EN's than to the plastic bottle preform identified as the example of a blank.  The "short boards" in issue are plain sawn wood suitable for multiple uses and not recognizable as one particular article of commerce.  *See generally*, *Ludvig Svensson (US) v. United States*, 62 F. Supp. 2d 1171 (C.I.T.1999); *Doherty-Barrow of Texas, Inc. v. United States*, 3 C.I.T. 228 (1982); and *American Import Co. v. United States*, 26 C.C.P.A. 72 (1938).

The Customs Service is apprised of HQ Ruling Letter 083795 issued on May 26, 1989.  HQ 083795 classified Red Cedar "short boards" in HTSUS subheading 4418.50.0040 as unfinished shakes and shingles.  It is specifically noted that the articles in issue in that ruling letter, in the condition as imported, possessed the approximate shape or outline of a shingle.  The sample was a tapered board measuring eighteen and one-fourth inches in length and ten and eleven-sixteenth inches in width.  The tip of the board measured nine-thirty-seconds of an inch (7 mm) and the bottom or butt measured seven-eighths of an inch (22mm).  HQ 083795 is, therefore, distinguishable from HQ 082694.

HOLDING

Headquarters Ruling Letter 082694 has been reconsidered and it is the conclusion of the Customs Service that the merchandise was incorrectly classified.  The correct classification of the Western Red Cedar boards or "short boards" in issue is 4407.10.0068, HTSUS.

The general column one duty rate is Free.

Headquarters Ruling Letter 082694 is revoked.

Sincerely,


John Durant, Director
Commercial Rulings Division

6

GENERAL RULES FOR THE INTERPRETATION
OF THE HARMONIZED SYSTEM

Classification of goods in the nomenclature shall be governed by the following principles :


RULE 1

**The titles of Sections, Chapters and sub-Chapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative Section or Chapter Notes and, provided such headings or Notes do not otherwise require, according to the following provisions.**


EXPLANATORY NOTE

(I)    The Nomenclature sets out in systematic form the goods handled in international trade. It groups these goods in Sections, Chapters and sub-Chapters which have been given titles indicating as concisely as possible the categories or types of goods they cover. In many cases, however, the variety and number of goods classified in a Section or Chapter are such that it is impossible to cover them all or to cite them specifically in the titles.

(II)    Rule 1 begins therefore by establishing that the titles are provided "for ease of reference only". They accordingly have no legal bearing on classification.

(III)   The second part of this Rule provides that classification shall be determined :

(a)   according to the terms of the headings and any relative Section or Chapter Notes, and

(b)   where appropriate, **provided the headings or Notes do not otherwise require**, according to the provisions of Rules 2, 3, 4, and 5.

(IV)   Provision (III) (a) is self-evident, and many goods are classified in the Nomenclature without recourse to any further consideration of the Interpretative Rules (e.g., live horses (heading 01.01), pharmaceutical goods specified in Note 4 to Chapter 30 (heading 30.06)).

(V)    In provision (III) (b) :

(a)    The expression "provided such headings or Notes do not otherwise require" is intended to make it quite clear that the terms of the headings and any relative Section or Chapter Notes are paramount, i.e., they are the first consideration in determining classification. For example, in Chapter 31, the Notes provide that certain headings relate **only** to particular goods.  Consequently those headings cannot be extended to include goods which otherwise might fall there by reason of the operation of Rule 2 (b).

(b)    The reference to Rule 2 in the expression "according to the provisions of Rules 2, 3, 4 and 5" means that :

(1)   goods presented incomplete or unfinished (e.g., a bicycle without saddle and tyres), and

(2)   goods presented unassembled or disassembled (e.g., a bicycle, unassembled or disassembled, all components being presented together) whose components could individually be classified in their own right (e.g., tyres, inner tubes) or as "parts" of those goods,

        are to be classified as if they were those goods in a complete or finished state, **provided the terms of Rule 2 (a) are satisfied and the headings or Notes do not otherwise require**.


RULE 2

**(a)**       **Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also be taken to include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), presented unassembled or disassembled.**

**(b)**       **Any reference in a heading to a material or substance shall be taken to include a reference to mixtures or combinations of that material or substance with other materials or substances. Any reference to goods of a given material or substance shall be taken to include a reference to goods consisting wholly or partly of such material or substance. The classification of goods consisting of more than one material or substance shall be according to the principles of Rule 3.**


EXPLANATORY NOTE

RULE 2 (a)
(Incomplete or unfinished articles)

(I)     The first part of Rule 2 (a) extends the scope of any heading which refers to a particular article to cover not only the complete article but also that article incomplete or unfinished, **provided** that, as presented, it has the essential character of the complete or finished article.

(II)     The provisions of this Rule also apply to **blanks** unless these are specified in a particular heading. The term **"blank"** means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part (e.g., bottle preforms of plastics being intermediate products having tubular shape, with one closed end and one open end threaded to secure a screw type closure, the portion below the threaded end being intended to be expanded to a desired size and shape).

        Semi-manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as "blanks".

(III)   In view of the scope of the headings of Sections I to VI, this part of the Rules does not normally apply to goods of these Sections.

(IV)   Several cases covered by the Rule are cited in the General Explanatory Notes to Sections or Chapters (e.g., Section XVI, and Chapters 61, 62, 86, 87 and 90).


RULE 2 (a)
(Articles presented unassembled or disassembled)

(V)    The second part of Rule 2 (a) provides that complete or finished articles presented unassembled or disassembled are to be classified in the same heading as the assembled article. When goods are so presented, it is usually for reasons such as requirements or convenience of packing, handling or transport.

(VI)   This Rule also applies to incomplete or unfinished articles presented unassembled or disassembled provided that they are to be treated as complete or finished articles by virtue of the first part of this Rule.


(VII)  For the purposes of this Rule, "articles presented unassembled or disassembled" means articles the components of which are to be assembled either by means of fixing devices (screws, nuts, bolts, etc.) or by riveting or welding, for example, **provided** only assembly operations are involved.

        No account is to be taken in that regard of the complexity of the assembly method. However, the components shall not be subjected to any further working operation for completion into the finished state.

        Unassembled components of an article which are in excess of the number required for that article when complete are to be classified separately.

(VIII) Cases covered by this Rule are cited in the General Explanatory Notes to Sections or Chapters (e.g., Section XVI, and Chapters 44, 86, 87 and 89).

(IX)   In view of the scope of the headings of Sections I to VI, this part of the Rule does not normally apply to goods of these Sections.

RULE 2 (b)
(Mixtures and combinations of materials or substances)

(X)    Rule 2 (b) concerns mixtures and combinations of materials or substances, and goods consisting of two or more materials or substances. The headings to which it refers are headings in which there is a reference to a material or substance (e.g., heading 05.07 - ivory), and headings in which there is a reference to goods of a given material or substance (e.g., heading 45.03 - articles of natural cork). It will be noted that the Rule applies only if the headings or the Section or Chapter Notes do not otherwise require (e.g., heading 15.03 - lard oil, **not ... mixed**).

Mixtures being preparations described as such in a Section or Chapter Note or in a heading text are to be classified under the provisions of Rule 1.

(XI)   The effect of the Rule is to extend any heading referring to a material or substance to include mixtures or combinations of that material or substance with other materials or substances. The effect of the Rule is also to extend any heading referring to goods of a given material or substance to include goods consisting partly of that material or substance.

(XII)  It does not, however, widen the heading so as to cover goods which cannot be regarded, as required under Rule 1, as answering the description in the heading; this occurs where the addition of another material or substance deprives the goods of the character of goods of the kind mentioned in the heading.

(XIII) As a consequence of this Rule, mixtures and combinations of materials or substances, and goods consisting of more than one material or substance, if prima facie classifiable under two or more headings, must therefore be classified according to the principles of Rule 3.

RULE 3

**When by application of Rule 2 (b) or for any other reason, goods are *prima facie*, classifiable under two or more headings, classification shall be effected as follows:**

**(a)       The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.**

**(b)       Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3 (a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable**

**(c)       When goods cannot be classified by reference to 3 (a) or 3 (b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration**

EXPLANATORY NOTE

(I)     This Rule provides three methods of classifying goods which, *prima facie*, fall under two or more headings, either under the terms of Rule 2 (b) or for any other reason. These methods operate in the order in which they are set out in the Rule. Thus Rule 3 (b) operates only if Rule 3 (a) fails in classification, and if both Rules 3 (a) and (b) fail, Rule 3 (c) will apply. The order of priority is therefore (a) specific description; (b) essential character; (c) heading which occurs last in numerical order.

(II)    The Rule can only take effect **provided the terms of headings or Section or Chapter Notes do not otherwise require**. For instance, Note 4 (B) to Chapter 97 requires that goods covered both by the description in one of the headings 97.01 to 97.05 and by the description in heading 97.06 shall be classified in one of the former headings. Such goods are to be classified according to Note 4 (B) to Chapter 97 and not according to this Rule.

RULE 3 (a)

(III)   The first method of classification is provided in Rule 3 (a), under which the heading which provides the most specific description of the goods is to be preferred to a heading which provides a more general description.

(IV)   It is not practicable to lay down hard and fast rules by which to determine whether one heading more specifically describes the goods than another, but in general it may be said that :

(a)    A description by name is more specific than a description by class (e.g., shavers and hair clippers, with self-contained electric motor, are classified in heading 85.10 and not in heading 84.67 as tools for working in the hand with self-contained electric motor or in heading 85.09 as electro-mechanical domestic appliances with self-contained electric motor).

(b)    If the goods answer to a description which more clearly identifies them, that description is more specific than one where identification is less complete.

    Examples of the latter category of goods are :

(1)   Tufted textile carpets, identifiable for use in motor cars, which are to be classified not as accessories of motor cars in heading 87.08 but in heading 57.03, where they are more specifically described as carpets.

(2)   Unframed safety glass consisting of toughened or laminated glass, shaped and identifiable for use in aeroplanes, which is to be classified not in heading 88.03 as parts of goods of heading 88.01 or 88.02 but in heading 70.07, where it is more specifically described as safety glass.

(V)    However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description than the others. In such cases, the classification of the goods shall be determined by Rule 3 (b) or 3 (c).

RULE 3 (b)

(VI)   This second method relates only to :

(i)     Mixtures.

(ii)    Composite goods consisting of different materials.

(iii)   Composite goods consisting of different components.

(iv)   Goods put up in sets for retail sales.

It applies only if Rule 3 (a) fails.

(VII)  In all these cases the goods are to be classified as if they consisted of the material or component **which gives them their essential character**, insofar as this criterion is applicable.

(VIII) The factor which determines essential character will vary as between different kinds of goods. It may, for example, be determined by the nature of the material or component, its bulk, quantity, weight or value, or by the role of a constituent material in relation to the use of the goods.

(IX)   For the purposes of this Rule, composite goods made up of different components shall be taken to mean not only those in which the components are attached to each other to form a practically inseparable whole but also those with separable components, **provided** these components are adapted one to the other and are mutually complementary and that together they form a whole which would not normally be offered for sale in separate parts.

Examples of the latter category of goods are :

(1)   Ashtrays consisting of a stand incorporating a removable ash bowl.

(2)   Household spice racks consisting of a specially designed frame (usually of wood) and an appropriate number of empty spice jars of suitable shape and size.

As a general rule, the components of these composite goods are put up in a common packing.

(X)   For the purposes of this Rule, the term "goods put up in sets for retail sale" shall be taken to mean goods which :

(a)   consist of at least two different articles which are, *prima facie*, classifiable in different headings. Therefore, for example, six fondue forks cannot be regarded as a set within the meaning of this Rule;

(b)   consist of products or articles put up together to meet a particular need or carry out a specific activity; and

(c)   are put up in a manner suitable for sale directly to end users without repacking (e.g., in boxes or cases or on boards).

"Retail sale" does not include sales of products which are intended to be re-sold after further manufacture, preparation, repacking or incorporation with or into other goods.

The term "goods put up in sets for retail sale" therefore only covers sets consisting of goods which are intended to be sold to the end user where the individual goods are intended to be used together. For example, different foodstuffs intended to be used together in the preparation of a ready-to-eat dish or meal, packaged together and intended for consumption by the purchaser would be a "set put up for retail sale".

Examples of sets which can be classified by reference to Rule 3 (b) are :

(1)   (a)  Sets consisting of a sandwich made of beef, with or without cheese, in a bun (heading 16.02), packaged with potato chips (French fries) (heading 20.04) :

Classification in heading 16.02.

(b)  Sets, the components of which are intended to be used together in the preparation of a spaghetti meal, consisting of a packet of uncooked spaghetti (heading 19.02), a sachet of grated cheese (heading 04.06) and a small tin of tomato sauce (heading 21.03), put up in a carton :

Classification in heading 19.02.

The Rule does not, however, cover selections of products put up together and consisting, for example, of :

-   a can of shrimps (heading 16.05), a can of *pâté de foie* (heading 16.02), a can of cheese (heading 04.06), a can of sliced bacon (heading 16.02), and a can of cocktail sausages (heading 16.01); or

-   a bottle of spirits of heading 22.08 and a bottle of wine of heading 22.04.

In the case of these two examples and similar selections of products, each item is to be classified separately in its own appropriate heading. This also applies, for example, to soluble coffee in a glass jar (heading 21.01), a ceramic cup (heading 69.12) and a ceramic saucer (heading 69.12) put up together for retail sale in a paperboard box.

(2)   Hairdressing sets consisting of a pair of electric hair clippers (heading 85.10), a comb (heading 96.15), a pair of scissors (heading 82.13), a brush (heading 96.03) and a towel of textile material (heading 63.02), put up in a leather case (heading 42.02) :

Classification in heading 85.10.

(3)     Drawing kits comprising a ruler (heading 90.17), a disc calculator (heading 90.17), a drawing compass (heading 90.17), a pencil (heading 96.09) and a pencil-sharpener (heading 82.14), put up in a case of plastic sheeting (heading 42.02) :

Classification in heading 90.17.

For the sets mentioned above, the classification is made according to the component, or components taken together, which can be regarded as conferring on the set as a whole its essential character.

(XI)   This Rule does not apply to goods consisting of separately packed constituents put up together, whether or not in a common packing, in fixed proportions for the industrial manufacture of, for example, beverages.

RULE 3 (c)

(XII)  When goods cannot be classified by reference to Rule 3 (a) or 3 (b), they are to be classified in the heading which occurs last in numerical order among those which equally merit consideration in determining their classification.

RULE 4

**Goods which cannot be classified in accordance with the above Rules shall be classified under the heading appropriate to the goods to which they are most akin.**

EXPLANATORY NOTE

(I)     This Rule relates to goods which cannot be classified in accordance with Rules 1 to 3. It provides that such goods shall be classified under the heading appropriate to the goods to which they are most akin.

(II)    In classifying in accordance with Rule 4, it is necessary to compare the presented goods with similar goods in order to determine the goods to which the presented goods are most akin. The presented goods are classified in the same heading as the similar goods to which they are most akin.

(III)  Kinship can, of course, depend on many factors, such as description, character, purpose.

RULE 5

**In addition to the foregoing provisions, the following Rules shall apply in respect of the goods referred to therein :**

**(a)     Camera cases, musical instrument cases, gun cases, drawing instrument cases, necklace cases and similar containers, specially shaped or fitted to contain a specific article or set of articles, suitable for long-term use and presented with the articles for which they are intended, shall be classified with such articles when of a kind normally sold therewith.  This Rule does not, however, apply to containers which give the whole its essential character;**

**(b)     Subject to the provisions of Rule 5 (a) above, packing materials and packing containers presented with the goods therein shall be classified with the goods if they are of a kind normally used for packing such goods. However, this provision is not binding when such packing materials or packing containers are clearly suitable for repetitive use.**

EXPLANATORY NOTE

RULE 5 (a)
(Cases, boxes and similar containers)

(I)    This Rule shall be taken to cover only those containers which :

(1)    are specially shaped or fitted to contain a specific article or set of articles, i.e., they are designed specifically to accommodate the article for which they are intended. Some containers are shaped in the form of the article they contain;

(2)    are suitable for long-term use, i.e., they are designed to have a durability comparable to that of the articles for which they are intended. These containers also serve to protect the article when not in use (during transport or storage, for example). These criteria enable them to be distinguished from simple packings;

(3)    are presented with the articles for which they are intended, whether or not the articles are packed separately for convenience of transport. Presented separately the containers are classified in their appropriate headings;

(4)    are of a kind normally sold with such articles; and

(5)    do not give the whole its essential character.

(II)    Examples of containers, presented with the articles for which they are intended, which are to be classified by reference to this Rule are :

(1)    Jewellery boxes and cases (heading 71.13);

(2)    Electric shaver cases (heading 85.10);

(3)    Binocular cases, telescope cases (heading 90.05);

(4)    Musical instrument cases, boxes and bags (e.g., heading 92.02);

(5)    Gun cases (e.g., heading 93.03).

(III)   Examples of containers not covered by this Rule are containers such as a silver caddy containing tea, or an ornamental ceramic bowl containing sweets.


RULE 5 (b)
(Packing materials and packing containers)

(IV)   This Rule governs the classification of packing materials and packing containers of a kind normally used for packing the goods to which they relate. However, this provision is not binding when such packing materials or packing containers are clearly suitable for repetitive use, for example, certain metal drums or containers of iron or steel for compressed or liquefied gas.

(V)    This Rule is subject to Rule 5 (a) and, therefore, the classification of cases, boxes and similar containers of the kind mentioned in Rule 5 (a) shall be determined by the application of that Rule.


RULE 6

**For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related Subheading Notes and, *mutatis mutandis*, to the above Rules, on the understanding that only subheadings at the same level are comparable.  For the purposes of this Rule the relative Section and Chapter Notes also apply, unless the context otherwise requires.**


EXPLANATORY NOTE

(I)    Rules 1 to 5 above govern, *mutatis mutandis*, classification at subheading levels within the same heading.

(II)    For the purposes of Rule 6, the following expressions have the meanings hereby assigned to them :

(a)    "subheadings at the same level" : one-dash subheadings (level 1) or two-dash subheadings (level 2).

Thus, when considering the relative merits of two or more one-dash subheadings within a single heading in the context of Rule 3 (a), their specificity or kinship in relation to a given article is to be assessed solely on the basis of the texts of the competing one-dash subheadings. When the one-dash subheading that is most specific has been chosen and when that subheading is itself subdivided, then, and only then, shall the texts of the two-dash subheadings be taken into consideration for determining which two-dash subheading should be selected.

(b)    "unless the context otherwise requires" : except where Section or Chapter Notes are incompatible with subheading texts or Subheading Notes.

This occurs, for example, in Chapter 71 where the scope assigned to the term "platinum" in Chapter Note 4 (B) differs from that assigned to "platinum" in Subheading Note 2. For the purpose of interpreting subheadings 7110.11 and 7110.19, therefore, Subheading Note 2 applies and Chapter Note 4 (B) is to be disregarded.

(III)   The scope of a two-dash subheading shall not extend beyond that of the one-dash subheading to which the two-dash subheading belongs; and the scope of a one-dash subheading shall not extend beyond that of the heading to which the one-dash subheading belongs.

*
*   *

Copyright 2009 CUSTOMS Info LLC. All Rights Reserved.

HQ **964019**

DECEMBER 13, 2000

**CLA-2 RR:CR:GC**    964019 JAS

**CATEGORY:**   Classification

**TARIFF NO.:**    8483.10.30

Mr. Lawrence M. Friedman
Barnes, Richardson & Colburn
303 East Wacker Drive, Suite 1100
Chicago, Illinois 60601

**RE**:   Crankshafts Processed in Mexico from Forgings of Brazilian Origin;
Originating Goods under NAFTA

Dear Mr. Friedman:

In letters, dated March 15 and September 13, 2000, on behalf of Cummins Engine Company, Inc., you inquire as to the eligibility as originating goods under the North American Free Trade Agreement (NAFTA) of crankshafts for diesel engines processed in Mexico from forgings of Brazilian origin. You also inquire as to the proper country of origin marking requirements for the crankshafts. We regret the delay in responding.

**FACTS**:

As described, the product is alloy steel crankshafts for diesel engines. The crankshaft forgings are produced in Brazil from the closed-die forging process, which involves forging between matrices. The articles are allowed to cool, then removed from the dies and their ends lightly machined to allow them to be securely clamped into machines which perform subsequent machining operations. The forgings' center of balance is then established by drilling locator center points on each end. This permits proper positioning of the forgings in machines that perform the subsequent processing operations. The forgings possess the shape of a crank shaft, are clearly recognizable as crank shafts and can only be processed into finished crank shafts. They do not require further working or shaping by forging. Rather, the further working essentially involves machining operations to bring the surfaces into tolerances required for finished crank shafts. Finally, the forgings are

- 2 -

shot blasted to remove scale and other surface impurities.  You state that all of the processing operations in Brazil, together, take less than fifteen minutes.  In Mexico, the locator center points are reestablished and grease pockets, necessary for finished crank shafts, are machined into the ends of each forging.  Complete, finished crankshafts are then produced by 21 additional turning, milling, drilling and heat treatment operations.  You state that the operations in Mexico touch over 95% of the forgings' surface, result in the removal of up to one third of the material by thickness on some surfaces, and between one-third and two-fifths of an inch of steel from some of the surfaces.

You maintain that on the facts presented the forgings entering Mexico from Brazil will be classifiable as semi-finished products of alloy steel in the appropriate provision of Chapter 72, HTSUS, and that upon importation into the United States from Mexico, the finished crankshafts will be classifiable in the appropriate provision for crankshafts, in heading 8483, HTSUS.  You conclude that as a result of this change in tariff classification, the crankshafts qualify as "originating goods" under the NAFTA rules of origin, with Mexico being the country of origin for marking purposes.

**ISSUE**:

Whether the imported crankshafts qualify as "originating goods" within the rules of origin in General Note 12(b), HTSUS.

**LAW AND ANALYSIS**:

Under General Rule of Interpretation (GRI) 1, Harmonized Tariff Schedule of the United States (HTSUS), goods are to be classified according to the terms of the headings and any relative section or chapter notes, and provided the headings or notes do not require otherwise, according to GRIs 2 through 6.  GRI 2(a) states, in part, that incomplete or unfinished articles are classifiable as if complete or finished provided that, as imported, they have the essential character of the complete or finished article.  Chapter 72, Note 1(ij), HTSUS, defines the term <u>Semifinished products</u> as "Continuous cast products of solid cross section, whether or not subjected to primary hot-rolling; and other products of solid section, which have not been further worked than subjected to primary hot-rolling shaped by forging, including blanks for angles, shapes or sections. These products are not presented in coils."

The Harmonized Commodity Description and Coding System Explanatory Notes (ENs) constitute the official interpretation of the HTSUS.  While not legally binding, the ENs  provide a commentary on the scope of each heading of the HTSUS and are thus useful in ascertaining the classification of merchandise under the System.  Customs believes the ENs should always be consulted.  <u>See</u> T.D. 89-80, 54 Fed. Reg. 35127, 35128 (Aug. 23, 1989).

- 3 -

ORIGINATING GOODS STATUS UNDER NAFTA

To be eligible for tariff preference under the NAFTA, goods must be "originating goods" within the rules of origin in General Note 12(b), HTSUS. General Note 12(b)(ii)(A), HTSUS, states, in relevant part, that for the purposes of this note, goods imported into the customs territory of the United States are eligible for the tariff treatment and quantitative limitations set forth in the tariff schedule as "goods originating in the territory of a NAFTA party" only if they have been transformed in the territory of Canada, Mexico and/or the United States so that except as provided in subdivision (f) of this note, each of the non-originating materials used in the production of such goods undergoes a change in tariff classification described in subdivisions (r), (s) and (t) of this note or the rules set forth therein.

One such authorized change in tariff classification is to subheading 8483.10 from any other heading. See General Note 12(t)/243(A), HTSUS. In facts nearly identical to those at issue here, the CIT in Cummins Engine Co., v. United States, Slip Op. 99-139 (Ct. Int'l Trade, decided December 21, 1999), held that automotive crankcase forgings from Brazil, processed in Mexico into finished automotive crankcases, were classifiable as other camshafts and crankshafts, in subheading 8483.10.30, HTSUS. With respect to the classification of the forgings entering Mexico, the Court rejected plaintiff's claim under heading 7224, HTSUS, as semifinished products of other alloy steel, because the grease pocket - 50 mm in diameter and 13 mm deep, a feature that exists for the use of the finished crankshaft in a vehicle and a feature that constituted the first step toward accomplishing the considerable further shaping of the forging - was machined into the article in Brazil. This, the Court concluded, made the forging entering Mexico from Brazil further worked than roughly shaped by forging. In the current situation, however, the grease pockets are machined into the forgings in Mexico, so that the issue to be resolved is whether the crankcase forgings from Brazil, processed as described but without grease pockets, are considered roughly shaped by forging and thus classifiable, upon entering Mexico, in heading 7224, HTSUS. If they are, then the requisite tariff shift is met and originating goods status is conferred on the finished crankshafts imported into the United States from Mexico.

We must now consider the meaning of the phrase "roughly shaped by forging" in Note 1(ij), HTSUS. The term is not defined in the HTSUS. However, the ENs to Heading 72.07, Section (B), on page 1079, describe semifinished pieces "roughly shaped by forging" as products "of rough appearance and large dimensional tolerances produced from blocks or ingots by the action of power hammers or forging presses." The ENs, applicable by appropriate substitution of terms to goods of heading

- 4 -

74.24, is even more specific as it addresses an example of a flattened zig-zag for a crank shaft as a piece roughly shaped by forging:

(B) PIECES ROUGHLY SHAPED BY FORGING

"* * * They may take the form of crude recognisable shapes in order that the final article can be fabricated without excessive waste, but the heading covers only those pieces which require considerable further shaping in the forge, press, lathe, etc. The heading would, for example, cover an ingot roughly hammered into the shape of a flattened zigzag and requiring further shaping to produce a marine crankshaft, but it would not cover a crankshaft forging ready for final machining. The heading similarly excludes drop forgings and pressings produced by forging between matrices since the articles produced by these operations are ready for final machining.

The forgings at issue are made from a billet (a semi-finished product of heading 72.24) or bar stock (a finished product of heading 72.27 or 72.28) by a closed-die process between matrices and are clearly recognizable as crank shafts. Notwithstanding the fact that machining operations must be performed in order to finish the forgings, the machining would not appear to be the type **of "considerable further shaping"** as described in the ENs.  Rather, it appears to consist of "finishing operations in which the identifiable journals and faces are machined to tolerance and balance."

From these facts, we conclude that the crank shaft forgings entering Mexico from Brazil are not roughly shaped by forging for purposes of Note 1(ij) to Chapter 72. The articles, therefore, are not semi-finished products of heading 7224.  The forgings, however, are recognizable as crank shafts.  Crank shafts are specifically named in heading 84.83.  EN (II) to GRI 2(a), at page 2, describes certain unfinished articles as "blanks" which are classified in the heading for the article. The crank shaft forgings in this case appear to be described in that EN as blanks:

The provisions of this Rule also apply to blanks unless these are specified in a particular heading. The term " blank " means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part (e.g., bottle preforms of plastics being intermediate products having tubular shape, with one closed end and one open end threaded to secure a screw type closure, the portion below the threaded end being intended to be expanded to a desired size and shape).

Therefore, we conclude that  the closed-die crank shaft forgings entering Mexico from Brazil are "blanks" under GRI 2(a) and, therefore, unfinished crank shafts provided for in heading 8483, HTSUS.  Consequently, finished crankshafts imported into the customs territory from Mexico do not meet the requisite tariff shift and do not qualify as "goods originating in the territory of a NAFTA party," and are not eligible for preferential tariff treatment under the NAFTA.

- 5 -

COUNTRY OF ORIGIN MARKING

The marking statute, section 304, Tariff Act of 1930, as amended (19 U.S.C. 1304), provides that, unless excepted, every article of foreign origin (or its container) imported into the U.S. shall be marked in a conspicuous place as legibly, indelibly and permanently as the nature of the article (or its container) will permit, in such a manner as to indicate to the ultimate purchaser in the U.S. the English name of the country of origin of the article.  Part 134, Customs Regulations (19 CFR Part 134), implements the country of origin marking requirements and exceptions of 19 U.S.C. 1304.

Section 134.1(b), Customs Regulations (19 CFR 134.1(b)), defines "country of origin" as:

> The country of manufacture, production or growth of any article of foreign origin entering the U.S.  Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of this part; however for a good of a NAFTA country, the NAFTA Marking Rules will determine the country of origin. (Emphasis added.)

Section 134.1(j), Customs Regulations (19 CFR 134.1(j)), provides that the "NAFTA Marking Rules" are the rules promulgated for purposes of determining whether a good is a good of a NAFTA country.  A "good of a NAFTA country" is defined in 19 CFR 134.1(g) as an article for which the country of origin is Canada, Mexico, or the U.S., as determined under the NAFTA Marking Rules set out at 19 CFR Part 102.

Section 102.11, Customs Regulations (19 CFR 102.11), sets forth the required hierarchy for determining whether a good is a good of a NAFTA country for marking purposes.  Paragraph (a) of this section states that the country of origin of a good is the country in which:

(1)     The good is wholly obtained or produced;

(2)     The good is produced exclusively from domestic materials; or

(3)     Each foreign material incorporated in that good undergoes an applicable change in tariff classification set out in section 102.20 and satisfies any other applicable requirements of that section; and all other applicable requirements of these rules are satisfied.

- 6 -

In this case, the applicable rule is 19 CFR 102.11(a)(3). The finished crankshafts are classifiable under subheading 8483.10.30, HTSUS.  The applicable change in tariff

classification is set out in section 102.20(o), Section XVI, Chapters 84 through 85, and provides:

> 8483.10... A change to subheading 8483.10 from any other subheading.

The crankshaft forgings from Brazil are classifiable in subheading 8483.10.30, HTSUS. Therefore, the crankshafts imported into the United States from Mexico will not undergo the requisite tariff shift, and 19 CFR 102.11(b) of the hierarchical rules must be applied. This paragraph provides in pertinent part as follows:

> Except for a good that is specifically described in the Harmonized System as a set, or is classified as a set pursuant to General Rule of Interpretation 3, where the country of origin cannot be determined under paragraph (a), the country of origin of the good:
>
> (1) Is the country or countries of origin of the single material that imparts the essential character of the good ...

When determining the essential character of a good under 19 CFR 102.11, 19 CFR 102.18(b)(1) provides that only domestic and foreign materials that are classified in a tariff provision from which a change is not allowed shall be taken into consideration. Section 102.18(b)(1)(iii), Customs Regulations (19 CFR 102.18(b)(1)(iii)), provides that if there is only one material that is classified in a tariff provision from which a change in tariff classification is not allowed, then that material will represent the single material that imparts the essential character to the good under 19 CFR 102.11.

Pursuant to 19 CFR 102.18(b)(1)(iii), the single material that imparts the essential character to a finished crankshaft is the forging. Accordingly, the country of origin of the finished crankshafts is the country of origin of the forgings, which is Brazil.

**HOLDING**:

Under the authority of GRI 1, the crankshafts imported into the United States from Mexico are provided for in heading 8483. They are classifiable in subheading 8483.10.30, HTSUS.

- 7 -

Because the processing performed in Mexico does not result in the requisite NAFTA change in tariff classification, the finished crankshafts do not qualify as originating goods, and are not eligible for preferential tariff treatment under the NAFTA. Based upon the information provided for the crankshaft forgings imported into Mexico from Brazil, pursuant to 19 CFR 102.11(b)(1) the country of origin of the finished crankshafts is the country of origin of the forgings, which is Brazil.

Sincerely,


John Durant, Director
Commercial Rulings Division



**WORLD CUSTOMS ORGANIZATION**
**ORGANISATION MONDIALE DES DOUANES**
Established in 1952 as the Customs Co-operation Council
Créée en 1952 sous le nom de Conseil de coopération douanière

| | |
|---|---|
| HARMONIZED SYSTEM COMMITTEE<br>-<br>26th Session<br>- | NC0317E1<br><br>O. Eng. |

Brussels, 10 October 2000.

## CLASSIFICATION OF CERTAIN FORGINGS FOR CRANK SHAFTS

(Item VIII.9 on Agenda)

### I. BACKGROUND

1.      On 11 September 2000, the Secretariat received the following Note from the *** Administration concerning the classification of certain forgings for crank shafts. The *** Administration has requested that the Secretariat put this question on the Agenda for the 26th Session of the Harmonized System Committee.

### II. NOTE FROM THE *** ADMINISTRATION ON THE CLASSIFICATION OF CERTAIN FORGINGS FOR CRANK SHAFTS

2.      The *** Administration has for some time been considering the classification of certain "blanks" under the Harmonized System.  The blanks in question are forgings, not further worked, which have the recognizable shape of crank shafts.  In order to seek clarification and uniformity, the *** Administration submits the classification of these articles to the Harmonized System Committee for consideration and decision.

3.      Since these articles have the essential character of crank shafts, GIR 2(a) would appear to direct classification of these forgings in heading 84.83.  See the comments in the General Explanatory Note to this rule.  However, it has been argued that these articles are "semi-finished products, which have been roughly shaped by forging" within the meaning of Note 1 (ij) to Chapter 72.

Product Description

4.      The product is an alloy steel forging of a crank shaft for a diesel engine and is sometimes described as a "blank" for a crank shaft.  The forging is shaped into the form of a crank shaft by a closed-die forging process. The forging possesses the shape of a crank shaft, is clearly recognizable as a crank shaft and can only be processed into a finished crank shaft. It does not require further working or shaping by forging.  Rather, the further

File No. 2825

For reasons of economy, documents are printed in limited number.  Delegates are kindly asked to bring their copies to meetings and not to request additional copies.

NC0317E1

working essentially involves machining operations to bring the surfaces into tolerances required for a finished crank shaft.

5.      Prior to presentation the forging is subjected to minor operations.  The ends are milled to facilitate secure clamping in a machine tool and locator points for center mass are machined into the ends in order to facilitate positioning and handling in various machine tools.  It is also subjected to a shot blasting process in order to remove scale from the surface of the forging.[1]  No shaping or forming is performed on the forging.  Photographs of the forging are included in the Annex.

6.      Although the forging has the shape of the finished product, it does require certain machining operations and certain heat treatments before completion into a finished crank shaft.  Machining is performed on all surfaces by grinders, lathes or drills.  This machining removes approximately 8.5 mm to 10 mm from most of the surfaces and may remove up to one-third of the thickness from certain other surfaces.

Classification Question

7.      The Committee is asked to decide whether the closed-die crank shaft forging, described above, is a "semi-finished" product that is "roughly shaped by forging" within the meaning of Note 1 (ij) to Chapter 72.

Discussion and Analysis

8.      There appears to be some confusion among importers as to whether the terms of heading 72.24 and Note 1 (ij) to Chapter 72 preclude the application of GIR 2(a) to certain blanks that are made by a forging process and are recognizable as, and only useable for, crank shafts.

9.      This confusion arises, in part, from the reference in Note 1 (ij) to Chapter 72 to certain "blanks."  Some have interpreted the reference as applying to all blanks, even those which are recognizable as final articles, if they have not been further worked.

10.     Under this interpretation of heading 72.24, pursuant to GIR 1 and Note 1 (ij), the heading 72.24 would include all blanks, provided the other terms of Note 1(ij) are satisfied. Application of GIR 2(a) would be precluded.

11.     The confusion also concerns the meaning of the term "not further worked than …roughly shaped by forging" in Note 1 (ij) to Chapter 72. Some have interpreted this phrase as applying to all forgings which have not been machined or otherwise surface worked after forging.

12.     Under this interpretation, any forging, no matter how recognizable as a specific article, is a "roughly shaped" product if it is not machined or otherwise finished on any of its surfaces, and, therefore, falls within the terms of Note 1 (ij).  Application of GIR 2(a) with respect to incomplete or unfinished articles would be precluded.

---

[1] These operations would not appear to constitute "further working" within the meaning of Note 1 (ij) because they do not constitute operations to form, fashion or shape the article to a greater extent. These processes are incidental to, and preparatory to the further working by which the shape and final dimension are obtained. They are not intended to shape or form the article.

NC0317E1

(a) Note 1 (ij) to Chapter 72 and Blanks

13.    The first question concerns the scope of the reference to "blanks" contained in the Note. We are of the view that, by its terms, Note 1 (ij) does not include all blanks.

14.    Note 1 (ij) defines "semi-finished products" as including, in addition to certain continuous cast products, other products of solid section not further worked than (a) subjected to primary hot rolling or (b) roughly shaped by forging.  Included within these two categories of products are "blanks for angles, shapes or sections."  The legal text is very specific.  It does not refer to all blanks.  It refers only to blanks of certain products which, in their finished condition, would also be classifiable in Chapter 72.  We believe that the reference to these specific blanks is very significant.  The specific inclusion of blanks for angles, shapes or sections operates as a limited exception to the rule that unfinished or incomplete goods, having the essential character of the finished good, are classified in the same heading as the good.  It cannot be taken to include all blanks.

15.    Therefore, we conclude that the reference to "blanks" in Note 1 (ij) applies only to those named in the Note, i.e., blanks for angles, shapes and sections, and would not apply to other blanks which have the approximate shape or outline of the finished article, i.e., unfinished articles having the essential character of the finished article.

(b) Roughly Shaped by Forging

16.    The second question with respect to the terms of Note 1 (ij) concerns the meaning of the phrase "have not been further worked than roughly shaped by forging."

17.    The term "roughly shaped by forging" is not defined in the Nomenclature.  However, the Explanatory Note to heading 72.07 sheds light on the meaning of the term.

18.    In the Explanatory Notes to Heading 72.07, Section (B), on page 1079, semi-finished pieces "roughly shaped by forging" are described as products "of rough appearance and large dimensional tolerances produced from blocks or ingots by the action of power hammers or forging presses."  The Explanatory Note, applicable *mutatis mutandis* to goods of heading 72.24, is even more specific as it addresses an example of a flattened zig-zag for a crank shaft as a piece roughly shaped by forging:

**(B) PIECES ROUGHLY SHAPED BY FORGING**

"…They may take the form of crude recognisable shapes in order that the final article can be fabricated without excessive waste, but the heading covers **only** those pieces which require considerable further shaping in the forge, press, lathe, etc.  The heading would, for example, cover an ingot roughly hammered into the shape of a flattened zigzag and requiring further shaping to produce a marine crankshaft, but it would **not cover** a crankshaft forging ready for final machining.  The heading similarly **excludes** drop forgings and pressings produced by forging between matrices since the articles produced by these operations are ready for final machining.

19.    The forging in issue is made from a billet (a semi-finished product of heading 72.24) or bar stock (a finished product of heading 72.27 or 72.28) by a closed-die process between matrices and is clearly recognizable as crank shaft.  Notwithstanding the fact that machining operations must be performed in order to finish the forging, the machining would not appear to be the type of "considerable further shaping" as described in the Explanatory Notes.

3.

NC0317E1

Rather, it appears to consist of "finishing" operations in which the identifiable journals and faces are machined to tolerance and balance.

20.    Therefore, we would conclude that the crank shaft forging is not a "roughly shaped forging" for purposes of Note 1 (ij) to Chapter 72.

21.    Since Note 1 (ij) to Chapter 72 is not applicable, it is clear that the foregoing articles are not semi-finished products of heading 72.24.

(c) GIR 2(a) and Relevant EN

22.    The forging is recognizable as a crank shaft.  Crank shafts are specifically named in heading 84.83.  Under Rule 2(a), a heading shall be taken to include a reference to that article incomplete or unfinished provided that the incomplete or unfinished article has the essential character of the complete or finished article.  Explanatory Note (11) to GIR 2(a), at page 2, describes certain unfinished articles as "blanks" which are classified in the heading for the article.  The crank shaft forging, in this case, appears to be described in that Explanatory Note as a blank :

(II)    The provisions of this Rule also apply to blanks unless these are specified in a particular heading. The term " blank " means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part (e.g., bottle preforms of plastics being intermediate products having tubular shape, with one closed end and one open end threaded to secure a screw type closure, the portion below the threaded end being intended to be expanded to a desired size and shape).

23.    Therefore, we would conclude that this crank shaft forging is properly classified in heading 84.83 as a crank shaft.

Conclusion

24.    The closed-die crank shaft forging (sometimes described as a blank) is an unfinished crank shaft and is classifiable in heading 84.83 by operation of GIR 2(a) and Note 1 (f) to Section XV.  Note 1 (ij) to Chapter 72 is inapplicable.

Annex

25.    Photographs of closed-die crank shaft forgings, finished crank shafts and roughly shaped forging for marine crank shaft :

1.A.  Crank shaft forging showing light machining on flange end to facilitate handling by a machine tool.

1.B.  Crank shaft forging showing drilled point (for center mass) on nose end to facilitate handling by a machine tool.

1.C.  Crank shaft forging showing light facing on flange end and drilling of locator points for center mass on flange end and nose end

2.A.  Finished Crank Shafts

2.B.  Finished Crank Shafts

4.

2.C.   Comparison of finished crank shaft and unfinished crank shaft forging

3.   Comparison of finished crank shafts and crank shaft forging

4.   Picture of a roughly shaped forging (zig-zag) for a marine crank shaft taken from <u>Custom Forging Capability Guide</u>, published by Forging Industry Association, Cleveland, Ohio 44115-1040.

## III. <u>SECRETARIAT COMMENTS</u>

26.   As previously noted, one interpretation for the reference to blanks in Note 1 (ij) to Chapter 72 would be that it applies to all blanks, even those which are recognizable as final articles, if they have not been further worked.  In Doc. 24.240, the \*\*\*proposed a definition for semi-finished products, which included the phrase "blanks for angles, for shapes and for sections".  Paragraph 43 of that document reads "it was understood that the \*\*\* proposal regarding blanks is based on the fact that the blanks concerned are products of industry sectors different from those which produce the finished articles.  On the other hand the classification of all recognizable blanks with the corresponding finished articles, as suggested by the \*\*\*Administration, would probably simplify the application of the Nomenclature in this respect.  A decision on these opposing views must be left to the members of the Committee and its Working Party."

27.   As the phrase "blanks for angles, shapes or sections" is contained in the present Note 1 (ij), the Secretariat understands that the Committee agreed with the \*\*\*'s view over the \*\*\* view.  Based on the aforementioned, the Secretariat is of the opinion that it cannot be taken to include all blanks.  The specific inclusion in this Note of blanks for angles, shapes or sections operates as a limited exception to the rule that unfinished or incomplete goods, having the essential character of the finished good, are classified in the same heading as the good.  Therefore, the Secretariat agrees with the \*\*\* Administration's conclusion in paragraph 15 that the "blanks" mentioned in Note 1 (ij) do not apply to all blanks and, as a result, would not apply to other blanks which have the approximate shape or outline of the finished article, i.e., unfinished articles having the essential character of the finished article.

28.   Regarding the meaning of the phrase "have not been further worked than roughly shaped by forging" in Note 1 (ij), the Explanatory Notes to heading 72.07, Section (B), on page 1079, provide some guidance on the interpretation of this term.  The crank shaft forgings at issue require machining operations that would not, in the Secretariat's opinion, be classed as "considerable further shaping", as described in the aforementioned Explanatory Note.  The crank shaft forgings do not require further shaping or hammering but appear to be ready for final machining.  Consequently, the Secretariat would conclude that the crank shaft forgings are not "roughly shaped forgings" for purposes of Note 1 (ij) to Chapter 72.

29.   Based on the conclusions in paragraphs 26 and 27, the Secretariat would conclude that the crank shaft forgings are not semi-finished products of heading 72.24.

30.   The Secretariat would conclude that the closed-die crank shaft forgings (sometimes described as blanks) are an unfinished crank shafts and are classifiable in heading 84.83 by application of GIR 2(a) and Note 1 (f) to Section XV.  Note 1 (ij) to Chapter 72 would not apply.

NC0317E1

IV. <u>CONCLUSION</u>

31.      The Committee is invited to rule on the classification of the closed-die crank shaft forgings at issue, taking into account the Note from \*\*\* Administration in paragraphs 2 to 25 and the Secretariat's comments in paragraphs 26 to 29, respectively.

\*   \*   \*

6.

Annex I to Doc. NC0317E1
(HSC/26/Nov. 2000)

I. A



I. B



I. C



\*   \*   \*

I.

Annex II to Doc. NC0317E1
(HSC/26/Nov. 2000)









\*    \*    \*

II.

Annex III to Doc. NC0317E1
(HSC/26/Nov. 2000)



3'

\*    \*    \*

Annex IV to Doc. NC0317E1
(HSC/26/Nov. 2000)



\*     \*     \*

Annex IV to Doc. NC0317E1
(HSC/26/Nov. 2000)

.metal shells like
.ls, which may incor-
ed nozzles and other
es.

Not unlike successive forging opera-
tions in a sequence of dies, multiple
open-die forging operations can be
combined to produce the required
shape. At the same time, these forg-
ing methods can be tailored to attain
the proper amount of total deforma-
tion and optimum grain-flow struc-
ture, thereby maximizing property
enhancement and ultimate perfor-
mance for a particular application.
Forging an integral gear blank and
hub, for example, may entail multi-
ple drawing or solid forging opera-
tions, then upsetting. Similarly,
blanks for rings may be prepared by
upsetting an ingot, then piercing the
center, prior to forging the ring.









7/10/97 A EXAMPLE OF
OPEN DIE FORGED
CRANKSHAFT
FOR MARINE
APPLICATION
NOTE: EXTENSIVE
FURTHER MACHINING
N---- --- TO PRODUCE

IV/2.

HQ 084217

June 28, 1989

CLA-2 CO:R:CV:G: 084217 JLV

CATEGORY:  Classification

TARIFF NO.:  7616.90.00

Steven W. Baker, Esq.
Bellsey and Baker
100 California Street, Suite 670
San Francisco, California 94111

RE:  Aluminum blanks and substrates for computer memory discs

Dear Mr. Baker:

     In a letter of February 28, 1989, as supplemented by a
letter, with samples, of March 28, 1989, in response to a
request for additional information, you request a ruling on
behalf of your clients, Marubeni America Corp. (Los Angeles)
and James J. Boyle & Co., on the tariff classification for
certain aluminum blanks and substrates for computer memory
discs.  Your request was forwarded to this office for response
on the classification issue under the Harmonized Tariff
Schedule of the United States Annotated (HTSUSA).

FACTS:

     The discs consist of circular flat discs, each of which
has a hole in the center, and are made of various aluminum
alloys (AA 5086.0, KS 5186-0, KS 5286-0, KS 5386-0, or KS
5586-0).  The submitted samples measure 5.25 inches in
diameter and 95 centimeters in diameter, although you state
that the discs will range in size from 2.5 to 14 inches in
diameter.  The majority are said to be used in permanent hard
disc drives; a smaller number are to be used in data packs
which can be inserted into and removed from the drive
mechanism.

     The primary difference between the blanks and the
substrates is the degree or stage to which the discs have been
processed prior to importation.  The discs are initially

- 2 -

stamped out in a blanking press from cold rolled aluminum coils to the inside and outside diameters; they are then cleaned, stacked, and press annealed in a furnace on a base platen under a load.  The resulting disc is a blank that has the tensile strength, yield strength, flatness, and other mechanical features necessary for the production of a finished disc.

Substrates are produced by further processing these blanks.  The processing includes annealing, chamfering of the inside and outside edges, and then either rough facing of the surface (facing to proper thickness, washing, and diamond turning, or rough grinding of the surface (grinding to proper thickness), washing, and polishing to a mirror bright surface finish.

The remaining processing consists of plating, polishing, cleaning, further polishing, cleaning, sputter (depositing a thin metallic film), and 100 percent testing.  The resulting article is a finished disc for use as indicated.

You state that the blanks and substrates are classifiable as unfinished parts of data processing machines in subheading 8473.30.40, HTSUSA, rather than as other articles of aluminum in subheading 7616.90.00, HTSUSA, as you were advised by the Customs officer at the port through which the goods will be entered.

In a ruling of March 14, 1989 (file 838004), Customs ruled that a polished nickel-plated aluminum ring, a substrate similar to some of the discs in issue, was classified as an article of aluminum in subheading 7616.90.0080, HTSUSA.

ISSUE:

Are the blanks or substrates incomplete or unfinished articles having the essential character of the complete or finished article within the meaning of General Rule of Interpretation (GRI) 2(a), and, therefore, classified in heading 8473 or heading 8523, rather than in heading 7616 or heading 7606?

LAW AND ANALYSIS:

Classification under the HTSUSA is according to the principles set out in the General Rules of Interpretation (GRI). GRI 1 states in pertinent part that classification shall be determined according to the terms of the headings and

- 3 -

any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the provisions that follow GRI 1. The blanks and substrates, in this case, are unfinished discs because they lack the magnetic surface finish necessary for their use as memory discs for storage units of heading 8471. GRI 2(a) states, in pertinent part, that any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the complete or finished article.

The Explanatory Notes (EN), the official interpretation for the HTSUSA at the international level, state that rule 2(a) applies to blanks which, although not ready for direct use, have the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part. In this case, the disc blanks and the substrates have the essential shape of the finished articles, and they do not appear to have any practical use other than completion into the intended memory discs. By virtue of their specific size and shape, these articles have assumed the character of the articles into which they will be completed. Therefore, these articles cannot be classified as plates of heading 7606, HTSUSA. Chapter 76, note 1(d).

Assuming that the blanks and substrates are unfinished parts of storage units of heading 8471, they are precluded from classification as parts of these units by section XVI note 2(a) because heading 8523 specifically provides for prepared unrecorded media for sound recording or similar recording of other phenomena. EN(4) to heading 8523 indicates that the heading includes discs of metal that are capable of being magnetized (magnetic coating on the surface) for

recording data for machines of heading 8471.

However, to the extent that these blanks and substrates are not yet prepared for use as media for recording other phenomena, they are precluded from classification in heading 8523.  EN(a) to heading 8523.  This EN directs the classification according to the material of which the blank is composed.  In this case, the blanks and substrates are of alloys of aluminum and other metals.  The aluminum predominates by weight over each of the other metals.  According to section XV note 3(a), the blanks and substrates are classified as an alloy of aluminum.

- 4 -

Section XV note 4 states that, unless the context requires otherwise, a reference to a base metal includes a reference to alloys which by virtue of note 3 of section XV are to be classified as alloys of that metal.  Because these articles are excluded from heading 7606, we conclude that the appropriate provision is heading 7616, subheading 7616.90.00, HTSUSA, for other articles of aluminum.  Ruling letter of March 14, 1989 (file 838004), noted and affirmed.

HOLDING:

Disc blanks and substrates of aluminum, not yet prepared for use as media for recording sound or other phenomena, are classified as other articles of aluminum in subheading 7616.90.00, HTSUSA.

Sincerely,

John Durant, Director
Commercial Rulings Division

```
Library:  valentin
File Name:  084217

6cc:  AD NY Seaport
2cc:  Chief, CIE
1cc:  AC, CO
1cc:  Reading File
1cc:  Dir, Comm. Rulings
```

N260676

February 6, 2015

CLA-2-37:OT:RR:NC:1:104

CATEGORY: Classification

TARIFF NO.: 3701.99.6060

Mr. John M. Peterson
Neville Peterson LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006

RE:    The tariff classification of photomask blanks from Japan

Dear Mr. Peterson:

In your letter dated January 6, 2015 on behalf of Shin-Etsu MicroSi, Inc. you requested a tariff classification ruling.

The photomask blanks consist of three layers, i.e., a substrate of high-purity quartz glass, a layer of metal and a top layer of photoresist.  Subsequent to importation, the blanks will be subjected to a photolithographic process in the United States.  You state that this process "creates lines corresponding to the specific circuit pathways that will appear in a semiconductor chip or IC".  The finished photomask will be used in a step-and-repeat machine of a kind used solely or principally for the manufacture of semiconductor wafers.  In a step-and-repeat machine, a finished photomask is placed between a light source and a silicon wafer.   Laser-generated light passes through the photomask in order to project the circuit pattern onto the photoresist-coated surface of a semiconductor wafer.  The photomask blanks are available in a variety of sizes, the most common being 6" x 6" x ¼" deep.

In your letter, you indicate that your client contends that the photomask blanks are classifiable in subheading 8486.20.0000,  Harmonized Tariff Schedule of the United States (HTSUS), which provides for "Machines and apparatus of a kind used solely or principally for the manufacture of semiconductor boules or wafers, semiconductor devices, electronic integrated circuits or flat panel displays; machines and apparatus specified in Note 9 (C) to this chapter; parts and accessories: Machines and apparatus for the manufacture of semiconductor devices or of electronic integrated circuits".  Additional U.S. Rule of Interpretation 1(c) states "In the absence of special language or context which otherwise requires ... a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory".  In

2

this instance, Additional U.S. Rule of Interpretation 1(c) controls with the more specific provision being subheading 3701.99.6060, HTSUS.

You state that the blanks " … are complete for their intended use as photomasks, save for the lithographic etching of surface patterns". Blanks are said to have the exact size and shape of finished photomasks and are suitable for no other use but as photomasks. Classification of goods under the HTSUS is governed by the General Rules of Interpretation ("GRI"). GRI 2(a) provides that "any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." As described above, the blanks, in their imported condition, have the essential character of photomasks of Heading 3701, HTSUS, and are considered unfinished photomasks, classifiable in Heading 3701, HTSUS, pursuant to GRI 2(a).

The applicable subheading for the photomask blanks will be 3701.99.6060, Harmonized Tariff Schedule of the United States (HTSUS), which provides for "Photographic plates and film in the flat, sensitized, unexposed, of any material other than paper, paperboard or textiles; instant print film in the flat, sensitized, unexposed, whether or not in packs:  Other:  Other:  Other … Other. The rate of duty will be 3.7 percent ad valorem.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Patricia O'Donnell at (646) 733-3011.

Sincerely,

Gwenn Klein Kirschner
Director
National Commodity Specialist Division

**U.S. Department of Homeland Security**
**U.S. Customs and Border Protection**
National Commodity Specialist Division
One World Trade Center, Suite 51.201
New York, NY 10007



**U.S. Customs and
Border Protection**

N350641

July 18, 2025

CLA-2-82:OT:RR:NC:N1:118

CATEGORY: Classification; Origin

TARIFF NO.: 8207.30.6095; 9903.01.25

James King
Delmar International (N.Y.) Inc.
1 Lincoln Blvd., Suite 201
Rouses Point, NY 12979

RE:  The tariff classification and country of origin of tool blanks

Dear Mr. King:

In your letter dated June 25, 2025, on behalf of Wila USA LLC, you requested a classification and country of origin determination for purposes of Section 232, IEEPA duties and marking under Section 304 of the Tariff Act of 1930, as amended (19 U.S.C. 1304). Pictures and descriptions of the manufacturing processes were included in your submission.

The articles under consideration are two unfinished tool parts that will used in a press brake machine after they are further processed in the United States.  The finished parts are identified as a top tool punch and a bottom tool die.  The top tool punch is installed in the upper beam of a press brake machine, while the bottom tool die is installed in the bottom beam. They are used in conjunction with each other to form and shape sheet metal. Depending on the specific shape of the punch and die, the press brake machine can make a variety of parts used in different industries. You have stated that you plan to import the top tool punch and the bottom tool die separately and unfinished at the time of importation.

You propose two manufacturing scenarios, which you refer to as Step 1 and Step 6.  The following scenarios are the same for the top tool punch and the bottom tool die.

Manufacturing scenario one (Step 1):

German steel bars or Italian steel plate will be imported into the Netherlands and used interchangeably to manufacture the unfinished tools.  In the Netherlands, the steel bars or steel plate are milled on all sides in a specialized mill machine into the overall form, shape, and contour of the finished tool.  The tool blank is then sent to the United States for further processing, including induction curing, tempering, straightening, and shot blasting.  The part of the tool that connects to the press brake machine is ground to accuracy, and the part of

the tool that bends sheet metal is sharpened to precision.  In some instances, depending on customer specifications, the length of the tool may be cut in order to fit into the press brake machine.  Finally, a safety-click mechanism is mounted onto the tool and the tool is laser engraved.

Manufacturing scenario two (Step 6):

German steel bars or Italian steel plate will be imported into the Netherlands and used interchangeably to manufacture the unfinished tools.  In the Netherlands, the steel bars or steel plate are milled in a specialized mill machine into the overall form, shape, and contour of the finished tool.  The tool blank is further processed, which includes induction curing, tempering, straightening, and shot blasting. The part of the tool that connects to the press brake machine is ground to accuracy.  The tool blank is then sent to the United States, where the part of the tool that bends sheet metal is sharpened to precision. In some instances, depending on customer specifications, the length of the tool may be cut in order to fit into the press brake machine.  Finally, a safety-click mechanism is mounted onto the tool and the tool is laser engraved.

**Classification**

Merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) in accordance with the General Rules of Interpretation (GRIs).  GRI 1 states in part that for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes.  GRI 2(a) extends the scope of the HTSUS headings to include unfinished parts, provided the unfinished parts have the essential character of the finished parts.  GRI 2(a) further states that:

> Any reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also include a reference to that article complete or finished (or failing to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

In addition, Explanatory Note (EN) II under GRI 2(a) states that:

> The provisions of this Rule also apply to blanks unless these are specified in a particular heading. The term "blanks" means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part.

> Semi-manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as "blanks."

Accordingly, two criteria which an article must meet in order to be classified as a blank for purposes of GRI 2(a) are (1) it must possess the approximate shape or outline of the finished article, and (2) the sole use must be for completion into the finished article.

In this case, GRI 2(a) is applicable to the articles in both scenarios.  They are blanks by definition and by statements in your submission.  At the time of importation, they meet the two criteria stated above. They have the approximate shape or outline of a top tool punch and a bottom tool die and cannot be used for any other purpose.

Information found in your submission indicates that the unfinished top tool punch and the bottom tool die are each a net shape blank which closely approximates the outline of the finished article it will form.  Although the articles require some post-importation processing, upon importation they are readily recognizable as the finished articles they will become.  There is also nothing to suggest that the articles have any practical use other than for incorporation into a press brake machine.  Therefore, in both scenarios, this office finds that the

imported tools are unfinished articles which have the essential character of complete or finished goods of subheading 8207.30, HTSUS.

The applicable subheading for the unfinished top tool punch and the unfinished bottom tool die (in both manufacturing scenarios), when imported separately, will be 8207.30.6095, HTSUS, which provides Interchangeable tools for handtools, whether or not power-operated, or for machine-tools (for example, for pressing, stamping, punching, tapping, threading, drilling, boring, broaching, milling, turning or screwdriving), including dies for drawing or extruding metal, and rock drilling or earth boring tools; base metal parts thereof:  Tools for pressing, stamping or punching, and parts thereof:  Not suitable for cutting metal, and parts thereof…Parts.  The general rate of duty will be 2.9 percent ad valorem.

**Country of Origin**

When determining the country of origin for purposes of applying current trade remedies under Section 232 and additional duties, the substantial transformation analysis is applicable. See, e.g., Headquarters Ruling Letter H301619, dated November 6, 2018. The test for determining whether a substantial transformation will occur is whether an article emerges from a process with a new name, character, or use different from that possessed by the article prior to processing. See Texas Instruments Inc. v. United States, 681 F.2d 778 (C.C.P.A. 1982). This determination is based on the totality of the evidence. See National Hand Tool Corp. v. United States, 16 C.I.T. 308 (1992), aff'd, 989 F.2d 1201 (Fed. Cir. 1993).

Additionally, Section 304 of the Tariff Act of 1930, as amended (19 U.S.C. 1304), provides that unless excepted, every article of foreign origin imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or its container) will permit, in such a manner as to indicate to the ultimate purchaser in the United States, the English name of the country of origin of the article. Congressional intent in enacting 19 U.S.C. 1304 was "that the ultimate purchaser should be able to know by an inspection of the marking on the imported goods the country of which the goods is the product. The evident purpose is to mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will." See United States v. Friedlander & Co., 27 C.C.P.A. 297, 302 (1940).

Part 134 of the U.S. Customs and Border Protection (CBP) Regulations (19 CFR 134) implements the country of origin marking requirements and exceptions of 19 U.S.C. 1304. Section 134.1(b), CBP Regulations (19 CFR 134.1(b)), defines "country of origin" as the country of manufacture, production, or growth of any article of foreign origin entering the United States. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of the marking laws and regulations.

In regard to the imported tools, it is our view that steel bars or steel plate are substantially transformed in the Netherlands into recognizable tool blanks (i.e., the top tool punch and the bottom tool die) in both of your manufacturing scenarios. Based on the submitted information, it is our opinion that no article emerges from the finishing operations in the United States with a new name, character, or use different from that prior to processing.  Although not ready for direct use, the tool blanks that arrive in the United States have a pre-determined use and are in a dedicated physical form of a finished top tool punch and a finished bottom tool die.  While several processes are performed in the Unites States, the amount of material removed is minimal.  In addition, the machining focuses on the precision of surface dimensions and finish.  Therefore, it is our determination that the country of origin of the unfinished top tool punch and unfished bottom tool die in both manufacturing scenarios (i.e., Step 1 and Step 6) is the Netherlands.

Effective April 5, 2025, Executive Orders implemented "Reciprocal Tariffs."  All imported merchandise must be reported with either the Chapter 99 provision under which the reciprocal tariff applies or one of the Chapter 99 provisions covering exceptions to the reciprocal tariffs.  At this time products from all countries will be subject to an additional 10 percent ad valorem rate of duty.  At the time of entry, you must report the

Add.78                                    Add.78                                    Add.78

Chapter 99 heading applicable to your product classification, i.e. 9903.01.25, in addition to subheading 8207.30.6095, HTSUS, listed above.

The tariffs and additional duties cited above are current as of this ruling's issuance.  Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided at https://hts.usitc.gov/.

The holding set forth above applies only to the specific factual situation and merchandise description as identified in the ruling request. This position is clearly set forth in Title 19, Code of Federal Regulations (CFR), Section 177.9(b)(1). This section states that a ruling letter is issued on the assumption that all of the information furnished in the ruling letter, whether directly, by reference, or by implication, is accurate and complete in every material respect. In the event that the facts are modified in any way, or if the goods do not conform to these facts at time of importation, you should bring this to the attention of U.S. Customs and Border Protection (CBP) and submit a request for a new ruling in accordance with 19 CFR 177.2. Additionally, we note that the material facts described in the foregoing ruling may be subject to periodic verification by CBP.

This ruling is being issued under the provisions of Part 177 of the Customs and Border Protection Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, please contact National Import Specialist Anthony Grossi at anthony.e.grossi@cbp.dhs.gov.

Sincerely,


    (for)

James Forkan
Acting Director
National Commodity Specialist Division

HQ H006327

August 28, 2007

CLA-2 OT:RR:CTF:TCM H006327 EMS

CATEGORY:  Classification

TARIFF NO.:  7307.29.0090

Greenberg Traurig, LLP
800 Connecticut Ave., NW
Suite 500
Washington, DC 20006
ATTN: Donald S. Stein, Esq.

RE:  The tariff classification of stainless steel forgings for BI-Lok tube
fittings

Dear Mr. Stein:

     This letter is in response to your correspondence, received on December
28, 2006 by U.S. Customs and Border Protection in New York, in which you
requested a binding ruling pertaining to the classification of certain stainless
steel forgings under the Harmonized Tariff Schedule of the United States
(HTSUS).  Your correspondence was referred to this office for a response.  You
provided a supplemental submission on March 30, 2007, and offered additional
facts and legal arguments at a meeting in our office on April 30, 2007. Our
response follows.

FACTS:

     The merchandise at issue consists of stainless steel forgings in the shape
of elbows, crosses, and tees.  The manufacture of the subject merchandise begins
in Japan with austenitic stainless steel bars that conform to Japan Industrial
Standard (JIS) G4303.  This bar material (also known as "bar stock") is cut into
proper lengths and heated in a machine identified as a "billet heater." After
heating, the bar material undergoes plastic deformation in an "open die forge"
machine.  This machine compresses the bar material between impression dies.  The
bar material is placed in the cavity of the lower die, and the upper die hammers
the bar material with an air-stamp hammer.  The hammer compresses the bar
material between the upper and lower dies into the shape of an elbow, cross, or
tee that is surrounded by flash.  Flash is "metal in excess of that required to
completely fill the finishing impression of the dies."  Forging Industry
Association, Forging Handbook 279 (Thomas G. Byrer 1985).

     The flash is subsequently removed from the forgings by a machine referred
to as a "trimming press."  In addition, the stamp of the "BI-Lok" name is
completed on the front flat of the forgings during the trimming process.  The
trimmed forgings are annealed through a process of heating and cooling for the
purpose of "restor[ing] the original properties of the bar material such as
corrosion resistance and ductility" to the forging.  The annealed forgings
conform to certain mechanical properties for stainless steel per JIS SUS304.
After annealing, the oxidized scale on the surface of the forgings is removed in
a shot-blasting machine.  A passivation film, which increases resistance to
corrosion, is applied to the forgings through immersion in an acid solution.

Upon completion of the aforementioned processes, the forgings are imported into the United States, where Generant maintains the forgings in its inventory. The forgings will be pulled from the stocking shelf when Generant intends to produce a specific type of BI-Lok tube fitting. According to Generant, each forging is a "parent" for "several different products." For example, a certain tee-shaped parent may be machined into thirteen different BI-Lok tee-shaped fittings, including male, female, and union tees, all of which vary based upon the sizes and shapes of one or more of the ends of the fittings.

The products into which a parent may be machined are made to exact specifications for certain types of BI-Lok tube fittings, and thus the subsequent manufacturing processes in the United States depend upon the type of fitting. However, there are certain commonalities among all of the subsequent manufacturing processes. One or more of the ends of each fitting will be reduced to a specific diameter by a "turndown machine." All ends are then hardened to meet BI-Lok specifications in a "rolling machine." To achieve precise dimensions and remove the solid-cross section, the tube fittings undergo machining processes that include cutting threads and boring to create a flow path. Upon completion of these processes and other surface finishing processes, the fittings are cleaned and undergo passivation. When a customer order is received, the fittings are assembled with ferrules and nuts, and then packaged for retail sale.

With respect to the classification of the parent forgings, in their condition as imported into the United States, the HTSUS provisions under consideration are as follows:

7218  Stainless steel in ingots or other primary forms; semi-finished products of stainless steel:
    *****
      Other:
    *****
7218.99.00                Other
                *****
7218.99.0090                  Other

7307          Tube or pipe fittings (for example, couplings. elbows, sleeves), of
    iron or steel:
             *****
             Other, of stainless steel:
              *****
7307.22             Threaded elbows, bends and sleeves:
7307.22.1000          Sleeves (couplings)
7307.22.5000          Other
7307.23.0000       Butt welding fittings
7307.29.00         Other
7307.29.0030          Nipples
7307.29.0090          Other

ISSUE:

Whether the imported stainless steel forgings are classifiable as semi-finished products under heading 7218, HTSUS, or as blanks for pipe or tube fittings under heading 7307, HTSUS.

LAW AND ANALYSIS:

Under General Rule of Interpretation (GRI) 1, HTSUS, goods are to be classified according to the terms of the headings and any relative section or chapter notes, and provided the headings or notes do not require otherwise, according to GRIs 2 through 6.

It is Generant's position that, pursuant to GRI 1, the stainless steel forgings produced in Japan are classifiable under heading 7218 as "semi-finished products of stainless steel." Chapter 72, Note 1(ij), HTSUS, defines the term "semifinished products" as "[c]ontinuous cast products of solid section, whether or not subjected to primary hot-rolling; and other products of solid section, which have not been further worked than subjected to primary hot-rolling or roughly shaped by forging, including blanks for angles, shapes or sections. These products are not presented in coils."

Consistent with Note 1(ij), the subject merchandise is a product of solid section produced by forging between matrices in an open die forge. However, the Note also requires, in relevant part, that the subject merchandise "have not been further worked than ... roughly shaped by forging." Generant's position that the subject merchandise meets the definition of "roughly shaped by forging" is grounded in the language of the Harmonized Commodity Description and Coding System Explanatory Notes (ENs) to heading 7207, which apply mutatis mutandis to heading 7218. The ENs constitute the official interpretation of the HTSUS. While not legally binding, the ENs provide a commentary on the scope of each heading of the HTSUS and are thus useful in ascertaining the classification of merchandise under the Harmonized System. CBP believes the ENs should always be consulted. See T.D. 89-80, 54 Fed. Reg. 35127, 35128 (Aug. 23, 1989).

Subpart B of the ENs to heading 7207 defines "pieces roughly shaped by forging" as follows:

These are semi-finished products of rough appearance and large dimensional tolerances, produced from blocks or ingots by the action of power hammers or forging presses. They may take the form of crude recognisable shapes in order that the final article can be fabricated without excessive waste, but the heading covers only those pieces which require considerable further shaping in the forge, press, lathe, etc. The heading would, for example, cover an ingot roughly hammered into the shape of a flattened zig-zag and requiring further shaping to produce a marine crankshaft, but it would not cover a crankshaft forging ready for final machining. The heading similarly excludes drop forgings and pressings produced by forging between matrices since the articles produced by these operations are ready for final machining.

(emphasis in original). In Cummins Inc. v. United States, the Court of Appeals for the Federal Circuit (CAFC) addressed the plaintiff's contention that "[b]ased on this note ... the product ... require[d] considerable further shaping, and ha[d] therefore only been roughly shaped by forging." 454 F.3d 1361, 1365 (Fed. Cir. 2006). Despite the extent of the further shaping required to make the product suitable for retail sale, the CAFC found that the product was precluded from classification as a "semi-finished" product under heading 7224, to which the EN cited above also applied mutatis mutandis, because the product was "further worked" per Note 1(ij) to Chapter 72. Id.

The CAFC construed the term "further worked" when qualified by "than ... roughly shaped by forging" as meaning "to form, fashion, or shape an existing product to a greater extent." Id. In Cummins, the CAFC distinguished the act of forging from subsequent operations performed on the product, specifically the processes of trimming, coining, and milling. The CAFC specifically determined that "forging is a discrete process from the[se] additional steps" and that a product that is trimmed, coined, and milled is precluded from classification as a semi-finished product of other alloy steel under heading 7224. Id. Likewise,

the subject merchandise in this case is not classifiable as a semi-finished product of stainless steel under heading 7218 if any of the subsequent operations performed after forging and prior to importation into the United States constitutes "further working" per Note 1(ij) to Chapter 72.

The subject merchandise undergoes trimming, shot blasting, and acid washing after forging in Japan.  The trimming process described in your submission is consistent with the description of trimming set forth by the Court of International Trade (CIT) in its decision in Cummins v. United States, as affirmed by the CAFC.
"[t]rimming" removes flash - the excess material that comes out of dies in the forging process" ... "accomplished through cutting hot, malleable flash with a die," ... and that "before the article in question enters the trimming machine, it is in one shape.  As a result of trimming[,] the flash [ ] comes out of the trimming machine a different shape.
Cummins Inc. v. United States, 377 F. Supp. 2d 1365, 1379 (Ct. Int'l Trade 2005) (citations omitted).  The CIT concluded in Cummins that based on this description, the product was "further worked" as a result of the trimming process that formed and shaped it after forging.  Id.  Likewise, in the instant case, the forgings removed from the open die forge are formed and shaped after forging because the trimming press removes the flash.  In addition, the completion of the stamping of the "BI-Lok" name on the front flat of the forging is also discrete from the forging process.

We note that even if the subject forgings require trimming in order to be commercially viable, this consideration would be no more persuasive here than it was before the CIT in Cummins.  The CIT declined to ascribe a "commercial meaning ... in which trimming and coining are included within the umbrella (or penumbra) of the term 'forging.'"  The CIT determined that no evidence suggested that this interpretation of "forging" was "universal" and that permitting such leeway in the Cummins case would "require the court to create an exception [to the general meaning of the phrase 'not further worked'] for its product."  Id. at 1379-80.  In no uncertain terms, the CIT concluded that "where the language does not mandate an exception, none will be permitted" and that the need for an exception was "clear evidence that its [Cummin's] imports do not fall under heading 7224, HTSUS."  Id. at 1380.

The same rationale applies for the classification of the subject merchandise as "semi-finished products of stainless steel" under heading 7218, HTSUS.  In Cummins, classification of the product under heading 7224, which covers "semi-finished products of other alloy steel," was precluded because the CIT declined to find an exception (on the basis of commercial viability) to the language of Note 1(ij) to Chapter 72.  Id.  The Note requires that "semifinished products" cannot be further worked ... than roughly shaped by forging."  There is no evidence proffered for our review that would suggest that Generant's imported merchandise is not commercially viable unless trimmed.  But, even if such evidence did exist, we would follow the CIT's reasoning in Cummins, thereby declining to create an exception for further worked products within the meaning of "semi-finished products" for the purposes of heading 7218 in this case.

In addition to our finding that the subject forgings are "further worked," we note that this merchandise is not otherwise "semi-finished" for purposes of heading 7218, HTSUS, because it is not "roughly shaped by forging" as required by Legal Note 1(ij) to Chapter 72.  The interpretive criteria for "pieces roughly shaped by forging" are set forth in the ENs to heading 7207, which apply mutatis mutandis to heading 7218.  The first criterion from EN 7207 requires that "pieces roughly shaped by forging" must be of "rough appearance."  In HQ 088116, dated February 27, 1991, CBP explained that in terms of the EN to heading 7207, "rough appearance" means the following: the products are not rolled "exactly to size" or, in other words, are not rolled to cross-sectional or other dimensional tolerances required for flat-rolled products; the surfaces

may be convex or concave; and the surfaces may have obvious roller marks or imperfections which require secondary hot-working to produce flat-rolled products. Applying this standard to forgings, the subject merchandise appears to have been forged and subsequently trimmed to specific dimensional tolerances required for the parent fitting. There are no obvious imperfections in the surface of the subject merchandise, given that it has undergone shot blasting and is covered in a passivation film. The fact that the BI-Lok brand name is stamped onto the forging prior to importation also suggests that the appearance is not "rough," because this stamp remains visible on the finished product even after processing in the United States.

The second criterion of EN 72.07 indicates that a semi-finished good must be of large dimensional tolerances. The information provided for our review does not demonstrate that the subject forgings are of large dimensional tolerances when imported into the United States. Table 2 of the original submission by Generant contains data that appears to indicate that the forgings are of fixed dimensions prior to undergoing any manufacturing processes in the United States. These fixed dimensions result from the shape of the matrices in which the forgings are formed. Dimensional variation that might be attributable to the presence of flash is eliminated prior to importation when the forgings are trimmed in a press. As a result of trimming, the shapes of the forgings are less rough than upon removal from the open die forge machine, and that shape closely approximates the shape of the finished fitting. Further, only the ends of the subject forgings undergo rolling, turning, and cutting in the United States. In their entirety, the forgings do not undergo additional further shaping on the forge or in a press after importation into the United States. In significant part, the forgings maintain their dimensions as of the time of importation through the production of the fitting for retail sale. We find no evidence of "large dimensional tolerances" for the imported forgings.

The third criterion of EN 72.07 indicates that a semi-finished good is "produced from block or ingots." The subject forgings are produced from austenitic stainless steel bar material that conforms to specific Japanese specifications. Bar is a steel product that is usually produced by the rolling or forging of semi-finished steel mill products commonly known as billets or blooms. When composed of stainless steel, these semi-finished products are classifiable in heading 7218. According to the ENs for heading 7214, HTSUS, which cover bar products, bar is a product with a more accurate and finished appearance than the blooms or billets from which it is made. The bar material (or stock) utilized by Generant as the first step in its manufacturing process appears to be distinguishable from block and ingots, which are primary forms of metals that are not considered semi-finished. See General Notes III and IV to Chapter 72, HTSUS. Based on the information provided by Generant, the subject forgings are not produced directly from block or ingots, but rather from a bar material that is cut to length and heated in a billet heater prior to the shaping of the forgings in the open die forge machine.

The fourth criterion of EN 72.07 indicates that a semi-finished product "may take the form of crude recognizable shapes in order that the final article can be fabricated without excessive waste, but the heading covers only those pieces which require considerable further shaping in the forge, press, lathe, etc." The further shaping of the merchandise that occurs subsequent to importation is not considerable in this case. The essential shapes of the fittings are forged from bar stock and then trimmed to more precise dimensions in Japan. Aside from boring the flow path, only one or more ends of the fitting are modified in the United States. The fact that the "BI-Lok" name is stamped into the forging prior to importation suggests that the processing in the United States is not considerable because this stamp remains visible on the finished fitting. In this regard, we note that in Cummins, where operations touched over 95 percent of the surface and resulted in the removal of up to one third of the

material by thickness on some surfaces, the turning, milling, and drilling of the crankshaft were not found to be "considerable further shaping" by CBP.  HQ 964019, dated December 13, 2000.  In NY I89213, dated December 31, 2002, CBP classified forgings for pipe fittings under heading 7307 even though after importation the forgings were to be drilled, bored, machined, faced, chamfered and ground and threads were to be cut.

It is noteworthy that the subject merchandise is distinguishable from other goods that CBP has found to be classifiable as "semi-finished products of stainless steel" under heading 7218, HTSUS.  For example, in NY I86054, dated September 27, 2002, CBP classified certain round extrusion billets of stainless steel under heading 7218, HTSUS.  After importation, those extrusion billets were to be "cut to various short lengths, reheated, and extruded into a variety of tubular products, solid shapes, and structural profiles.  Another example is NY G87410, dated March 14, 2001, in which stainless steel billets rough-forged from ingots were found to be classifiable under heading 7218, HTSUS.  After importation, those billets were to be reheated and further forged.  See also HQ 088116 (finding that "[s]emifinished products, such as sheet bar, are intended for further hot-working").  These previous decisions suggest that goods classified as semi-finished products of stainless steel in accordance with GRI 1 are those which will be subjected to significant reshaping in the United States and which are not destined to result in a specific type of finished article.

In contrast, the subject forgings are classifiable as incomplete or unfinished articles in accordance with GRI 2(a), HTSUS.  Under GRI 2(a), "[a]ny reference to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as presented, the incomplete or unfinished article has the essential character of the complete or finished article."[1]  EN (II) to GRI 2(a) further defines a "blank" as "an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part."  The EN establishes two criteria for articles that are "blanks" for GRI 2(a) purposes: approximate shape or outline and sole use for completion into the finished article or part.  The EN instructs that irrespective of the degree of processing a good has undergone, its specific size and shape and dedication to use can dictate whether it has assumed the essential character of the article or part it will become after importation. Therefore, it is CBP's position that articles qualifying as "blanks" per se are said to possess the essential character of the complete or finished good.  HQ 967908, dated January 24, 2006.[2]  This determination is made without regard to the cost and intricacy of the subsequent manufacturing in the United States.

The subject forgings satisfy the definition of a blank under EN (II) to GRI 2(a).  They are not ready for direct use, given their solid cross-section and the absence of threading in their condition as imported.  The forgings are incapable of performing the function of a tube fitting, i.e. "connecting the bores of two tubes together, or for connecting a tube to some other apparatus, or for closing the tube aperture."  See ENs to Heading 7307, HTSUS.  Contrary to Generant's position, this inability does not preclude the subject forgings from classification as a blank under GRI 2(a).  The forgings have the approximate shape and outline of the finished tube fitting.  Other than the ends, which will be sized and threaded in the United States, the size and shape of the forgings remains the same as between the time of importation and after subsequent manufacturing.  There is no evidence to suggest that the forgings can be used for completion into anything other than a finished tube fitting.  While parent forgings may be processed into different types of fittings based on the subsequent manufacture of its ends, all are nonetheless tube fittings.  Tube fittings are classifiable in heading 7307, which covers: "[t]ube or pipe

fittings (for example, couplings, elbows, sleeves), of iron or steel."  Per GRI 2(a), this heading covers incomplete or unfinished tube fittings of stainless steel, including blanks thereof.

We note that the "lack of important performance requirements ... at importation is not deemed legally relevant" when determining whether a good constitutes a blank under GRI 2(a).  See HQ 967908.  CBP has previously held that certain goods were classifiable as blanks in heading 7307, HTSUS, even though the goods were incapable of performing their essential function in their condition as imported.  For example, in HQ 962368, dated August 26, 1999, CBP examined whether unfinished ductile cast iron connectors were classifiable as blanks for tube or pipe fittings on the basis of GRI 2(a).  Upon importation, "the fittings consist[ed] of cast metal couplings without threads, sealing rings, insulating nuts, lock nuts or cones."  It was the protestant's position in that case that the absence of threads and the other components meant that the goods were substantially incomplete, not having the "essential shape of the finished articles."   However, CBP determined that the goods were "readily recognizable as fittings and connectors of electrical conduit" and were "sufficiently complete in their most basic form to have the essential character of connectors for electrical conduit."

In HQ 732883, dated August 1,1990, the imported articles consisted of "unfinished malleable cast iron components of pipe fittings which as imported ha[d] no threading, beveled edges or other features beyond their rough shape. In their condition as imported the components [could] not be joined together to function as a pipe fitting."  The pipe fittings at issue in that case were unions, the castings for which consisted of a nut, a head, and a tail between 1/4 and 3 inch diameter.  CBP also noted that the "U.S. manufacturing process after importation ... is extensive.3  Despite post-importation machining operations, including boring and threading, CBP determined that the three-piece castings used to produce the unions constituted blanks within the meaning of GRI 2(a) because the castings for the unions had the approximate shape or outline of the finished unions.  Accordingly in that case, CBP classified the goods under heading 7307, HTSUS.

CBP's decisions in HQ 967908 and HQ 732883 demonstrate that a blank classified pursuant to GRI 2(a) need not be able to perform its essential function in its condition as imported.  Like the goods at issue in the those decisions, the subject forgings may be incapable of meeting the performance requirements of finished BI-Lok tube fittings, but they are nonetheless classifiable as blanks under GRI 2(a) because they have the approximate shape and outline of the finished fittings.  Classification at the subheading level is controlled by GRI 6, which provides that the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to GRIs 1 through 5, on the understanding that only subheadings at the same level are comparable.

In their condition as imported, the subject forgings do not meet the terms of the specific subheadings of heading 7307.22 (threaded elbows, bends and sleeves) or 7307.23 (butt welding fittings), HTSUS.  These forgings are blanks for tube fittings, with ends that have not yet been machined.  They are properly classifiable, in accordance with GRI 1, under subheading 7307.29, HTSUS, which provides for "Other" fittings.

HOLDING:

Under the authority of GRI 2(a), the imported forgings are provided for in heading 7307, HTSUS, as blanks for tube fittings.  They are specifically classifiable in subheading 7307.29.0090, HTSUS, in accordance with GRIs 6 and 1, as other tube fittings of stainless steel because the solid cross-section at the time of importation is not indicative of the internal form of the finished fitting (i.e. threaded, butt welding, etc.).  The 2007 column one, general rate of duty is 5 percent ad valorem.

Duty rates are provided for your convenience and are subject to change.  The text of the most recent HTSUS and the accompanying duty rates are provided on the Internet at www.usits.gov/tata/hts/.

Sincerely,

Gail A. Hamill, Chief
Tariff Classification and Marking Branch

1 We note that EN (II) to GRI 2(a) explains that "[t]he provisions of this Rule also apply to blanks unless these are specified in a particular heading."  Note 1(ij) to Chapter 72 indicates that semifinished products of stainless steel include blanks for angles, shapes, and sections.  Angles, shapes, and sections are defined under Note 1(m) to Chapter 72, in relevant part, as "[p]roducts having a uniform solid cross section along their whole length."  Consistent with this definition, the subject merchandise is not a blank for an angle, shape or section because, after importation into the United States, the solid cross-section will be removed so that it may properly function as a tube fitting through which liquid will flow.
2 In HQ 967908, CBP determined that the GRI 2(a) discussion of "blanks" at EN (II) to GRI 2(a), "provides an independent, objective criteria for determining whether an incomplete or unfinished good is to be classified as if complete or finished."  CBP explained that "[i]f this were not the case, the 'blanks' language would be unnecessary and superfluous as the classification of articles having the approximate shape or outline of the finished good would in all cases be governed by the principal of essential character."
3 In HQ 723883, the cost and intricacy of the post-importation manufacturing processes were extensive.  Cost data demonstrated that the processing done in the United States added between 216 percent and 910 percent in direct manufacturing costs to the cost of the imported castings, depending upon the size of the fitting.  Also, the information provided indicated that "[t]o manufacture the union a multistation dial index boring and threading machine and a lathe are used.  The inside diameter of the casting for the tail piece is bored, trued and threaded.  Then the outside diameter of the tail piece is trued.  The raised portion of the tail (the hub) is rounded and a groove created to accommodate a molded-on nylon gasket.  The end of the tail piece is faced to create a flat surface at a right angle to the plane created by the machined inside diameter, and one end is beveled.  The head piece is processed by boring, facing, threading and tapping.  The nut is finished by boring and threading."
??

??

??

??

2

**HQ** 967908

JANUARY 24, 2006

**CLA-2 RR:CTF:TCM**    967908 JAS

**CATEGORY:**  Classification

**TARIFF NO.:**  8538.90.8080

Michael E. Roll, Esq.
Pisani & Roll
1875 Century Part East, Suite 600
Los Angeles, CA 90067

**RE**:  Aluminum Castings; NY L83113 Affirmed

Dear Mr. Roll:

In your letter, dated September 15, 2005, on behalf of Tyco Electronics Corporation, you request reconsideration of NY L83113, which the Director, National Commodity Specialist Division, U.S. Customs and Border Protection (CBP), New York, issued to you on March 16, 2005.

In NY L83113 certain aluminum castings from Taiwan used in making shell assemblies or housings for electrical connectors for the aerospace industry were found to be classifiable as other parts suitable for use solely or principally with the apparatus of heading 8535, 8536 or 8537, in subheading 8538.90.8080, Harmonized Tariff Schedule of the United States (HTSUSA).  You maintain the castings are classifiable in subheading 7616.99.50, HTSUS, as other articles of aluminum.  Samples of the imported casting, the casting processed in the United States after importation, and the complete or finished electrical connector housing were provided.  You presented additional factual and legal arguments during a teleconference on December 29, 2005, with members of my staff, which you confirmed by facsimile transmittal, dated January 17, 2006.

- 2 -

**FACTS**:

The merchandise is an aluminum casting, designated number 118-01-052-02, which is further machined by sizing two mounting holes and the flashing removed either manually or by machine.  This is the condition of the merchandise as imported.  The casting is further processed after importation by removing an aluminum oxide film formed during casting, applying a layer of nickel, plating with cadmium which provides an electrically conductive surface, then coating with chromate to protect the cadmium from corrosion.  The plating and coating are processes required to meet performance requirements such as electrical conductivity, vibration and mechanical shock exposure as well as exposure to temperature and humidity.  No further machining operations are performed.  At this point the identifying number is changed to 118-01-052-07. The casting, processed as indicated, is then shipped to Mexico for assembly with other components into a finished housing for an electrical connector and given the identifying part number MTC100-JH1-P32.

The HTSUS provisions under consideration are as follows:

**7616**        Other articles of aluminum:

            Other:

**7616.99**          Other:

**7616.99.50**          Other

            *                    *                    *                    *

**8538**        Parts suitable for use solely or principally with the apparatus of heading 8535, 8536 or 8537:

**8538.90**        Other:

            Other:

**8538.90.80**          Other

**ISSUE**:

Whether the aluminum casting, number 118-01-052-02, upon importation, qualifies as a blank under GRI 2(a) and, therefore, as an incomplete or unfinished part of an electrical connector of heading 8535 or 8536.

- 3 -

**LAW AND ANALYSIS**:

Under General Rule of Interpretation (GRI) 1, Harmonized Tariff Schedule of the United States (HTSUS), goods are to be classified according to the terms of the headings and any relative section or chapter notes, and provided the headings or notes do not require otherwise, according to GRIs 2 through 6. GRI 2(a) states in part that any reference in a heading to an article includes that article incomplete or unfinished provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article.

The Harmonized Commodity Description and Coding System Explanatory Notes (ENs) constitute the official interpretation of the Harmonized System at the international level. Though not dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS. Customs and Border Protection (or CBP, as appropriate) believes the ENs should always be consulted. *See* T.D. 89-80, 54 Fed. Reg. 35127, 35128 (Aug. 23, 1989).

The decision in NY L83113 was based on the finding "Part number 118-01-052-02, however, as imported has the character of a part of an electrical connector. It is already advanced to the point  where it is recognizable and dedicated for use as a [p]art…"  In respect of incomplete or unfinished articles, after discussing the concept of essential character at (I) the GRI 2(a) ENs, at (II), indicate "[t]he provisions of [Rule 2(a)] also apply to **blanks** unless these are specified in a particular heading. The term "**blank**" means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part (original bolded, underscoring added). This EN instructs that irrespective of the degree of processing a good has undergone, its specific size and shape and dedication to use can dictate whether it has assumed the character of the article or part it will become. Therefore, it is CBP's position that articles qualifying as "**blanks**" per se are said to possess the essential character of the complete or finished good. This principle is reflected in NY L83113.

In support of the heading 7616 classification you cite relevant ENs which state that heading 7616 covers all articles of aluminum except those covered more specifically in the HTSUS. While you concede the castings have the approximate size, shape or outline of the connector part they will become, you argue that they lack important performance requirements such as electrical conductivity which you maintain imparts the essential character to a part provided for in heading 8538. In addition, the cost of the plated aluminum casting is approximately 85% higher than the unplated casting.

- 4 -

You cite several rulings in which CBP held that articles imported incomplete or unfinished lacked the essential character of the complete or finished article because they required substantial further processing after importation.  You cite numerous additional rulings in which you indicate CBP classified articles as if complete or finished because they qualified as "blanks," without any reference to whether they had the essential character of the complete or finished article.  Other rulings affirmatively stated that the articles had the essential character of the complete or finished article because they had the approximate size or shape of the complete or finished article or were dedicated for use as the finished article.  You maintain, however, that these rulings represent an incorrect interpretation of GRI 2(a).  You state that the GRI 2(a) EN does not state that blanks have the essential character of the complete good; rather, the EN only states that blanks are subject to GRI 2(a).  You contend that CBP's position is based on an EN, which is instructive at best, but does not supersede the legal text of GRI 2(a).  Thus, you opine that a proper reading of GRI 2(a) requires that a good having the approximate shape or outline of the complete or finished article must also have the essential character of the complete or finished good.  You conclude that because upon importation casting number 118-01-052-02 does not have the electrically conductive finishes necessary to provide a maximum resistance value between connectors, it lacks the essential character of a connector housing otherwise provided for in heading 8538.  The casting is therefore classifiable in heading 7616.

CBP disagrees with your interpretation of GRI 2(a).  It is our opinion that the GRI 2(a) EN discussion of "blanks," at (II), provides an independent, objective criteria for determining whether an incomplete or unfinished good is to be classified as if complete or finished.  If this were not the case, the "blanks" language would be unnecessary and superfluous as the classification of articles having the approximate shape or outline of the finished good would in all cases be governed by the principal of essential character.

Our failure to discuss in detail the numerous cases you cite does not mean they were not fully evaluated and considered.  However, in view of the discussion above, we will only discuss the decisions which illustrate the legal principles which we believe control this case.  See Apple Computer, Inc. v. United States, 749 F. Supp. 1142 (Ct. Int'l Trade, decided October 19, 1990).  Among those is a case you cite, HQ 557992, dated January 23, 1996, concerns zirconium tubes imported cut-to-length but otherwise in bare configuration, for use as fuel rods for nuclear reactors.  Because they required substantial post-importation fabrication, as well as the addition of a critical component, uranium fuel in pellet form, the tubes were found to lack the essential character of finished or complete fuel elements.  As there is no discussion in HQ 557992 of whether the zirconium tubes qualified as "blanks," we do not view this decision as instructive.

- 5 -

CBP's position on "blanks" is clearly demonstrated in HQ 084219, dated July 7,1989, another case you cite, concerning aluminum blanks or bare substrates for computer memory discs.  Notwithstanding that the discs required further processing after importation by cleaning, plating and polishing, into prepared unrecorded media of heading 8523, the ruling stated, in part, "[t]he disc blanks have the essential shape of the finished articles, and they do not appear to have any practical use other than for completion into the intended memory discs.  By virtue of their specific size and shape, these articles have assumed the character of the articles into which they will be completed."  HQ 084219 stated that GRI 2(a) would otherwise direct the classification of these unfinished recording discs in heading 8523, but for the fact they were not physically finished, i.e., prepared, as required by the 8523 heading text.  Classification thus defaulted to heading 7616 according to the discs' constituent material.

As noted earlier, you indicate on p. 5 of your September 15, 2005, submission, that the [imported aluminum] casting has the physical shape of the connector part which it will ultimately be used.  In view of the discussion above, the lack of important performance requirements in the casting at importation is not deemed legally relevant.  CBP's position on the classification of articles qualifying as "blanks" has been both consistent and longstanding.  See HQ 084219, supra, HQ 957094, dated January 30, 1995, and related cases.  For these reasons, the aluminum casting, number 118-01-052-02, qualifies as a blank and possesses the essential character of a housing for electrical connectors.

**HOLDING**:

Under the authority of GRI 2(a), aluminum castings designated number 118-01-052-02, are provided for in heading 8538.  They are classifiable in subheading 8538.90.8080, HTSUSA, as other parts suitable for use solely or principally with the apparatus of heading 8535, 8536 or 8537.

**EFFECT ON OTHER RULINGS**:

NY L83113, dated March 16, 2005, is affirmed.

Sincerely,

Robert A. Altneu

Myles B. Harmon, Director
Commercial and Trade Facilitation Division

N220176

July 5, 2012

CLA-2-82:OT:RR:NC:1:104

CATEGORY: Classification

TARIFF NO.: 8209.00.0030

Mr. Daniel Smith
Joseph Smith Customhouse Broker, Inc.
210 East Sunrise Highway, Suite 301
Valley Stream, NY 11581-1328

RE:    The tariff classification of inserts from Brazil

Dear Mr. Smith:

In your letter dated June 1, 2012, on behalf of Sandvik Tooling Inc., you requested a tariff classification ruling addressing the classification and eligibility from Brazil for duty-free treatment under the Generalized System of Preferences (GSP) of certain sintered metal carbide inserts.

The inserts in question are designed for use in the metalworking industry.  A variety of such inserts are produced in factories located in Brazil from material supplied from Sweden or the United States.  You have supplied the following information as to the various manufacturing processes involved in the production of the inserts in both the blank and finished states.

Blank Production
Premixed powder is supplied to the Brazilian facility in a ready to press state.  This powder is manufactured either in the United States or in Sweden.  The powder is premixed in a defined composition based on the type of inserts that will be manufactured from it.  The powder is put in a pressing machine and pressed into the specific defined form.  The un-sintered inserts in a green or chalk state are then placed into a sintering furnace.  Sintering allows for the hardening and bonding of the material elements in the powder.  Once sintering is completed, the insert blanks are examined.  If they pass quality control, the blanks proceed to insert production.

Insert Production
Blanks for insert production may originate from blanks manufactured in Brazil or Sweden.  Each blank undergoes a specific type of grinding as determined by the type of insert being produced.  Once grinding is complete, some blanks may undergo additional edge rounding either by blasting with a dry oxide or shaping with a brush.  After grinding and edge rounding operations, the inserts undergo surface cleaning and coating operations.  Coatings may be applied by chemical vapor deposition or physical vapor deposition.  Surface cleaning may again be needed after chemical vapor deposition to reduce the coatings on the top and bottom surfaces.  After a final

quality control check, the inserts are laser marked with the appropriate grade and packaged into boxes for labeling.  After labeling, the inserts are delivered to the export area for final export packing and delivery to the United States distribution center in Hebron, Kentucky.  No further work or processing is done on the finished inserts in the United States.

The applicable subheading for the inserts described above will be 8209.00.0030, Harmonized Tariff Schedule of the United States (HTSUS), which provides for "Plates, sticks, tips and the like for tools, unmounted, of cermets… Of sintered metal carbides.  The rate of duty will be 4.6 percent ad valorem.

Duty rates are provided for your convenience and are subject to change.  The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.

Articles classifiable under subheading 8209.00.0030, HTSUS, which are products of Brazil, may be entitled to duty free treatment under the GSP upon compliance with all applicable regulations.  The GSP is subject to modification and periodic suspension, which may affect the status of your transaction at the time of entry for consumption or withdrawal from warehouse. To obtain current information on GSP, check our Web site at www.cbp.gov and search for the term "GSP".

You inquired as to whether the Swedish blanks used in the manufacturing process have undergone a double substantial transformation such that their cost may be included in the computation of the 35 percent value-content requirement under the GSP.

Explanatory Note (EN) II under GRI 2(a) in the Harmonized Commodity Description and Coding System provides guidance on the application of GRI 2(a), stating that:

> The provisions of this Rule also apply to blanks unless these are specified in a particular heading.  The term "blanks" means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part.
>
> Semi-manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as "blanks."

In this case, GRI 2(a) is applicable to the blanks of Swedish origin.  The Swedish blanks (1) possess the approximate shape or outline of the final product in that the finished inserts' specifications and shapes are established in the essential shape of the blanks and (2) the sole use of the blanks is for the completion into finished inserts and cannot be used for any other purpose.  It is noted that the degree or substantial nature of processing required to finish blanks is not addressed in GRI 2(a).

Under the GSP, eligible articles the growth, product or manufacture of a designated beneficiary developing country (BDC) which are imported directly into the customs territory of the U.S. from a BDC may receive duty-free treatment if the sum of 1) the cost or value of materials produced in the BDC, plus 2) the direct costs of the processing operation in the BDC, is equivalent to at least 35% of the appraised value of the article at the time of entry.  See, 19 CFR §10.177 and §10.178.

Brazil is a BDC.  See General Note 4(a), HTSUS.  Therefore, the finished inserts manufactured from Swedish blanks will be eligible for duty-free treatment if (1) they are classified under a GSP-eligible provision, (2) they are considered to be a "product of" Brazil, (3) they are "imported directly" into the U.S., and (4) the 35 percent value-content requirement is satisfied.  The finished inserts in question are classified under heading 8209, HTSUS, which is a GSP eligible provision.

Merchandise is considered the "product of" a BDC if it is either wholly the growth, product or manufacture of a BDC or has been substantially transformed there into a new or different article of commerce.  A substantial transformation occurs "when an article emerges from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process."  *Texas Instruments Incorporated v. United States*, 2CIT 36, 520 F. Supp. 1216 (CIT 1981), reversed, 69 CCPA 151, 681F.2d 778 (CCPA 1982) noted.

However, if an article is produced or assembled from materials which are imported into the BDC, the cost or value of those materials may be counted toward the 35% value-content minimum only if they undergo a double substantial transformation in the BDC.  That is, the cost or value of the imported materials used to produce the inserts may be included in the GSP 35% value-content computation only if they are first substantially transformed into a new or different intermediate article of commerce, which is itself substantially transformed in the production of the finished article.

In this case, based upon the submitted documentation, it is this office's opinion that the Swedish blanks are not processed into a new or different intermediate article in Brazil, but rather is material undergoing a continuous manufacturing process which results in the creation of the finished inserts.  The blanks merely represent one stage of the inserts, i.e., the blank stage.  The Swedish blanks are not substantially transformed into separate and distinct intermediate articles of commerce which are then substantially transformed into the finished inserts.   As the blanks imported into Brazil from Sweden are not subjected to a double substantial transformation in the production of the inserts, the cost or value of the Swedish blanks may not be included in the GSP 35% value-content calculation.

Accordingly, this office finds that the operations performed on the Swedish insert blanks do not create a new article with a new name, character or use.  The insert blank is not substantially transformed by operations such as grinding and coating, it is merely further processed.  As a substantial transformation does not occur in Brazil, the imported inserts manufactured using Swedish blanks will not be a product of Brazil for purposes of the GSP.  As such, such inserts are not eligible for GSP treatment.

4

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177).

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported.  If you have any questions regarding the ruling, contact National Import Specialist Patricia O'Donnell at (646) 733-3011.

Sincerely,

Thomas J. Russo
Director
National Commodity Specialist Division

**HQ H095037**

May 20, 2010

**CLA-2 OT:RR:CTF:TCM**  H095037 JER

**CATEGORY:**  Classification

**TARIFF NO.:**  8480.79.9010

BJ Shannon, Esq.
Alston & Bird, LLP
950 F Street, NW
Washington, DC 20004-1404

**RE:**    Request for Binding Ruling; Classification of Half-Cylinders

Dear Ms. Shannon:

This is in response to your letter dated January 6, 2010, on behalf of Sidel, Inc. ("Sidel") to United States Customs and Border Protection ("CBP"), in which Sidel requested a binding ruling pertaining to the tariff classification of stainless steel and aluminum alloy half-cylinders under the Harmonized Tariff Schedule of the United States ("HTSUS").  Your request has been forwarded to this office by the National Commodity Specialist Division for direct reply.

**FACTS:**

The subject merchandise are stainless steel and aluminum alloy half-cylinders, which will be used in the production of shell holders, mold body components or mold bodies.  The three completed articles will be used in the blow molding process in the production of plastic beverage bottles.  The stainless steel half-cylinders are produced from bricks of hot rolled stainless steel.  The aluminum alloy half-cylinders consist of anodized aluminum.  Both types are milled to a half-round shape then cut to a length of 300 millimeters (mm), and machined to a half-cylindrical shape with an outside diameter of 150 mm.  Each half-cylinder is machined to include either six quarter-spherical notches, three along each vertical edge of the flat surface or vertical grooves along the edges.  These notches or grooves facilitate the locking of two half-cylinders to form a complete cylinder.  Each half-cylinder is machined to include a horizontal groove

across the convex side of the half-cylinder which facilitates connection of the completed article to the blow molding machine.  Additional holes may be bored on the flat surface, or "face" of the half-cylinder into which pins or bushings will be placed during production.  Other holes or grooves may be machined or bored into the face of the half-cylinders which are only used to position the half-cylinder during machine of grooves or notches.

After importation, the subject merchandise is further processed into three completed articles: shell holders, mold body components or mold bodies.  The shell holders retain the length of the half-cylinders and are used in pairs to hold shells of bottle molds.  The shell holders are ultimately designed to hold the mold shell insert in place.  The mold body components are used in the molding of either the top of a bottle or the bottom of a bottle.  The mold bodies are used in pairs with each body forming half the shape of a bottle.

## ISSUE:

Whether the subject half-cylinders are classifiable as other articles of steel under heading 7326, HTSUS, or as other articles of aluminum under heading 7616, HTSUS, or as parts of molding machines under heading 8477, HTSUS, or as "blanks" used in the production of blow molds under heading 8480, HTSUS.

## LAW AND ANALYSIS:

Classification under the HTSUS is made in accordance with the General Rules of Interpretation (GRIs). GRI 1 provides that the classification of goods shall be determined according to the terms of the headings of the tariff schedule and any relative section or chapter notes.  In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, the remaining GRIs 2 through 6 may then be applied in order.

GRI 2(a) provides that: [a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article.  It shall also include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

The 2009 HTSUS provisions under consideration are as follows:

| | | |
|---|---|---|
| 7326 | Other articles of iron or steel: | |
| 7326.90 | Other: | |
| 7326.90.85 | Other…. | |
| | * | * | * |
| | | |
| 7616 | Other articles of aluminum: | |
| | Other: | |
| 7616.99 | Other: | |

2

7616.99.50                               Other….
                              *              *              *

8477             Machinery for working rubber or plastics or for the manufacture of products from these materials, not specified or includes elsewhere in this chapter, parts thereof:
                              *              *              *
8477.30.00             Blow-molding machines
                              *              *              *
8480             Molding boxes for metal foundry; mold bases; bolding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics:
                     Molds for rubber or plastics:
8480.79                     Other types:
8480.79.90                     Other
8480.79.9010                     Blow molds

                              *              *              *

Section XVI, Note 2 provides in pertinent part as follows:

> Subject to note 1 to this section, note 1 to chapter 84 and note 1 to chapter 85, parts of machines (not being parts of the articles of heading 8484, 8544, 8545, 8546 or 8547) are to be classified according to the following rules:
>
> (a) Parts which are goods included in any of the headings of chapter  84 or 85 (other than headings 8409, 8431, 8448, 8466, 8473, 8487, 8503, 8522, 8529, 8538 and 8548) are in all cases to be classified in their respective headings;
>
> (b) Other parts, if suitable for use solely or principally with a particular kind of machine, or with a number of machines of the same heading (including a machine of heading 8479 or 8543) are to be classified with the machines of that kind or in heading 8409, 8431, 8448, 8466, 8473, 8503, 8522, 8529 or 8538 as appropriate. However, parts which are equally suitable for use principally with the goods of headings 8517 and 8525 to 8528 are to be classified in heading 8517.

                     *        *        *

The Harmonized Commodity Description and Coding System Explanatory Notes (ENs) constitute the official interpretation of the Harmonized System at the international level.  While not legally binding nor dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS and are generally indicative of the proper interpretation of these headings.  See T.D. 89-80, 54 Fed. Reg. 35127 (August 23, 1989).

EN (II) to GRI 2(a), HTSUS, provides that:

> (II) The provisions of this Rule [2(a)] apply to **blanks** unless these are specified in a particular heading.  The term **"blank"** means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional cases, for completion into the finished article or part.

3

Semi-manufactures not yet having the essential shape of the finished articles (such as is generally the case with bars, discs, tubes, etc.) are not regarded as "blanks."

EN 84.80, HTSUS, provides in relevant part, that:

\*     \*     \*

In general, the essential function of a mould is to retain the material in a predetermined shape while it sets; some moulds also exert a certain pressure on the material. But the heading **excludes** stamping dies of **heading 82.07** since these shape the material solely by means of a powerful blow or compression (e.g., dies for stamping out sheet-metal goods).

\*     \*     \*

(G) **MOULDS FOR RUBBER OR PLASTICS**

This group includes :

(1) **" Bladder " moulds for vulcanising tyres**. These consist of two adjustable metal chill-moulds, steam or electrically heated, enclosing a kind of air-inflated ring-shaped bag (the air-bag) or hot water-inflated bag (the water-bag), which presses the tyre firmly against the mould surfaces.

(2) **Moulds for moulding or vulcanising miscellaneous rubber articles**.

(3) **Moulds for making plastic articles**, whether or not electrically or otherwise heated; they may operate by gravity, or by injection or compression.

\*     \*     \*

You contend that the subject stainless steel half-cylinders and the subject aluminum alloy half-cylinders are classified as other articles of steel or aluminum not elsewhere specified or included under headings 7326 and 7616, HTSUS respectively. Heading(s) 7326 and 7616, HTSUS, are a residual provisions which provide for other articles of steel or aluminum, respectively, not elsewhere specified or included. The Court has held that basket or residual provisions "are intended as a broad catch all to encompass the classification of articles for which there is no more specifically applicable subheading. "EM Indus., v. United States, 22 CIT 156, 165, 999 F. Supp. 1473, 1490 (1998). In the instant case, molds are provided for *eo nomine* under heading 8480, HTSUS.

You state that in their condition as imported, the subject half-cylinders do not meet the criteria set forth in EN (II) to GRI 2(a) as "blanks" because, as you contend, these articles are not solely used to produce articles of one HTSUS heading. Rather, each half-cylinder is milled into a blow mold of heading 8480, HTSUS, or a mold shell of heading 8477, HTSUS.

4

**The Classification of "Blanks" under GRI 2(a)**

The Courts have considered the definition of a "blank" and have held that an article which had the general shape of the completed article and was intended solely for use as the completed article, met the definition of a "blank" within the meaning of EN (II) to GRI 2(a).  Cummins Inc., v. United States, 29 C.I.T. 525; 377 F. Supp. 2d 1365 *citing* Cummins Engine Co. v. United States, 23 C.I.T. at 1023-24, 83 F. Supp. 2d at 1371.  Likewise, CBP has previously considered whether an article is classified as a "blank" for purposes of GRI 2(a).  In Headquarters Ruling Letter ("HQ") 085579, dated April 26, 1990, CBP held that cold forgings for inner and outer rings of bearings were "blanks" for tariff purposes.  In HQ 085579, we noted that the ENs to GRI 2(a) provide specific guidance on the application of GRI 2(a) to articles referred to as "blanks."  See also, Cummins Engine at 1023.

We note that EN (II) addresses two criteria for articles which are "blanks" for purposes of GRI 2(a): 1) the merchandise must have the approximate shape or outline of the finished article, and 2) its sole use must be for completion into the finished article.  Accordingly, resolution of this matter rests on whether the subject half-cylinders meet the two-prong definition of a "blank" as set forth in Cummins Engine, HQ 085579 and the ENs to GRI 2(a) and whether the finished articles are classifiable under a single heading.

First, based on the description and photographs provided (in Attachments A through H, to your submission), the length, diameter, fundamental shape and general outline of the subject articles closely resemble that of the completed articles.  For instance, the subject half-cylinders are uniformly cut to a length of 300 mm and machined to a half-cylindrical shape with an outside diameter of 150 mm.  The completed articles, whether shell holders, mold body components or mold bodies, will have a similar height, length and diameter.   Likewise, each "blank" is half-round in shape with horizontal grooves across the convex side to facilitate connection to a blow molding machine and are machined to include either six quarter-spherical notches or vertical grooves which facilitate the inter-locking of the half-cylinders to form a complete cylinder.  The completed articles will possess similar physical features.  Accordingly, it is our view that the physical distinctions between the completed articles and the half-cylinders (e.g., concave interior surface cavity, additional bolts, attachments, etc.) are much like saw blade blanks or key blanks wherein the article has the approximate shape of a saw blade or key but is lacking only in the grooves or teeth of the finished article which make it into a particular key or saw.  See HQ 968137, dated May 30, 2006; HQ 733837, dated February 5, 1991 and HQ 734062, dated April 22, 1991 (Wherein CBP considered whether saw blade blanks or key blanks were substantially transformed when the grooves and/or teeth were machined out of the blank); see also, HQ 953079, dated July 8, 1993 (In which CBP classified

5

steel panel blanks used to be further processed into finished auto parts as "blanks"). Accordingly, we find that the subject merchandise has the approximate shape and general outline of the completed articles whether a shell holders, mold body components or mold body, and lacks only the cavity which makes it a mold or mold shell for a particular plastic bottle.

Second, in your submission, you confirm that the subject half-cylinders will be used to produce blow molds or variations thereof for the production of plastic beverage bottles.[1] You state that the subject merchandise will ultimately be used to produce shell holders, mold body components or mold bodies. In either case, each article has the fundamental characteristics that are essential to the purpose and function required in blow molding. Further, the dimensions and physical features of the instant half-cylinders support the conclusion that the sole purpose of these articles is to produce blow molds and variations thereof. Similarly, the subject half-cylinders have no other known intended use nor does your submission suggest that they have the capacity to form any other machines, equipment or goods other than completed blow molds of heading 8480, HTSUS. As such, we find that the sole use of these articles is to further process them into blow molds of heading 8480, HTSUS.

## The Classification of the "Finished Articles"

You argue that the subject merchandise does not meet the definition of a blank because the imported merchandise results in three different articles: shell holders, mold body components and mold bodies with their own distinct identities and distinct uses. However, we find that a finished shell holder, mold body component and mold body, are all *prima facie* classifiable under heading 8480, HTSUS, as blow molds. A mold for tariff classification purposes is an article which has the capacity to give final shape and form to the manufactured article and may range from a simple single cavity type to more complex multi-cavity types.[2] EN 84.80 provides, in pertinent part, that: "[i]n general, the essential function of a mould is to retain the material in a predetermined shape while it sets…" Hence, upon completion, the instant merchandise does not result in articles of three HTSUS headings but instead are further processed into variations of blow molds of heading 8480, HTSUS.

---

[1] We note that Sidel Inc. is an industry leader in the manufacturing of stretch blow molds and parts for blow mold machinery. Tooling, at http://www.sidel.com/en/Our-products/TOOLING

[2] *The Random House Dictionary of the English Language* (1973 Ed.) provides the following definition of a mold (as commonly defined): 1. A hollow form or matrix for giving a particular shape to something in a molten or plastic state, 2. That on or about which something is formed or made." Customs Headquarters ("HQ") went on to state in HQ 544147 dated July 5, 1988 that "a mold is ordinarily perceived as the item which gives final shape and form to the manufactured article." This definition, however, is too simplistic for tariff classification purposes. Molds range from simple single cavity/small-volume use types to complex multi-cavity/large–volume use types. Some may incorporate heating elements or features that allow for the changing of the mold's size. They can operate by methods such as injection, compression or gravity. Molds can be used by hand or in machinery such as injection molding machines. Classification of Molds and Their Parts Under the HTSUS, CBP Informed Compliance Publication (August 2008).

The shell holder for instance, has the essential character and function of a blow mold of heading 8480, HTSUS.  As the submission supports, the shell holder consists of a shell to hold an insert of a bottle mold.  Once the insert is added to the shell holder, the completed article forms and functions as a blow mold.  See Attachment D of the submission (which depicts a shell holder with an insert, having all of the essential features of a blow mold).  In HQ 966364, dated July 15, 2003, CBP held that a "cast die" which was imported without sand core inserts was classified under heading 8480, HTSUS, by application of GRI 2(a) because it had the essential character of a completed cast die (i.e., a mold with an insert).  In HQ 966364, we stated that "casting dies imported without sand core inserts" represent the aggregate of distinctive parts that establish the identity of the goods as molds of 8480."  The unfinished shell holder (molds) here are different.  These articles with or without the shell insert have assumed the character and essential function of an article of heading 8480, HTSUS. They have the shape appearance and capacity to perform the essential function of a mold and represent the aggregate of distinctive features which establish the identity of the shell holder as a blow mold of heading 8480, HTSUS.  We stated in HQ 966364 that the first rule of GRI 2(a) extends the scope of a heading which refers to a particular article to cover not only the completed article but also that article incomplete or unfinished, provided that, as presented, the good has the essential character of the complete or finished article.  Moreover, in the Classification of Molds, *supra* note, 3 at 15-16, CBP stated that: "[i]n the case of an unfinished mold, providing the unfinished mold has the essential shape or outline of the finished mold, the unfinished mold would be classified as a mold." Accordingly, if imported separately, the shell holders would be considered incomplete or unfinished articles (lacking only the shell insert) and would be classified as blow molds under heading 8480, HTSUS, by application of GRI 2(a).

Similarly, the mold body components are *prima facie* classified under 8480, HTSUS, as they provide the essential function of a mold and are described by the terms of the heading as well as the description set forth in EN 84.80.    In your submission, you state that the mold body components facilitate the molding of either the top or bottom of a [plastic] bottle.   See Attachment E of the submission (which depicts a blow mold for the top portion of a bottle).  As your submission confirms, "the larger component [of the mold body component ] facilitates molding of the bottom of a bottle.  The shorter component, or 'shoulder' facilitates molding of the top of a bottle."  Such are characteristics of a blow mold within the meaning of heading 8480, HTSUS.  See HQ 954331, dated June 10, 1993; see also, NY I83311, dated June 26, 2002 (In which CBP classified articles as blow molds for plastic items under heading 8480, HTSUS).

Likewise, the mold bodies are also *prima facie* classified under 8480, HTSUS, as they provide the essential function of a mold and are described by the terms of heading as well as the description set forth in EN 84.80.  According to your submission, the mold bodies are used in pairs, with each body in the pair

forming half the shape of the bottle." See Attachment F. As your submission supports, following the attachment of various clamps, bushes and pins, the mold bodies can be closed and the bottle may be blown. Such are characteristics of a blow mold of heading 8480, HTSUS.

**Neither the Half-Cylinders or the Completed Articles are Classified as Parts**

You also assert that subject half-cylinders are not parts of blow molds of heading 8480, HTSUS and that the shell holders (of which some of the subject half-cylinders will be processed into) are classifiable as parts of molding machines of heading 8477, HTSUS. As required by Note 2(a) to Section XVI, parts which are goods of any of the headings of Chapters 84 and 84 (expect for headings not relevant here) are in all cases to be classified in their own respective headings. See Nidec Corp. v. United States, 861 F. Supp. 136 (CIT 1994), aff'd. 68 F.3d 1333 (Fed. Cir. 1995). The Nidec court determined that if a good can be classified in its own heading in accordance with Section XVI Note 2(a), then classification as a part under Section XVI Note 2(b) is improper. As previously stated, we find that the shell holders are *prima facie* classifiable under heading 8480, HTSUS, as blow molds by application of GRI 2(a). See HQ 966364 (cited above). As a result, the finished articles for which the subject half-cylinders will be processed into are precluded from classification as parts of a machine of heading 8477, HTSUS, by operation of Note 2(a) to Section XVI.

Having established that each of the three "finished articles" for which the subject half-cylinders are used, are indeed classifiable as blow molds under heading 8480, HTSUS, it follows that a "blank" solely used for the completion of these articles having the general or approximate shape of the finished articles, are classified as "blanks" in accordance with GRI 2(a). Accordingly, we find that the subject half-cylinders are classified as "blanks" under heading 8480, HTSUS.

Lastly, you assert that the instant merchandise is similar to the steel roll shells in NY N04978, dated January 26, 2009; the raw ductile iron alloy castings in HQ H025103, dated February 6, 2009; the tubing in HQ 958724, dated March 21, 1996; the steel springs in NY N08057, dated October 29, 2009 and the stainless steel and aluminum baskets, trays and cases in HQ H036115, dated November 19, 2008, and therefore the subject merchandise should be classified either as a part of a machine or as an article of steel or aluminum in a basket provision. Arguendo, the rulings which you cite are relevant to the classification of the instant merchandise, we have determined that the instant articles are not parts. Additionally, since the subject half-cylinders are described by the terms of heading 8480 as blow molds by application of GRI 2(a), they cannot be classified in a less specific residual provision which provides for articles of aluminum or steel by application of GRI 3(a). See EM Indus v. United Sates at 165.

**HOLDING:**

By application of GRI 2(a) and pursuant to Note 2(a) to Section XVI, the subject half-cylinders are classified in heading 8480, HTSUS.  Specifically, the half-cylinders are classified under subheading 8480.79.9010, HTSUSA, which provides for: "Molding boxes for metal foundry; mold bases; bolding patterns; molds for metal (other than ingot molds), metal carbides, glass, mineral materials, rubber or plastics: Molds for rubber or plastics: Other types: Other: Blow molds."  The 2009 column one, general rate of duty is 3.1% *ad valorem*.

Duty rates are provided for convenience only and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on the World Wide Web at www.usitc.gov/tata/hts/.  A copy of this ruling letter should be attached to entry documents filed at the time the goods are entered.  If the documents have been filed without a copy, this ruling should be brought to the attention of the CBP officer handling the transaction.

Sincerely,

Gail A. Hamill, Chief
Tariff Classification and Marking Branch

9

HQ H243798

May 9, 2017

**CLA-2 OT:RR:CTF:TCM** H243798  ALS

**CATEGORY**: Classification

**TARIFF NO**.: 6307.90.98

Port Director
U.S. Customs and Border Protection
5600 Pearl Street
Rosemont, Illinois  60018

**RE**: Internal Advice; Tariff Classification of Non-woven Rotor Radial and Chordal Brake Segments


Dear Port Director:

This letter is in reply to your request for internal advice of May 20, 2013, initiated by counsel, on behalf of Honeywell International and its Honeywell Aerospace-South Bend Division, regarding "the proper tariff classification under the Harmonized Tariff Schedule of the United States (HTSUS) of certain rotor radial and chordal brake segments."  This letter also takes into consideration the contents of our discussion during an in-person meeting with Honeywell representatives on October 27, 2016.

**FACTS**:

Honeywell describes the articles at issue as such:  They are radial and chordal brake segments, which are manufactured by needling web and unidirectional tow fabrics together to form a duplex fabric of a specific areal weight and width specified for the segment.  The width and final cut of the fabric has a radial orientation of the unidirectional fibers for a radial segment and a chordal orientation of the unidirectional fibers for a chordal segment.  The unidirectional tow fabric is produced to a specific areal[1] weight by needling

---

[1] An "areal" is this context is defined as "the quantitative measure of a plane or curved surface; two-dimensional extent."  http://dictionary.reference.com/browse/areal (2016).

specific numbers of bundles of untwisted continuous filament oxidized polyacrylonitrile (PAN) tow fibers where the tow count is a function of the specified areal weight, mass of the PAN fiber, and width of the fabric.  The fabric is non-woven.  Honeywell states that the brake segments are "specifically designed for their dedicated end-use with aircraft brake systems at the time of entry..."

Before importation, the segments have been cut into particular shapes for use with aircraft braking systems with carbon discs.  The diagrams and the sample submitted with Honeywell's request indicate that a segment is formed as if cut from a doughnut shaped circle, similar to that of a vehicle's brake disc.

After importation, the brake discs are "laid up with alternating layers of radial and chordal segments", six per layer, with the segments being needled together in a process referred to as "preform needling."  After preform needling, the discs with the segments laid up upon them are carbonized, densified, and heat treated.  The discs are then final machined and antioxidant is applied.

CBP issued a Notice of Action to Honeywell on March 29, 2012, in which it notified Honeywell that the tariff classification for radial and chordal brake segments, which Honeywell had entered under HTSUS subheading 5603.94.9070 on March 7, 2012, was being changed to HTSUS subheading 6307.90.9889, which in 2012 provided for "Other made up articles, including dress patterns: Other: Other... Other..."  In doing so, CBP found that the radial and chordal brake segments are in fact non-woven but not cut into either squares or rectangles.

Honeywell now acknowledges that "classification within HTSUS heading 5603 may not be the most appropriate heading given that the segments are not square or rectangle."  Honeywell now asserts that the radial and chordal brake segments are classifiable under HTSUS heading 8803.

**ISSUE**:

Are radial and chordal brake segments, as described above, properly classified under HTSUS heading 6307, which provides for "Other made up articles, including dress patterns", or under HTSUS heading 8803, which provides for "Parts of goods of heading 8801 or 8802"?

**LAW AND ANALYSIS**:

Classification under the HTSUS is determined in accordance with the General Rules of Interpretation ("GRI") and, in the absence of special language or context which otherwise requires, by the Additional U.S. Rules of Interpretation ("ARI").  GRI 1 provides that the classification of goods shall be "determined according to the terms of the headings and any relative section or chapter notes."

Add.108                          Add.108                          Add.108

In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings and legal notes do not otherwise require, GRIs 2 through 6 may be applied in order.  GRI 2(a) provides that--

> [a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article. It shall also include a reference to that article complete or finished (or falling to be classified as complete or finished by virtue of this rule), entered unassembled or disassembled.

The following headings and subheadings of the HTSUS are under consideration in this case:

| 6307 | Other made up articles, including dress patterns: |
| 6307.90 | Other: |
| | Other: |
| 6307.90.98 | Other... |

*          *          *

| 8803 | Parts of goods of heading 8801 or 8802: |
| 8803.30.00 | Other parts of airplanes or helicopters... |

*     *     *     *     *     *     *     *     *     *     *     *

Honeywell contends that heading 8803 is the more appropriate HTSUS provision for the radial and chordal brake segments than heading 6307 because they are "specifically designed for their dedicated end-use with aircraft braking systems at the time of entry, as well as being a necessary and fundamental component of an aircraft braking system."  Honeywell argues that the subject articles are not excluded from heading 8803 as parts of general use because they do not meet the definition of such as provided in Note 2 of Section XV of the HTSUS.  See HTSUS Section XVII, Note 2(b), referring to HTSUS Section XV, Note 2.

Honeywell further contends that the radial and chordal brake segments are suitable for use solely or principally with articles of heading 8803 because they are specifically designed for the respective braking systems in which they will be installed, and they "are generally not interchangeable between end uses and braking systems, with each part number designed, manufactured, and intended for use with a respective braking system."

Honeywell also cites CBP Ruling NY N258524 (October 24, 2014) to assert that "[l]ike the brake parts at issue in NYRL N258524, Honeywell's imported brake segments have the essential character of the finished brake discs as they have been produced to a specific shape, size, and technical specification which are dedicated for use on a particular aircraft."  NY N258524 held that wheel halves and the brake piston housing forgings have the essential character of the finished article, citing GRI 2(a).  Honeywell also cites CBP Ruling NY

-3-

N953014 (April 12, 1993) to assert that because the subject radial and chordal brake segments have the "essential character of the finished article" they are most appropriately classified in heading 8803.

Note 7(a) of Section XI, HTSUS, under which heading 6307 is provided, notes in part the following:

> 7. For the purposes of this section, the expression "made up" means:
>
> (a) Cut otherwise than into squares or rectangles…

With regard to whether or not the radial and chordal brake segments have the essential character of aircraft braking systems pursuant to Note 2(a), we have previously addressed the question in a similar case and stated the following:

> You cite Baxter Healthcare Corp. of Puerto Rico v. U. S., 182 F.3d 1333 (CAFC, 1999) for the proposition that the P.E.S./P.E.T. fiber bundles impart the "essential character" to the hollow fiber dialyser because their dimensions, and therefore, their identity, is fixed with certainty at the time of importation. In Baxter, monofilament was imported in rolls for use in oxygenators. In deciding whether the merchandise is classified as a material or as an unfinished part, the court discussed only the dimensions of the article to decide that the monofilament bundles there did not impart the "essential character" to the oxygenator.
>
> However, the court also mentioned other factors, such as whether the monofilament had to undergo substantial transformation in order to function within the oxygenator to oxygenate blood, in deciding the "essential character" question. In this regard, the Baxter court cited with approval the case of Benteler Indus., Inc. v. United States, 17 C.I.T. 1349, 840 F. Supp. 912 (1993), wherein articles used exclusively as side door impact beams were classified as "parts" rather than "material" even though they were cut to length subsequent to importation because the imported pipes required no additional parts or assembly. Baxter, supra. (emphasis added).
>
> In stark contrast to the impact beams in Benteler, supra, the instant merchandise requires substantial additional assembly to become a semipermeable membrane functional within the dialyser. It must be unwrapped, inserted into a dialyser jacket, separated by application of a potting compound, cured and trimmed. The addition of the potting compound and resulting separation of the fibers is an essential, time-consuming and costly process in producing a functioning dialyser. Without this process, the diffusion of elements between blood and dialysate solution could not occur across the membrane because the solutions would mix instead of traveling alternatively through and around the membranes which allows for the exchange of elements to occur. As such, the imported fiber bundles do not function as useable dialysis membranes and hence, lack the essential character of a complete or finished semipermeable membrane. They are simply fibers. Encyclopedia of Chemical Technology, supra.

CBP Ruling HQ 964676 (January 7, 2002).

We again note that the radial and chordal brake segments are textile articles that are cut into non-square and non-rectangular shapes and are imported in that condition. As such they are, in the condition in which they are

-4-

imported, "made up" as the term is used in note 7(a) to Section XI, HTSUS. As made up textiles, the brake segments do not have the characteristics of aircraft braking systems, even unfinished or incomplete versions of such. Although shaped to be processed into brake discs, which are then incorporated into an aircraft braking system, the subject brake segments must undergo several steps of processing after importation before even becoming parts of aircraft braking system. Consequently, we find, consistent with Benteler, supra, that the brake segments are not, in their condition as imported, unfinished or incomplete aircraft braking systems. Thus, GRI 2(a) is inapplicable to this case.

With regard to whether the instant brake segments are considered "parts" of aircraft braking systems to be classified in heading 8803, HTSUS, the U.S. Court of International Trade (CIT) has held that a subpart of a particular automotive part should not be classified in heading 8708, HTSUS, if that subpart is more specifically provided for elsewhere in the Nomenclature. See Mitsubishi Electronics America, Inc. v. United States, 19 CIT 378 (1995). Specifically, the CIT in Mitsubishi addressed the classification of an automotive "starter drive assembly" and noted that:

> [I]f the subject merchandise is not a clutch, but rather a part of a starter motor, then it cannot be classified as a part of an automobile, even though it is used solely in automobiles. This is because a subpart of a particular part of an article is more specifically provided for as a part of the part than as a part of the whole. Id. at 383 n.3.

Similarly, because Note 3 of Section XVII provides that, "references in chapters 86 to 88 to "parts" or "accessories" do not apply to parts or accessories which are not suitable for use solely or principally with the articles of those chapters", CBP must first examine whether the subject radial and chordal brake segments are suitable for use solely or principally with the articles chapters 86 to 88, HTSUS, before the merchandise can be classified as "parts and accessories" in heading 8803, HTSUS.

Chapter 88, HTSUS, covers "aircraft, spacecraft, and parts thereof." It is clear that the subject radial and chordal brake segments will be, upon importation, further processed into carbon brake pads, laid up upon brake discs, and thereby installed on aircraft as a component of the aircraft braking system. It is equally clear, however, that we are compelled by the reading of Mitsubishi, supra, to note the distinction between aircraft and aircraft braking systems. The radial and chordal brake segments are, after being further processed and laid up upon brake discs, clearly parts of aircraft braking systems, and that aircraft braking systems are parts of aircraft. Just as the part of the starter motor in Mitsubishi is a subpart of the motor vehicle and therefore "is more specifically provided for as a part of the part than as a part of the whole," so are the radial and chordal brake segments in this case. So while we acknowledge that the subject brake segments might be recognized as parts of aircraft braking systems, aircraft braking systems are not specifically covered by name in Chapter 88.

Add.111                    Add.111                    Add.111

Consequently, by application of Note 3 of Section XVII, HTSUS, the radial and chordal brake segments are not suitable for use solely or principally with the articles chapters 86 to 88, HTSUS, specifically of heading 8803. Therefore, heading 8803 is inapplicable to the subject radial and chordal brake segments.

Honeywell also cites GRI 3 and Additional U.S. Rules of Interpretation (ARI) 1(c) to assert that the radial and chordal brake segments are more specifically provided for in heading 8803 than heading 6307. GRI 3(a) provides the following:

> 3. When, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows:
> (a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods or to part only of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

ARI 1(c) provides the following:

> 1. In the absence of special language or context which otherwise requires--
> (c) a provision for parts of an article covers products solely or principally used as a part of such articles but a provision for "parts" or "parts and accessories" shall not prevail over a specific provision for such part or accessory;...

The radial and chordal brake segments are not prima facie classifiable in heading 8803 because they are not parts of aircraft. Thus, GRI 3(a) is inapplicable in this case. The radial and chordal brake segments are not specifically provided for in chapter 88, HTSUS, thus ARI 1(c) is inapplicable in this case.

Heading 6307, HTSUS, is a basket provision, and classification therein is only appropriate if the merchandise is not included elsewhere more specifically in the Nomenclature. See, e.g., CBP Ruling H266607 (February 19, 2016). We note at this point that in understanding the language of the HTSUS, the Explanatory Notes of the Harmonized Commodity Description and Coding System ("ENs"), which constitute the official interpretation of the Harmonized System at the international level, may be utilized. The ENs, although not dispositive or legally binding, provide a commentary on the scope of each heading, and are generally indicative of the proper interpretation of the HTSUS. See T.D. 89-80, 54 Fed. Reg. 35127 (August 23, 1989).

The EN for heading 6307 states "this heading covers made up articles of any textile material which are **not included** more specifically in other headings of Section XI or elsewhere in the Nomenclature." [**Emphasis** in original.] There is no *eo nomine* provision in HTSUS for non-woven radial and chordal brake

-6-

segments of untwisted continuous filament oxidized PAN tow fibers, or any other HTSUS provision that describes the subject brake segments.  Chapter 63, HTSUS, covers, among other things, "other made up textile articles."  There is no dispute that the radial and chordal brake segments consist of textile material, specifically non-woven untwisted continuous filament oxidized PAN tow fibers. Thus, given that no other HTSUS provision more specifically includes the radial and chordal brake segments, we conclude that they are properly classified under heading 6307, HTSUS, as "Other made up articles, including dress patterns." Specifically, the radial and chordal brake segments are to be classified under subheading 6307.90.98, HTSUS, as "Other made up articles, including dress patterns: Other: Other: Other..."

**HOLDING**:

The subject radial and chordal brake segments are properly classified under heading 6307, HTSUS, as "Other made up articles, including dress patterns."  Specifically, the radial and chordal brake segments are to be classified under subheading 6307.90.98, HTSUS, as "Other made up articles, including dress patterns: Other: Other: Other..." The general column one rate of duty, for merchandise classified in this subheading is seven percent (7%).

Duty rates are provided for your convenience and subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on the World Wide Web at www.usitc.gov.

You are to mail this decision to the internal advice requester no later than 60 days from the date of the decision. At that time, the Office of International Trade, Regulations and Rulings, will make the decision available to CBP personnel, and

to the public on the CBP Home Page on the World Wide Web at www.cbp.gov, by means of the Freedom of Information Act, and other methods of public distribution.

Sincerely,

Myles B. Harmon, Director
Commercial and Trade Facilitation Division

Title : 63.07 - Other made up articles, including dress patterns.

---

**63.07 - Other made up articles, including dress patterns.**

> 6307.10 - Floor-cloths, dish-cloths, dusters and similar cleaning cloths

> 6307.20 - Life-jackets and life-belts

> 6307.90 - Other

This heading covers made up articles of any textile material which are **not included** more specifically in other headings of Section XI or elsewhere in the Nomenclature.

It includes, in particular :

(1) Floor-cloths, dish-cloths, dusting cloths and similar cleaning cloths (whether or not impregnated with a cleaning preparation, but **excluding** those of **heading 34.01** or **34.05**).

(2) Life-jackets and life-belts.

(3) Dress patterns, usually made of stiff canvas; these are sometimes supplied with the various parts stitched together in the form of the garment.

(4) Flags, pennants and banners, including bunting for entertainments, galas or other purposes.

(5) Domestic laundry or shoe bags, stocking, handkerchief or slipper sachets, pyjama or nightdress cases and similar articles.

(6) Garment bags (portable wardrobes) **other than** those of **heading 42.02**.

(7) Loose covers for motor-cars, machines, suitcases, tennis rackets, etc.

(8) Flat protective sheets (**excluding** tarpaulin and ground sheets of **heading 63.06**).

(9) Textile coffee-filters, icing bags, etc.

(10) Shoe-polishing pads (**excluding** those of **heading 34.05**).

(11) Pneumatic cushions (**excluding** camping goods of **heading 63.06**).

(12) Tea cosy covers.

(13) Pincushions.

(14) Boot, shoe, corset, etc. laces with fitted ends; but laces consisting of spun yarns or cords with fitted ends are **excluded** (**heading 56.09**).

(15) Belts which, although worn around the waist, do not have the character of belts of **heading 62.17**, e.g., belts for occupational use (electricians', aviators', parachutists', etc.); webbing carrier straps and similar articles. (Straps having the character of articles of saddlery or harness are **excluded** - **heading 42.01**.)

(16) Carry cots, portable cradles and similar carriers for children.

> Infants' seats of the type intended to be hooked, for example, over the backs of car seats are **excluded** (**heading 94.01**).

(17) Umbrella or sun umbrella covers and cases.

(18) Fans and hand screens, with textile mounts (leaves) and frames of any material, and mounts presented separately. However, fans or hand screens with frames of precious metal are classified in **heading 71.13**.

(19) Packing cloths which, after use as bale wrappings, are roughly or loosely stitched together at the edges, but which do not constitute sacks or bags or unfinished sacks or bags of **heading 63.05**.

(20) Cheese-cloths, cut into rectangles, with the ends of the warp threads knotted to prevent unravelling. (Cheese-cloths woven in the piece prepared for cutting to size or shape, but requiring further fabrication before use, are to be classified as piece goods.)

(21) Trimmings for umbrellas, sun umbrella, walking-sticks, etc; sword-knots and the like.

(22) Textile face-masks of a kind worn by surgeons during operations.

(23) Face-masks for protection against dust, odours, etc., not equipped with a replaceable filter, but consisting of several layers of nonwovens, whether or not treated with activated carbon or having a central layer of synthetic fibres.

(24) Rosettes (e.g. those awarded at competitions), other than those for garments.

(25) Pieces of textile fabric which have undergone some working (such as hemming or the formation of necklines), intended for the manufacture of garments but not yet sufficiently completed to be identifiable as garments or parts of garments.

(26) Support articles of the kind referred to in Note 1 (b) to Chapter 90 for joints (e.g., knees, ankles, elbows or wrists) or muscles (e.g., thigh muscles), **other than** those falling in other headings of Section XI.

(27) Nonwoven articles, cut to a specific shape, coated on one side with an adhesive protected by a sheet of paper or other material and designed to adhere around the lower part of the breast in order to form or shape the breast.

Besides the finished articles listed above, this heading covers articles in the length, made up within the meaning of Note 7 to Section XI, **provided** they are not included in other headings of Section XI. For instance, it applies to textile draught excluders for doors or windows (including those stuffed with wadding).

The heading **excludes** textile articles classified in more specific headings of this Chapter or of Chapters 56 to 62. It further **excludes** :

(a)   Saddlery and harness for any kind of animal (**heading 42.01**).

(b)    Travel goods (suit-cases, rucksacks, etc.), shopping-bags, toilet-cases, etc., and all similar containers of **heading 42.02**.

(c)   Printed matter (**Chapter 49**).

(d)   Labels, badges and similar articles of **heading 58.07**, **61.17** or **62.17**.

(e)   Knitted headbands (**heading 61.17**).

(f)    Sacks and bags of **heading 63.05**.

(g)   Footwear, parts of footwear (including removable in-soles), and other articles (gaiters, spats, leggings, etc.) of **Chapter 64.**

(h)   Headgear and parts and fittings thereof of **Chapter 65**.

(ij)   Umbrellas and sun umbrellas (**heading 66.01**).

(k)   Artificial flowers, foliage or fruit and parts thereof, and articles made of artificial flowers, foliage or fruit (**heading 67.02**).

(l)    Pneumatic canoes, kayaks and other craft (**heading 89.03**).

(m)  Measuring tapes (**heading 90.17**).

(n)   Watch straps (**heading 91.13**).

(o)   Toys, games and entertainment articles, etc., of **Chapter 95**.

(p)   Mops (**heading 96.03**), hand sieves and hand riddles (**heading 96.04**) and powder-puffs (**heading 96.16**).

(q)   Sanitary towels (pads) and tampons, napkins (diapers) and napkin liners and similar articles of **heading 96.19**.

_____

Copyright 2009 CUSTOMS Info LLC. All Rights Reserved.